*Execution Version*

# OPERATING AGREEMENT OF
# BEND SURGERY CENTER, LLC

DM_US 47637902-19.085092.0013

Exhibit 1
Page 1 of 90



# TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | DEFINITIONS | 1 |
| 2. | ORGANIZATION | 3 |
| 3. | PURPOSE AND POWERS | 3 |
| 4. | CAPITAL CONTRIBUTIONS AND MEMBERSHIP INTERESTS | 4 |
| 5. | EXPENSES OF THE LLC | 4 |
| 6. | ALLOCATION OF INCOME AND LOSS AND DISTRIBUTIONS | 5 |
| 7. | BOARD OF DIRECTORS | 5 |
| 8. | MEMBERS | 6 |
| 9. | OFFICERS | 13 |
| 10. | INDEMNIFICATION | 15 |
| 11. | FISCAL MATTERS | 16 |
| 12. | ASSIGNMENT AND TERMINATION OF MEMBERSHIP INTERESTS AND ADMISSION OF NEW MEMBERS | 16 |
| 13. | DISSOLUTION, WINDING UP, AND TERMINATION OF THE LLC'S EXISTENCE | 21 |
| 14. | GENERAL PROVISIONS | 21 |

DM_US 47637902-19.085092.0013

Exhibit 1
Page 2 of 90

THIS OPERATING AGREEMENT (the "Agreement") of Bend Surgery Center, LLC, a Tennessee limited liability company (the "LLC") is made and entered into as of the 1st day of June, 2014 (the "Effective Date"), by and between AmSurg Holdings, Inc., a Tennessee corporation ("AmSurg"), and each of the other persons listed on the signature page to this Agreement and the persons and entities that may be admitted to the LLC as members after the Effective Date ("Owners") (each of AmSurg and Owners, a "Member" and collectively, the "Members").

### W I T N E S S E T H :

WHEREAS, the Owners sold to AmSurg a portion of their membership interests in the LLC pursuant to a Membership Interest Purchase Agreement, dated the date hereof; and

WHEREAS, the Members desire to set forth their mutual rights and obligations in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises, covenants and undertakings hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree as follows:

1. DEFINITIONS

When used in this Agreement, the following terms shall have the meanings set forth below:

1.1. "Act" means the Tennessee Revised Limited Liability Company Act, being Sections 48-249-101 *et seq.* of the Tennessee Code Annotated, as amended from time to time, and any corresponding provisions of any successor legislation.

1.2. "Affiliate," with respect to any individual or Entity, means any individual or other Entity directly or indirectly controlling, controlled by or under common control with such individual or Entity.

1.3. "Affiliated Physician" means any individual physician who directly or indirectly through another entity has an ownership interest in the LLC, is an Immediate Family Member of any individual who directly or indirectly through another entity has an ownership interest in the LLC, or is a grantor, trustee or beneficiary of any trust that is a Member.

1.4. "Agent" means any agent of the LLC, including any officer, director, employee, independent contractor, or agent of a Member acting on behalf of the LLC.

1.5. "Agreement" means this Operating Agreement, as amended from time to time.

1.6. "AmSurg" has the meaning set forth in the introductory paragraph hereof.

1.7. "AmSurg Corp." means AmSurg Corp., a Tennessee corporation and the sole shareholder of AmSurg.

1.8. "Articles of Organization" means the Articles of Organization of the LLC filed with the Secretary of State of the State of Tennessee, as amended from time to time.

1.9. "Available Cash Flow" means all cash funds of the LLC on hand at the end of each month, less (a) provision for payment of all outstanding and unpaid current cash obligations of the LLC at the end of such month (including those which are in dispute) and (b) provisions for reserves reasonably determined by AmSurg for anticipated operating expenses, capital expenditures and other contingencies (which may include debt service on LLC indebtedness and fees payable to Affiliates); provided, however, that proceeds from the disposition of all or substantially all of the LLC's capital assets shall not be included in Available Cash Flow.

1.10. "Board" means the Board of Directors of the LLC.

1.11. "Book Capital Account" has the meaning given to such term in Section 4.3 hereof.

1.12. "Capital Contribution" in respect of any Member means the amount of all cash and other property, tangible or intangible, contributed by such Member to the capital of the LLC. The initial capital account balance for each Member shall be as set forth on Exhibit A.

1.13. "Center" means the ambulatory surgery center operated by the LLC and located in Bend, Oregon, including the real property, or leasehold improvements, furniture, fixtures, the Equipment, books, records, supplies, accounts receivable, goodwill, other intangibles and other assets used in its operation.

1.14. "Code" means the Internal Revenue Code of 1986, as amended from time to time, any corresponding provisions of any successor legislation, and the regulations adopted thereunder.

1.15. "Director" means, individually, any natural person serving on the Board.

1.16. "Dissolution Event" has the meaning given to such term in Section 13.2 hereof.

1.17. "Effective Date" has the meaning given to such term in the introductory paragraph of this Agreement.

1.18. **"Eligibility Requirements"** means the requirement that a physician Owner or Affiliated Physician must affirm in writing, in connection with the initial acquisition of Membership Interests and, thereafter, by the execution and delivery to the LLC within 30 days after each anniversary of such physician Owner's or the Owner affiliated with an Affiliated Physician's admission to the LLC (or such other annual period as the LLC shall from time to time designate) of an Annual Certification in the form attached hereto as Exhibit B, representing that:

    1.18.1. the physician Owner or Affiliated Physician agrees to fully inform each patient referred to the Center by the physician Owner or Affiliated Physician of his or her investment interest in the LLC;

    1.18.2. a Substantial Portion (as defined below) of the physician Owner's or Affiliated Physician's medical practice income from all sources for the prior 12 month period or the previous fiscal year was derived from the physician Owner's or the Affiliated Physician's performance of outpatient surgical procedures (defined for purposes hereof to be those surgical procedures that are authorized to be performed in ambulatory surgical centers under the applicable Medicare regulations, whether or not such procedures are paid for by Medicare, workers' compensation insurance or other payors);

    1.18.3. the physician Owner or Affiliated Physician performed a Substantial Portion of his or her outpatient surgical procedures (defined as described in subsection 1.18.2 above) at the Center during the prior 12 month period or the previous fiscal year (or, if a new physician Owner or Affiliated Physician, he or she expects to perform a Substantial Portion of such procedures at the Center each year);

    1.18.4. if the physician Owner or Affiliated Physician provides services that are paid for by any federal health care program (including Medicare and Medicaid), the physician Owner or Affiliated Physician agrees to treat patients receiving medical benefits or assistance under such federal health care programs in a nondiscriminatory manner; and

    1.18.5. the physician Owner or Affiliated Physician is a physician duly licensed to practice medicine in the State of Oregon.

The Board may, in its discretion, exempt from the Eligibility Requirements set forth in this Section 1.18 certain Owners who do not, directly or indirectly, refer patients to the Center, so long as such exemption is in compliance with federal and state laws and regulations.

1.19. **"Entity"** means any corporation, partnership, trust, limited liability company or other entity.

1.20. **"Equipment"** means the equipment used in connection with the operation of the Center.

1.21. **"Financial Rights"** means a Member's rights as a member of the LLC (i) to share in the profits and losses of the LLC to the extent provided in this Agreement and (ii) to share in distributions to the extent provided in this Agreement.

1.22. **"Fundamental Regulatory Change"** means any change in federal or state law or regulation that results in (a) the referral of Medicare or any other patients to the Center by Owners, or the submission of claims to Medicare for services performed by or at the direction of Owners, becoming illegal, (b) the existence of a substantial likelihood that the receipt of cash distributions from the LLC to Owners is or will be found to be in violation of federal or state law, or (c) the ownership by Owners of Membership Interests in the LLC becoming illegal.

1.23. **"Governance Rights"** means all of a Member's rights as a member of the LLC other than Financial Rights and the right to assign Financial Rights.

1.24. **"Immediate Family Member"** means an individual's spouse, siblings, lineal ancestors and lineal descendants and shall include step relations.

1.25. **"Information"** has the meaning given to such term in Section 8.10 hereof.

1.26. **"LLC"** has the meaning given to such term in the introductory paragraph of this Agreement.

1.27. **"LLC Profit"** means net income of the LLC for the applicable period determined on an accrual basis in accordance with generally accepted accounting principles; provided, that in determining LLC Profit (except in connection with Section 12.8), any net income of the LLC attributable to direct or indirect referrals from, procedures performed by or other business generated by all Terminating Owners and their Affiliates shall be excluded from the net income of the LLC.

1.28. **"Market Area"** has the meaning given to such term in Section 8.2 hereof.

1.29. **"Medical Director"** means the person elected by Owners and approved by the Board pursuant to Section 8.3 to provide medical supervision and to coordinate professional and clinical activities at the Center.

1.30. **"Members"** has the meaning set forth in the introductory paragraph hereof.

1.31. **"Membership Interest"** means a Member's interest in the LLC, which when expressed as a

Exhibit 1
Page 4 of 90

percentage of all Membership Interests in the LLC shall be equal to such Member's Membership Percentage. The Membership Interest shall consist of (a) the Member's Financial Rights, (b) the Member's right to assign Financial Rights to the extent permitted under this Agreement, and (c) the Member's Governance Rights.

1.32.    **"Membership Percentage"** means the percentage interest of a Member as shown on Exhibit A, as amended from time to time as provided in Section 4.8 or 12.9 hereof or as otherwise required by this Agreement or the Code.

1.33.    **"New Member"** has the meaning given such term in Section 12.7 hereof.

1.34.    **"Officers"** means the President, Vice Presidents, Treasurer, Secretary, and any other person appointed to be an officer by the Board of the LLC.

1.35.    **"Owners"** has the meaning set forth in the introductory paragraph hereof.

1.36.    **"Performance Improvement Chairman"** means the person elected by Owners and approved by the Board pursuant to Section 8.3 to provide oversight and coordinate the development and operation of the Center's performance improvement program.

1.37.    **"Person"** shall mean any individual, partnership, corporation, association, trust, limited liability company, or other legal entity, whether foreign or domestic.

1.38.    **"Prime Rate"** means that rate of interest equal to the prime rate as published from time to time by SunTrust Bank in Nashville, Tennessee, or any successor thereto.

1.39.    **"Principal Indebtedness"** means the principal amount of the LLC's indebtedness for borrowed money plus indebtedness for capitalized leases.

1.40.    **"Qualified Owner"** means a physician Owner that has, or an Owner whose Affiliated Physician has, active medical staff privileges at the Center and meets the Eligibility Requirements.

1.41.    **"Responsible Person"** has the meaning given to such term in Section 48-249-115(a)(6) of the Act.

1.42.    **"Substantial Portion"** means, for purposes of the Eligibility Requirements, at least 33%; provided, however, that the Board may establish a lower percent for an individual Owner (or its Affiliated Physician, as applicable) based on a case-by-case analysis to the extent such lower percent is in compliance with federal and state laws and regulations. If the Board establishes a lower percent, the Owner (or its Affiliated Physician, as applicable) must consistently meet the lower percentage.

1.43.    **"Successor"** means a Member's executor, administrator, guardian, conservator, other legal representative or successor in interest.

1.44.    **"Tax Capital Account"** has the meaning given to such term in Section 4.4 hereof.

1.45.    **"Tax Matters Member"** has the meaning given to such term in Section 11.6 hereof and shall also mean the "tax matters partner" as that term is used in the Code.

1.46.    **"Treasury Regulations"** includes proposed, temporary and final regulations promulgated under the Code.

1.47.    **"Triggering Event"** has the meaning given to such term in Section 8.11 hereof.

1.48.    **"Triggering Event Date"** means the last day of the calendar month immediately preceding the month during which a Triggering Event occurs.

2.    ORGANIZATION

2.1.    **Formation; Effective Date.** The parties have formed the LLC by filing Articles of Organization and a Certificate of Conversion with the Secretary of State of the State of Tennessee. This Agreement shall become effective upon execution by the Members as of the Effective Date.

2.2.    **Adoption of Agreement.** The Members hereby adopt this Agreement as the operating agreement of the LLC, as the term "operating agreement" is used in the Act, to set forth the rules, regulations and provisions regarding the management of the business of the LLC, the governance of the LLC, the conduct of its business and the rights and privileges of its members. The operating agreement of the LLC shall be in writing, and the terms of the operating agreement shall be as set forth in this Agreement.

2.3.    **Name.** The name of the LLC shall be Bend Surgery Center, LLC. The LLC may adopt and conduct its business under such assumed or trade names as the Board may from time to time determine. The LLC shall file any assumed or fictitious name certificates as may be required to conduct business in any state.

2.4.    **Principal Place of Business.** The initial registered agent of the LLC shall be Claire M. Gulmi. The initial registered office and the principal executive office of the LLC shall be 20 Burton Hills Boulevard, Davidson County, Nashville, Tennessee 37215.

3.    PURPOSES AND POWERS

3.1.    **Purposes.** The purposes of the LLC shall be to own and operate the Center and to carry on any and all activities necessary, proper, convenient or advisable in connection therewith.

3.2. **Powers**. The LLC may exercise all powers necessary or convenient to carry out its business and affairs and to effectuate the purposes set forth in Section 3.1 hereof which may be legally exercised by limited liability companies under the Act.

3.3. **Independent Medical Judgment**. No provision of this Agreement shall limit the independent medical judgment of any practicing physician with staff privileges at the Center with regard to the providing of patient care. Further, nothing contained herein requires any practicing physician with staff privileges at the Center to use or recommend the use of facilities or services owned, operated or provided by the LLC.

4. **CAPITAL CONTRIBUTIONS AND MEMBERSHIP INTERESTS**

4.1. **Capital Contribution**. Each Member shall be credited with having contributed capital to the LLC in the amount set forth opposite such Member's name on Exhibit A hereto.

4.2. **Additional Contributions**. Members shall make additional Capital Contributions as may be determined from time to time by the Board in an amount proportional to their Membership Percentages. The timing, amount and terms of such additional Capital Contributions shall be determined by the Board. The Capital Contributions of each Member shall be made on the same terms and conditions.

4.3. **Book Capital Accounts**. Each Member shall have a capital account to which the fair market value of such Member's Capital Contribution shall be credited (the "Book Capital Account"). Each Member's share of the income, including tax-exempt income, expenses, gain or loss of the LLC shall be charged or credited to such Member's Book Capital Account. All distributions to a Member shall be charged to such Member's Book Capital Account.

Any Capital Contributions made solely by one Member or made out of proportion to the Membership Percentages shall, in the sole discretion of the President, either (a) be treated as a loan to the LLC and shall not affect the balance of the Book Capital Accounts, or (b) shall cause an appropriate adjustment to be made to the Book Capital Accounts.

4.4. **Tax Capital Accounts**. The capital accounts for the Members for federal income tax purposes (the "Tax Capital Accounts") shall be maintained and adjusted in accordance with the principles set forth in Treasury Regulation Section 1.704-1(b)(2)(iv), and the items of income, profit, gain, expenditures, deductions, losses, distributions and contributions which increase or decrease such Tax Capital Accounts shall be those items which, pursuant to such provision, affect the balance of capital accounts.

Any Capital Contributions made solely by one Member or made out of proportion to the Membership Percentages shall, in the sole discretion of the President, either (a) be treated as a loan to the LLC and shall not affect the balance of the Tax Capital Accounts, or (b) shall cause an appropriate adjustment to be made to the Tax Capital Accounts.

4.5. **LLC Loans**. Subject to the provisions of Section 7.3, AmSurg or an Affiliate thereof may, from time to time and as it deems necessary, lend, or arrange for the LLC to borrow, additional working capital sufficient to enable the LLC to carry on its business as contemplated by Article 3 hereof.

Any loan by AmSurg or an Affiliate thereof to the LLC made for working capital purposes shall be evidenced by a promissory note which shall bear interest at a fair market value rate and which shall contain other terms substantially similar to those which might be agreed to with a non-affiliated lender. Any required monthly payments (including any past due amounts) under any such loan by the LLC or any other party shall be made before any distributions of Available Cash Flow are made to the Members pursuant to Section 6.3 hereof.

4.6. **Withdrawal or Reduction of Members' Capital Contributions**. No Member shall have the right to withdraw from the LLC. A Member shall not receive out of the LLC's property all or any part of such Member's Capital Contributions except as provided in Sections 6.3 and 13.3 hereof.

4.7. **Interest and Preferential Rights**. Except with respect to any loans made pursuant to Sections 4.3, 4.4 and 4.5 hereof, no interest shall accrue on any Capital Contributions and no Member shall have any preferential rights with respect to distributions or upon dissolution of the LLC.

4.8. **Membership Interests and Amendments to Exhibit A**. Each Member shall be credited with the Membership Interest (expressed as a percentage of all Membership Interests) and initial capital account balance set forth opposite such Member's name on Exhibit A. The amounts shown on Exhibit A with respect to capital account balances and Membership Interests shall be appropriately amended to reflect changes to such amounts as a result of any changes in the membership of the LLC or assignments of Membership Interests. Exhibit A shall also be amended from time to time to reflect any changes in the addresses of Members.

5. **EXPENSES OF THE LLC**

5.1. **Organizational Expenses**. Each Member shall bear its own expenses incurred in connection with the preparation, review, and negotiation of this Agreement,

the Membership Interest Purchase Agreement and any other documents contemplated hereunder.

**5.2.** **Operating Expenses.** The LLC will reimburse the Members for reasonable and documented travel expenses approved by the Board and incurred in connection with performing their respective duties hereunder.

## 6. ALLOCATION OF INCOME AND LOSS AND DISTRIBUTIONS

**6.1.** **Allocation of Net Taxable Income or Loss and Tax Credits.** Except as provided in Sections 6.2 and 6.5, all income and gain of the LLC includable for federal, state and local income tax purposes, all expenses and losses of the LLC deductible for federal, state and local income tax purposes, as applicable, and all federal income tax credits shall be allocated in proportion to the Membership Percentage of each Member; provided, that such allocations in connection with the liquidation or dissolution of the LLC shall be made, as nearly as possible, so as to produce Book Capital Accounts of the Members that are in proportion to their respective Membership Percentages.

**6.2.** **Allocations to Reflect Contributed Property.** If a Member contributes property to the LLC which has a difference between its tax basis and its fair market value on the date of its contribution, then all items of income, gain, loss and deduction with respect to such contributed property shall be shared for federal income tax purposes among the Members pursuant to Section 704(c) of the Code so as to take into account the variation between the basis of such property and its fair market value at the time of contribution.

Any elections or other decisions relating to such allocations shall be made by the Tax Matters Member in any manner that reasonably reflects the purpose and intention of this Agreement; provided, however, that any election or determination related to the method for making Section 704(c) allocations or reverse Section 704(c) allocations under Section 1.704-3 of the Treasury Regulations (e.g., traditional, remedial or curative) that adversely affects the Owners in a manner that materially differs from the effect of such election or determination on AmSurg shall require Board approval. Except as otherwise provided in such Section 1.704-3(d) of the Treasury Regulations, the Capital Accounts of the Members shall be adjusted in accordance with Section 1.704-1(b)(2)(iv)(g) of the Treasury Regulations for allocations to the Members of income, gain, loss and deduction (including depreciation, depletion, amortization or other cost recovery) as computed for book purposes, with respect to the property contributed; and the amount of book depreciation, depletion or amortization for a period with respect to an item of contributed property shall be the amount that bears the same relationship to the book

value of such property as the depreciation (or cost recovery deduction), depletion or amortization computed for tax purposes with respect to such property for such period bears to the adjusted tax basis of such property. If such property has a zero adjusted tax basis, the book depreciation, depletion or amortization may be determined under any reasonable method selected by the Tax Matters Member.

References in this Section 6.2 to book and tax depreciation, depletion, amortization, and gain or loss with respect to property that has an adjusted tax basis that differs from its book value include, under analogous rules and principles, the unrealized income or deduction with respect to accounts receivable, accounts payable and other accrued but unpaid items.

**6.3.** **Distribution of Available Cash Flow.** Except as provided in Section 4.5, the LLC shall distribute Available Cash Flow. Such distributions shall be made in monthly installments within fifteen (15) days after the end of each month and shall be made to all Members pro rata in proportion to the respective Membership Percentages of the Members at the time of each distribution.

**6.4.** **Consequences of Distributions.** Upon the determination to distribute funds in any manner expressly provided in this Article 6, made in good faith, no Member shall incur liability on account of such distribution, even though such distribution may have resulted in the LLC retaining insufficient funds for the operation of its business, which insufficiency resulted in loss to the LLC or necessitated the borrowing of funds by the LLC.

**6.5.** **Distribution Upon Termination.** When the LLC is terminated, pursuant to Article 13 or otherwise, the final distribution to Members shall be in proportion to their Membership Percentages.

## 7. BOARD OF DIRECTORS

**7.1.** **Number and Term.** The LLC shall have a Board consisting of three (3) directors appointed by AmSurg (the "AmSurg Directors"), and three (3) directors elected by the Owners (the "Owner Directors"), in each case in accordance with Section 7.5 below. Each Director shall hold office for a period of one (1) year or until such Director's earlier resignation, removal or death.

**7.2.** **Duties.** Except as otherwise specifically set forth in this Agreement, the Board shall have ultimate authority with respect to the LLC's operations, including, but not limited to, physician credentialing, granting of privileges and approval of operating policies and procedures of the Center.

DM_US 47637902-19.085092.0013

Exhibit 1
Page 7 of 90

7.3.    **Acts Requiring Board Approval.** Without obtaining the consent of the Board, no Member or Officer shall:

7.3.1.    Sell, exchange, lease or otherwise transfer all or substantially all of the assets of the LLC;

7.3.2.    Dissolve the LLC;

7.3.3.    Merge or consolidate the LLC into another entity;

7.3.4.    Cause the LLC to incur indebtedness for borrowed funds or refinancing of borrowed funds in excess of $250,000 in the aggregate in one (1) year.

7.3.5.    Establish or change in any material respect the operating policies and procedures of the Center, except for policies and procedures relating to corporate governance and regulatory compliance, employment matters and financial reporting matters;

7.3.6.    Hire or discharge the clinical director of the Center;

7.3.7.    Vary or change in any material respect any portion of the professional liability coverage of the Center;

7.3.8.    Request or require a Capital Contribution to be made by any Member;

7.3.9.    Authorize the LLC to adopt or conduct its business under an assumed or trade name;

7.3.10.    Purchase assets not related to the business of the LLC or change the primary business purpose of the LLC;

7.3.11.    Select, terminate, or provide notice of non-renewal to the Center's anesthesia provider;

7.3.12.    Select or terminate the Center's administrator, provided, that the President shall have the authority to assign the duties and responsibilities of the Center administrator, supervise his or her day-to-day performance, conduct his or her annual performance review, and determine his or her compensation, in each case consistent with any contractual obligations of the LLC; or

7.3.13.    Approve any material expansion of the premises of the Center.

7.4.    **Acts Requiring Approval of the Members.** Without the approval of AmSurg and the Owners holding at least a majority of the Membership Interests held by the Owners, no Member or Officer or Director shall:

7.4.1.    Sell, exchange, lease or otherwise transfer all or substantially all of the assets of the LLC;

7.4.2.    Dissolve the LLC;

7.4.3.    Merge or consolidate the LLC into another entity;

7.4.4.    Close the Center; or

7.4.5.    Relocate the Center from its then current location to another location, other than upon the termination or expiration of the then current lease for the Center..

7.5.    **Election.** The AmSurg Directors shall be appointed by AmSurg, and the Owner Directors shall be elected by the Owners holding at least a majority of the Membership Interests then held by the Owners. In the event any AmSurg Director ceases to serve as a member of the Board for any reason, the resulting vacancy shall be filled by AmSurg. In the event any Owner Director ceases to serve as a member of the Board for any reason, the resulting vacancy shall be filled by the Owners holding at least a majority of the Membership Interests then held by the Owners. Any AmSurg Director may be removed with or without cause by AmSurg. Any Owner Director may be removed with or without cause by the Owners holding at least a majority of the Membership Interests then held by the Owners. A Chairman of the Board shall be elected by at least a majority of the members of the Board at the first meeting of the Board held in each fiscal year.

7.6.    **Quorum and Voting.** A quorum of the Board shall consist of at least a majority of the number of Directors. If a quorum is present when a vote is taken, the affirmative vote of at least a majority of Directors present shall be the act of the Board, unless the Articles of Organization or this Agreement requires the vote of a greater number of Directors. Each Director shall have one vote on each matter considered by the Board.

7.7.    **Regular Meetings of the Board.** Regular meetings of the Board shall be held quarterly at such places, within or without the State of Oregon, on such dates and at such times as the Board may determine from time to time.

7.8.    **Meeting by Telephone.** Any or all Directors may participate in a regular or special meeting by conference telephone or any other means of communication by which all Directors participating may simultaneously hear each other during the meeting. A Director participating in a meeting by this means is deemed to be present in person at the meeting.

7.9.    **Action on Written Consent.** Action required or permitted to be taken at a meeting of the Board may be taken without a meeting, if the number of Directors required to approve any such action consent to the taking of such action without a meeting and approve

DM_US 47637902-19.085092.0013

Exhibit 1
Page 8 of 90

such action by signing one or more written consents describing the action taken. The LLC shall promptly distribute copies of any such action to the Directors, but the failure of the LLC to distribute copies of such action shall not void or otherwise effect the validity of such action in any manner.

7.10.    **Notice of Meetings.**    The President or any two of the Directors may call a special meeting of the Board of Directors by giving 48 hours' prior notice to all Directors of the date, time and place of the meeting. The notice need not state the purpose of the meeting.

8.    MEMBERS

8.1.    **Medical Malpractice Insurance.** Each Owner shall maintain at all times medical malpractice insurance complying with the Medical Staff Bylaws of the Center.

8.2.    **Ownership and Investment Restrictions.** No Owner or Affiliated Physician, nor any Affiliate of any Owner or Affiliated Physician shall:

8.2.1.    have any direct or indirect ownership interest in, or manage, lease, develop or otherwise have any financial interest in any business or entity competing or planning to compete with the LLC (including, but not limited to, any ambulatory surgery center or any physician office in which surgical procedures are performed and for which facility fees, tray fees or other fees in addition to standard professional fees are charged) within a twenty-five (25) mile radius of the Center (the "Market Area"), or

8.2.2.    become an employee of a hospital or an Affiliate of a hospital that is located within the Market Area, or enter into any contract or other arrangement (whether as a result of his or her employment or otherwise) that requires or incentivizes him or her to perform procedures at any hospital or facility affiliated with a hospital in the Market Area, provided that an Owner or Affiliated Physician may become an employee of a hospital or hospital affiliate and may receive compensation paid by such a hospital or affiliate that does not require or incentivize such Owner or Affiliated Physician to perform surgical procedures that are eligible to be performed at the Center at the employing hospital or affiliate or which compensation is not based, in whole or in part, on surgery referrals to or procedures performed at the employing hospital or affiliate, and provided, further, that Owners may, directly or indirectly through their medical practice or group medical practice, contract with or participate as a provider in (1) the Federal Bundled Payments

for Care Improvement Program (or other comparable Federal program) or any comparable program in connection with a non-government third party payor, (2) a clinically integrated network, as such term is commonly defined by the Federal Trade Commission, (3) any accountable care organization participating in the Medicare or Medicaid Shared Savings Programs or any comparable program in connection with a non-government third party payor,

in each case described in Sections 8.2.1 and 8.2.2 until the later of (i) five (5) years from the date of this Agreement, or (ii) two (2) years after such Owner (or with respect to an Affiliated Physician, the Owner with whom such Affiliated Physician is affiliated) ceases to be a Member of the LLC. With respect to persons who are admitted as Owners and Affiliated Physicians following the date of this Agreement, the restrictions described in Sections 8.2.1 and 8.2.2 shall apply until two (2) years after such Owner (or with respect to an Affiliated Physician, the Owner with whom such Affiliated Physician is affiliated) ceases to be a Member of the LLC.

The foregoing shall not prohibit any Owner or Affiliated Physician, nor any Affiliate of an Owner or Affiliated Physician, from (i) owning shares of capital stock constituting less than 1% of the outstanding capital stock of any corporation whose common stock is traded on a national securities exchange, (ii) practicing medicine or performing surgical procedures at any facility, (iii) receiving a reasonable fee in exchange for providing medical director or call coverage services to a tertiary hospital, (iv) serving on medical staffs or medical staff committees for hospitals, or (v) continuing to own an equity interest in or entering into arrangements with entities disclosed on Exhibit 8.2. The parties acknowledge and agree that this Section 8.2 does not require physician Owners or Affiliated Physicians to perform surgical procedures at the Center or to refer patients to the Center, and imposes no restrictions on where such procedures are performed or where referrals are made.

Each Owner who is a physician and each Affiliated Physician acknowledges and agrees that the enforcement of the provisions of this Section 8.2 against him or her would not prevent such person from engaging in his or her profession, the practice of medicine.

Each Owner and Affiliated Physician recognizes and acknowledges that the ascertainment of damages in the event of a breach of this Section 8.2 would be difficult, and agrees that AmSurg, in addition to all other remedies it may have, shall have the right to injunctive relief if there is such a breach. Notwithstanding the foregoing, in the event a physician Owner or Affiliated Physician, or any Affiliate of a

Exhibit 1
Page 9 of 90

physician Owner or Affiliated Physician violates the provisions of Section 8.2.2, such physician Owner or Affiliated Physician shall pay to the LLC, as liquidated damages, an amount equal to (a) five (5) times the LLC Profit plus the LLC's interest expense for the preceding twelve (12) calendar months, minus (b) the LLC's Principal Indebtedness outstanding as of the date of such breach, with this amount multiplied by such Owner's ownership interest in the LLC (or such Owner's ownership interest in the LLC immediately prior to the termination of his or her membership in the LLC), it being acknowledged by the parties that the damages to the LLC in such event would be difficult to ascertain.

8.3.    **Services Provided by Owners.** As additional consideration for his or her Membership Interests and without further charge to the LLC other than the expenses outlined in Section 5.2 hereof, the Owners holding at least a majority of the Membership Interests then held by the Owners shall elect and shall provide the Center with a Medical Director and a Performance Improvement Chairman, in each case, subject to the reasonable approval of the Board. The Medical Director and the Performance Improvement Chairman shall assist the Board of Directors, the Officers and the Center Administrator of the Center in the management of the medical and clinical affairs of the LLC.

8.3.1.    **Medical Director Duties.** The Medical Director will perform the duties and responsibilities assigned from time to time by the Board, including, but not limited to:

8.3.1.1    Assisting in the selection of suitable treatment modality for all patients of the Center;

8.3.1.2    Assisting with the development of clinical procedures which are designed to assure adequate monitoring of patients and the treatment process;

8.3.1.3    Directing, coordinating and reporting to the Board on all medical aspects of the Center's operations;

8.3.1.4    Assisting with the development of procedures which are designed to assure (i) adequate training of nurses and other clinical staff in appropriate treatment techniques, and (ii) the supervision of all non-physician clinical staff at the Center;

8.3.1.5    Assisting with the development of clinical procedures which are designed to assure the availability of a patient care policy and procedures manual and other written materials that reflect current

professional standards and assisting in the periodic review and revision thereof;

8.3.1.6    Developing and maintaining professional memberships and active visibility in the local community through the provision of consulting, educational and related services in a manner consistent with the role of Medical Director which are designed to promote the positive visibility of the Center in the community;

8.3.1.7    Devising the medical policy statements of the Center, presenting the statements for the approval of the Board and upon securing Board approval, implementing and monitoring the policies;

8.3.1.8    Assisting the LLC in attracting qualified physicians to the medical staff of the Center and recommending to the Board that qualified physicians be granted clinical privileges at the Center;

8.3.1.9    Assisting the LLC in attracting qualified non-physician staff to work at the Center and assessing, in conjunction with other members of the medical staff, the performance of non-physician staff;

8.3.1.10    Assisting the Board in its compliance efforts, including compliance with applicable state and federal statutes, all standards of applicable accreditation bodies, and regulations and agency directives concerning the medical standards of patient care required at the Center, and reporting to the Board any known deficiencies therein;

8.3.1.11    Accepting appropriate and reasonable medical staff duties and assignments at the Center including (i) acting as the liaison between the medical staff and the Board, (ii) appointing physicians to serve as members and chairmen of medical staff committees, and (iii) serving on all committees of the Center; and

8.3.1.12    Participating in long and short range planning for the Center, reviewing the Center's operating budget, and, where appropriate, making recommendations on the budget.

Exhibit 1
Page 10 of 90

**8.3.2. Performance Improvement Chairman Duties.** The Performance Improvement Chairman will perform the duties and responsibilities reasonably assigned from time to time by the Board or its designee, including, but not limited to:

8.3.2.1  Overseeing the performance improvement program and all corresponding activities of the Center, subject to the authority of the Board;

8.3.2.2  Assisting in the development and revision of indicators necessary to adequately evaluate care provided by the Center and that meet or exceed governmental requirements;

8.3.2.3  Directing the review of data summaries of all identified indicators, as well as information from other sources regarding the quality of care provided by the Center;

8.3.2.4  Directing the development of educational programs based on the needs identified through committee activities and supporting department-wide education on continuous process improvement principles;

8.3.2.5  Overseeing the credentialing and recredentialing process for the Center's medical staff, subject to the authority of the Board;

8.3.2.6  Overseeing and administering the risk management program for the Center, subject to the authority of the Board;

8.3.2.7  Overseeing and administering medical malpractice issues related to the Center, subject to the authority of the Board;

8.3.2.8  Working with the Center's performance improvement committee and conducting quarterly performance improvement committee meetings; and

8.3.2.9  Reviewing the Center's performance improvement program on at least an annual basis.

**8.4. Member Representations.** Each Owner hereby represents that he or she maintains a current license to practice medicine in the State of Oregon, has not been excluded from participation in the Medicare program or any other governmental health care program for any reason, has not been convicted of any crime in violation of any state or Federal law related to health care matters, and has no knowledge of any circumstances or conditions that would reasonably be expected to have a material adverse impact on the operations of the Center or his or her medical practice (other than conditions which might have a material adverse effect on the health care industry or ambulatory surgery industry in general).

**8.5. Meetings.** Meetings of the Members, for any purpose or purposes, may be called by the President, any two (2) directors, AmSurg or Owners holding at least a majority of the Membership Interests then held by the Owners by giving 48 hours' prior notice to all Members of the date, time and place of the meeting. The notice need not state the purpose of the meeting.

**8.6. Action by Members Without a Meeting; Telephone Meetings.** Action required or permitted to be taken at a meeting of the Members may be taken without a meeting, if Members holding at least the percentage Membership Interests required to approve any such action consent to the taking of such action without a meeting and approve such action by signing one or more written consents describing the action taken. The LLC shall promptly distribute copies of any such action to the Members and the Directors, but the failure of the LLC to distribute copies of such action shall not void or otherwise affect the validity of such action in any manner. A meeting also may take place by telephone conference call or any other form of electronic communication through which the Members may simultaneously hear each other, and any Member participating through such means shall be considered to be "represented in person" for the purposes of constituting a quorum pursuant to Section 8.6. A Member participating in a meeting by this means is deemed to be present in person at the meeting.

**8.7. Record Date.** For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section 8.7, such determination shall apply to any adjournment thereof.

**8.8. Quorum.** AmSurg and Owners holding at least a majority of the Membership Interests then held by the Owners, represented in person or by proxy, shall constitute a quorum at any meeting of Members.

DM_US 47637902-19.085092.0013

Exhibit 1
Page 11 of 90

8.9.    **Required Vote; Manner of Acting.** Except as otherwise provided in Section 8.7 above, if a quorum is present, the affirmative vote of AmSurg and the Owners holding at least a majority of the Membership Interests then held by the Owners shall be the act of the Members.

8.10.    **Confidentiality.** Except as required by law or legal process, each Owner and Affiliated Physician shall maintain the confidentiality of all documents and information provided by AmSurg or AmSurg Corp. in connection with the formation of, and the business to be conducted by, the LLC, including, but not limited to, pro forma financial information, outcome studies, information concerning AmSurg Corp. and its business strategy and any documents to be utilized in connection with the ownership and operation of the Center and/or the LLC, including strategic plans, capital and operating budgets, employee compensation rates, and managed care contracts and related documentation (the "Information"). No Owner or Affiliated Physician will discuss or disclose any of the Information to any third party or take any action that could compromise the confidentiality of the Information without the prior written consent of AmSurg Corp.; provided, that the Owners may disclose the Information to their personal accountants, attorneys and other advisors. Each Owner and Affiliated Physician shall, upon termination of his or her membership in the LLC, promptly return to AmSurg and the LLC all Information in his or her possession, including without limitation all policy, procedure and program manuals and related documents, and such person shall not make or retain any copies thereof. By their execution of this Agreement, each Owner and Affiliated Physician acknowledges that the Information is proprietary and contains specialized knowledge and data that constitutes valuable intellectual property.

AmSurg and AmSurg Corp. shall maintain the confidentiality of the Information from any competing business or facilities AmSurg or AmSurg Corp. may own; provided, that AmSurg or AmSurg Corp. may disclose the Information to their accountants, attorneys and other advisors. By their execution of this Agreement, AmSurg and AmSurg Corp. acknowledge that the Information is proprietary and contains specialized knowledge and data that constitutes valuable intellectual property.

Notwithstanding the foregoing, the Information shall not include information that (a) is, or becomes, generally available to the public, other than as a result of a disclosure in breach of this Section 8.10 by any Owner, (b) is, or becomes, available to the Owner from a source other than AmSurg or its representatives, provided that such source is not, and was not, known by the Owner, to be bound by a confidentiality agreement with, or any other contractual, fiduciary or other legal obligation of confidentiality to, AmSurg or any of its Affiliates, and

(c) AmSurg agrees in writing was available to the Owner receiving the Information on a non-confidential basis prior to disclosure.

8.11.    **Triggering Events.**

8.11.1.    Each of the following events shall be deemed a "Triggering Event" for purposes of this Section 8.11 with respect to any Owner (and such Owner shall hereinafter be referred to as "Terminating Owner"):

8.11.1.1 the death of such Terminating Owner or the Affiliated Physician of such Terminating Owner;

8.11.1.2 the certification of such Terminating Owner or the Affiliated Physician of such Terminating Owner as permanently disabled by at least two (2) licensed physicians;

8.11.1.3 such Terminating Owner or the Affiliated Physician of such Terminating Owner failing to maintain active medical staff privileges at the Center or the cessation of the practice of medicine by such Terminating Owner or the Affiliated Physician of such Terminating Owner on a full-time basis (that is, at least thirty (30) hours per week, forty weeks per year);

8.11.1.4 the relocation of the practice of such Terminating Owner or the Affiliated Physician of such Terminating Owner outside of the Market Area;

8.11.1.5 such Terminating Owner or the Affiliated Physician of such Terminating Owner no longer maintaining a current license to practice medicine in the State of Oregon (the foregoing not being applicable to a temporary suspension of a license to practice in Oregon for a period of less than ninety (90) days);

8.11.1.6 such Terminating Owner or the Affiliated Physician of such Terminating Owner no longer meeting the qualifications to be a Qualified Owner;

8.11.1.7 such Terminating Owner or the Affiliated Physician of such Terminating Owner is involved in a divorce proceeding or matrimonial dissolution that becomes final and in

Exhibit 1
Page 12 of 90

which a transfer of any of such Terminating Owner's Membership Interest is ordered, in which case this subsection shall be applied solely to the ex-spouse of the Terminating Owner or the Affiliated Physician of such Terminating Owner; provided, however, that in the event the LLC exercises its right to purchase any of the Terminating Owner's Membership Interest pursuant to this subsection, the Terminating Owner or the Affiliated Physician of such Terminating Owner shall have an option to repurchase such membership interest for the same purchase price paid by the LLC in accordance with Section 8.11.2;

8.11.1.8 a Terminating Owner or the Affiliated Physician of a Terminating Owner (A) makes an assignment for the benefit of creditors or admits in writing his inability to pay debts generally as they become due, (B) applies to any tribunal for the appointment of a trustee or receiver of any substantial part of his assets, (C) commences any voluntary proceeding under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or other liquidation laws of any jurisdiction, (D) becomes the subject of any involuntary proceedings and such Terminating Owner or the Affiliated Physician of such Terminating Owner indicates his approval, consent or acquiescence, or (E) becomes the subject of an order appointing a trustee or receiver, adjudicating him bankrupt or insolvent, or approving a petition in any involuntary proceeding, and such order remains in effect for ninety (90) days;

8.11.1.9 the exclusion of such Terminating Owner or the Affiliated Physician of such Terminating Owner by the Centers for Medicare & Medicaid Services or the state Medicaid agency from participation in the Medicare or Medicaid program for any reason;

8.11.1.10 the conviction of such Terminating Owner or the Affiliated Physician of such Terminating Owner of a felony in violation of any

state or federal law related to healthcare matters;

8.11.1.11 the violation of the provisions of Section 8.2 by such Terminating Owner or the Affiliated Physician of such Terminating Owner; and

8.11.1.12 the determination by AmSurg and the Owners holding at least a majority of the Membership Interests then held by all Owners (other than the Terminating Owner) that the Terminating Owner's Membership Interest shall be repurchased by the LLC.

8.11.2.    The Terminating Owner shall notify the LLC and the other Owners in writing of the occurrence of such Triggering Event within five (5) days of the Triggering Event occurring.    Each Owner other than the Terminating Owner shall have the option to purchase the Membership Interest held by such Terminating Owner (the "Triggered Interests"), allocated in this manner: the amount to be purchased by a specific Owner shall not exceed such purchasing Owner's pro rata interest determined with respect to such Owner's current Membership Percentage in the LLC compared with the Membership Percentages of other Owners other than the Terminating Owner, unless all of the Owners other than the Terminating Owner agree to purchase in different proportions.    The purchase price for all of the Terminating Owner's Triggered Interests shall be the "Purchase Price" of such Triggered Interests (as defined below); each purchasing Owner shall pay a purchase price equal to the value of the applicable portion of the Triggered Interests being purchased by such Owner, which shall equal the product of the Purchase Price of the Terminating Member's collective Triggered Interests multiplied by the percentage portion of the Triggered Interests being purchased by such purchasing Owner. The Owners purchasing the Triggered Interests shall simultaneously close on such purchase(s) on the 30th day following the date of notice of the Triggering Event.

8.11.3.    To the extent that any Triggered Interests are not purchased pursuant to Section 8.11.2 as described above, the LLC, at the direction of AmSurg, shall have the right, but not the obligation, to purchase all, but not less than all, of the remaining Triggered Interests on the terms and conditions described in Section 8.11.2. In the event the LLC exercises

Exhibit 1
Page 13 of 90

its option, it shall give notice to the Terminating Owner and close on the purchase of such Triggered Interests within 60 days of notice of the Triggering Event.

8.11.4.    The purchase price (the "Purchase Price"), for all of the Terminating Owner's Triggered Interests shall be determined as follows:

8.11.4.1 If the Triggering Event is one described in Sections 8.11.1.1 through 8.11.1.8 and Section 8.11.1.12, an amount equal to (i) three (3) times the LLC Profit for the twelve (12) calendar months immediately following the Triggering Event Date (the "Applicable 12 Month Period") plus the LLC's interest expense for the twelve (12) calendar months immediately preceding the Triggering Event Date, minus (ii) the LLC's outstanding Principal Indebtedness as of the Triggering Event Date (the "Prospective EBITDA Amount"), with this amount multiplied by the selling Terminating Owner's pro rata percentage ownership interest in the LLC.

8.11.4.2 If the Triggering Event is one described in Sections 8.11.1.9 and 8.11.1.10, the purchase price shall be equal to 50% of the amount determined in accordance with Section 8.11.4.1.

8.11.4.3 If the Triggering Event is described in Section 8.11.1.11, the purchase price shall be One Dollar ($1.00).

8.11.5.  To the extent the Purchase Price is determined to be $1.00 pursuant to Section 8.11.4.3, the applicable portion of such amount shall be paid by the purchasing parties to the Terminating Owner on the closing.  To the extent the calculation of the Purchase Price is dependent upon the Prospective EBITDA Amount, the LLC and/or the purchasing Owners shall not pay the purchase price at closing and no amount shall be due by the LLC and/or the purchasing Owners at closing.  Rather, at the closing, each of the parties purchasing the Triggered Interests shall deliver to the Terminating Owner a promissory note evidencing his, her or its obligation to pay their respective portion of Purchase Price (the "Promissory Note"), bearing simple interest per annum at the applicable base interest rate

published by the U.S. Treasury to calculate imputed interest as in effect on the last day of the Applicable 12-Month Period, prepayable without penalty, and payable in not more than twenty-four (24) equal monthly installments, commencing one (1) month after the end of the Applicable 12-Month Period.  The maker under such promissory note shall not pay or owe any interest with respect to the Applicable 12-Month Period or with respect to the fact that the purchase price will not be paid until after the end of the Applicable 12-Month Period.

Within thirty (30) days after the end of the Applicable 12-Month Period (the "Determination Date"), the Board shall calculate the Prospective EBITDA Amount and the resulting Purchase Price hereunder, and shall deliver a copy of such calculations to the Terminating Owner and each of the purchasers of the Triggered Interests.  Upon receipt of such calculations, each of the purchasers shall have the option to either pay their respective portion of the Purchase Price (A) in full, in legal tender of the United States, by check or by wire transfer; or (B) pursuant to the terms of the Promissory Note that he, she or it delivered at the closing.

8.12.    **Annual Certification.**  In order to assist the LLC in determining whether it meets the standards set forth in the safe harbor to the Anti-Kickback Statute applicable to ambulatory surgery center investments, each physician Owner and Affiliated Physician shall certify annually to the LLC in writing, with respect to the prior fiscal year, on or before March 31: (i) the portion of his or her annual professional income derived from performing outpatient surgical procedures; and (ii) the percentage of such Owner's outpatient surgical procedures that were performed at the Center.  A copy of the form of Annual Certification is attached hereto as Exhibit B.  For purposes of this Section 8.12, "outpatient surgical procedures" means those surgical procedures that were authorized to be performed in ambulatory surgical centers under the applicable Medicare regulations for the prior fiscal year.  The March 31 annual certification requirements shall commence on March 31, 2014 with respect to the fiscal year ending December 31, 2013 and shall continue each year thereafter.

8.13.    **Fiduciary Duty.**    Notwithstanding the foregoing or any other provision of this Agreement or applicable law, each Owner and Affiliated Physician acknowledges and agrees that AmSurg and its Affiliates may own and operate, and may continue to own and operate, facilities and businesses located within the Market Area that compete with the business of the LLC.  The Owners and the Affiliated Physicians acknowledge

and agree that AmSurg and its Affiliates shall not be restricted in the ownership or operation of any such competing facilities and businesses, shall have no obligation to give priority to the ownership and operation of the business of the LLC, and shall have no obligation or liability to the LLC or the Owners as a result of actions taken in furtherance of the ownership or operation of such competing facilities and businesses.

9.    OFFICERS

9.1.    **Appointment of Officers.** The Board shall appoint a President and may appoint one or more Vice Presidents, a Treasurer, a Secretary and such other officers as the Board shall elect from time to time, all of whom will be Affiliates of AmSurg, to serve as the officers of the LLC.

9.2.    **Term.** The Officers shall serve for an indefinite term until removed and replaced by the Board.

9.3.    **President.**

9.3.1.    **General.** Subject to the provisions of this Agreement, including without limitation Sections 7.3 and 7.4, the management of the business affairs of the LLC shall rest with the President, who shall have all the authority which may be possessed by a president pursuant to the Act, and such additional authority as otherwise conferred by law or is necessary or advisable in the discharge of the duties of the President under this Agreement. The President shall perform his or her duties to the best of his or her ability and shall use his or her best efforts to carry out the business of the LLC. The President shall not serve as an agent, officer, employee, or consultant for any competing business or facilities AmSurg or AmSurg Corp. may own.

9.3.2.    **Powers.** Subject to the provisions of Sections 7.3 and 7.4 and those powers reserved to the Members and the Board by this Agreement or the Articles of Organization, the President may, on behalf of and at the cost, expense and risk of the LLC and in accordance with the operating and capital budgets of the LLC:

9.3.2.1    On behalf of the LLC, spend the capital and net income of the LLC in the exercise of any rights or powers possessed by the President hereunder;

9.3.2.2    Make capital expenditures on behalf of the LLC;

9.3.2.3    Cause the LLC to lease, acquire, own, manage and operate the

Center, and enter into agreements containing such terms, provisions and conditions as the President may deem advisable;

9.3.2.4    Cause the LLC to lease, acquire, own and operate any equipment, fixtures, supplies or other items necessary for the operation of the Center;

9.3.2.5    On behalf of and for the benefit of the LLC, enter into any contracts or arrangements necessary for the conduct of the business of the LLC;

9.3.2.6    Purchase from or through others contracts of liability, casualty and other insurance which the President deems advisable for the protection of the LLC or for any purpose convenient or beneficial to the LLC;

9.3.2.7    On behalf of and for the benefit of the LLC, incur indebtedness;

9.3.2.8    Sell or otherwise dispose of, upon such terms and conditions as the President may deem advisable, appropriate or convenient, any of the assets of the LLC that do not constitute all or substantially all of the LLC's assets;

9.3.2.9    Establish bank accounts in the name and on behalf of the LLC and designate the signatories thereon;

9.3.2.10    Invest in short-term debt obligations of federal and state governments and their agencies, commercial paper and certificates of deposit of commercial banks, savings bank or savings and loan associations and "money market" mutual funds, such funds as are temporarily not required for the purposes of the LLC's operations; and

9.3.2.11    Delegate all or any of its duties hereunder and, in furtherance of any such delegation, appoint, employ or contract with any person (including Affiliates of the Members) for the transaction of the business of the LLC, which persons may, under the supervision of the President, act as consultants, accountants, attorneys, brokers, escrow agents, or

Exhibit 1
Page 15 of 90



in any other capacity deemed by the President necessary or desirable, and pay appropriate fees to any of such persons. Without limiting the foregoing, AmSurg may delegate to AmSurg Corp. the authority to negotiate and execute agreements with payors on behalf of the LLC.

9.4. **Duties**. Without further charge to the LLC other than the expenses outlined in Section 5.2 hereof, AmSurg, through the President, shall consult in and oversee the administrative operations of the Center and, subject to the terms of this Agreement, including without limitation Sections 7.3 and 7.4, and the general direction and control of the Board, coordinate all business and administrative activities pertaining to the Center, including, but not in any way limited to, the following:

9.4.1. Assist the Center in operating in an efficient and business like manner;

9.4.2. Coordinate the purchase or lease of equipment, supplies and pharmaceuticals (including purchases through national purchasing programs) necessary for the operation of the Center;

9.4.3. Coordinate all reasonable and necessary actions to maintain all licenses, permits and certificates required for the operation of the Center, and to ensure that all appropriate certification and accreditation available to the Center's operations are obtained;

9.4.4. Coordinate, with the support of the Medical Director and the Board, ongoing marketing programs to increase community and payor awareness of the Center;

9.4.5. Negotiate the amount and method of reimbursement that the Center will receive from all appropriate third party payors, both public and private;

9.4.6. Establish, maintain, revise and administer, with the support and approval of the Board, the overall charge structure of the Center and arrange for payment of such charges by others, when appropriate;

9.4.7. Arrange and negotiate financing for equipment and future capital needs of the Center;

9.4.8. Develop and revise, subject to approval by the Board, all necessary policies and operating procedures pertaining to each aspect of the Center's operations (except for policies and procedures relating to corporate and regulatory compliance, employment

matters and financial reporting matters, which shall be approved by AmSurg and shall not be subject to Board approval);

9.4.9. Hire, supervise, discipline and discharge, in conjunction with the Medical Director, all persons working in the Center and providing direct patient care, as needed;

9.4.10. Train Center personnel with respect to all aspects of the Center's operations, including but not limited to administrative, clinical, financial and marketing matters;

9.4.11. Arrange for the purchase by the LLC of necessary insurance coverage for the Center;

9.4.12. Establish and administer accounting procedures and controls and systems for the development, preparation and keeping of records and books of accounting related to the business and financial affairs of the Center;

9.4.13. Oversee the preparation of the annual report and tax information returns required to be filed by the LLC, and deliver a copy of same to the Members in a timely manner as needed;

9.4.14. Furnish the LLC in a timely fashion monthly operating reports and other reports reasonably requested by the Board or any Director;

9.4.15. Prepare for Board review all capital and annual operating budgets as needed; and

9.4.16. Perform all duties herein required of it in good faith and with reasonable diligence so as to maximize the Center's ability to efficiently provide appropriate quality health care to patients.

For the avoidance of doubt, (a) AmSurg shall not allocate or charge to the LLC any of its general corporate overhead expenses relating to the services to be provided by AmSurg pursuant to this Section 9.4 and (b) AmSurg shall not at any time impose on the LLC a percentage-based or other recurring management fee.

9.5. **Right to Rely Upon the Authority of the President**. No person dealing with the President shall be required to determine the President's authority to make any commitment or undertaking on behalf of the LLC, nor to determine any fact or circumstance bearing upon the existence of its authority. In addition, no purchaser of any property of the LLC shall be required to determine the sole and exclusive authority of the President to sign and deliver on behalf of the LLC any instrument of transfer, or to see to the application or distribution of revenues or proceeds paid or credited in connection therewith, unless such purchasers shall have



received written notice from the LLC affecting the same.

**9.6.    Vice President.** The Vice President or Vice Presidents (if any) shall assist the President in the management of the LLC, and shall perform such other duties as the Board may from time to time prescribe.

**9.7.    Secretary.** The Secretary shall be responsible for recording the minutes of all Board and Member meetings. The Secretary shall have the responsibility of authenticating records of the LLC and receiving notices required to be sent to the Secretary and shall perform such other duties as the Board may from time to time prescribe.

**9.8.    Treasurer.** The Treasurer shall have custody of the LLC's funds and securities, shall keep or cause to be kept full and accurate account of receipts and disbursements in books of the LLC, shall disburse or cause to be disbursed the funds of the LLC as required in the ordinary course of business, and shall perform such other duties as may be incident to his or her office or as prescribed by the Board.

**9.9.    Limitation on Liability.** An Officer shall not be liable for any action taken as an Officer, or any failure to take action as an Officer, except to the extent that such Officer's conduct failed to comply with the standards set forth in Section 48-249-115 of the Act.

**9.10.    Resignation.** Any Officer of the LLC may resign at any time by giving written notice to the Members. The resignation of any Officer shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

**9.11.    Compensation and Reimbursement.** No Officer shall have any right to compensation for services performed on behalf of the LLC except as determined from time to time by the Board. Notwithstanding the foregoing, an Officer shall have the right to be reimbursed by the LLC for any reasonable and documented out-of-pocket expenses incurred by such Officer in connection with any services performed by such Officer on behalf of the LLC.

**9.12.    No Exclusive Duty.** Each Officer may have other business interests and may engage in other activities in addition to those relating to the LLC. Neither the LLC nor any Member shall have the right to share or participate in such other investments or activities of such Officer based on such Officer's status as an Officer of the LLC. No Officer shall incur any liability to any Member or the LLC as a result of engaging in any other business or venture.

**10.    INDEMNIFICATION**

**10.1.    Authority to Indemnify.** The LLC shall indemnify, and upon request shall advance expenses to, an individual made a party to a proceeding because such individual is or was a Responsible Person, to the full extent permitted by law, against liability incurred in the proceeding if the Responsible Person satisfies the following standard of conduct:

**10.1.1.** The Responsible Person's conduct was in good faith and the Responsible Person reasonably believed (a) in the case of conduct in the Responsible Person's official capacity with the LLC, that his or her conduct was in the best interest of the LLC and (b) in all other cases, that his or her conduct was at least not opposed to the LLC's best interest; and

**10.1.2.** In the case of any criminal proceeding, the Responsible Person had no reasonable cause to believe his or her conduct was unlawful.

**10.2.    Limitations on Authority to Indemnify.** Except as required by applicable law, the LLC may not indemnify a Responsible Person (a) in connection with a proceeding by or in the right of the LLC in which the Responsible Person was adjudged liable to the LLC, and (b) in connection with any other proceeding charging improper personal benefit to such Responsible Person, whether or not involving action in the Responsible Person's official capacity, in which the Responsible Person was adjudged liable on the basis that personal benefit was improperly received by such Responsible Person.

The indemnification and advancement of expenses granted pursuant to this Article 10 shall not be deemed exclusive of any other rights to which a Responsible Person seeking indemnification or advancement of expenses may be entitled, whether contained in this Article 10, the Articles of Organization, the Act, a resolution of the Board, or an agreement providing for such indemnification; provided, however, that no indemnification may be made to or on behalf of any Responsible Person if a judgment or other final adjudication adverse to the Responsible Person establishes his or her liability:

**10.2.1.** For any breach of duty of loyalty to the LLC or its Members;

**10.2.2.** For acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; or

**10.2.3.** For any liability for unlawful distributions incurred under Section 48-249-307 of the Act.

**10.3.    Advances for Expenses.** To the full extent permitted by law, the indemnification and advances

provided for herein shall include expenses (including attorneys' fees), judgments, fines and amounts paid in settlement. If the LLC advances expenses to a Responsible Person pursuant to this Article 10 and it is subsequently determined that the Responsible Person is not entitled to indemnification, the Responsible Person will repay such advances within fifteen (15) days of such determination.

10.4.    **Indemnification of Officers, Employees and Agents.** An Officer, employee, independent contractor or Agent of the LLC who is not a Responsible Person is entitled to indemnification and advancement of expenses to the same extent as a Responsible Person. The LLC shall also indemnify and advance expenses to an Officer, employee, independent contractor or Agent who is not a Responsible Person to the extent required, consistent with public policy, by specific action of the Board or by contract.

## 11.    FISCAL MATTERS

11.1.    **Books and Records.** The LLC's books and records (including a current list of the names and addresses of all Members) and an executed copy of this Agreement, as currently in effect, shall be maintained at the principal executive office of the LLC, and each Member shall have access thereto at all reasonable times.

11.2.    **Fiscal Year.** The fiscal year of the LLC shall be the calendar year.

11.3.    **Tax Status; Elections.** Notwithstanding any provision hereof to the contrary, solely for purposes of the federal income tax laws, each of the Members hereby recognizes that the LLC will be subject to all provisions of Subchapter K of Chapter 1 of Subtitle A of the Code; provided, however, the filing of a U.S. Partnership Return of Income shall not be construed to extend the purposes of the LLC or expand the obligations or liabilities of the Members. Upon the transfer of an interest in the LLC or in the event of a distribution of the LLC's property, the Tax Matters Member may, but is not required to, elect pursuant to Section 754 of the Code to adjust the basis of the LLC's property as allowed by Sections 734(b) and 743(b) thereof.

11.4.    **Reports to Members.** As soon as reasonably practicable after the end of each fiscal year, but not later than ninety (90) days after the end of each fiscal year, the LLC shall make available to each Member an unaudited balance sheet of the LLC at the end of the previous fiscal year and unaudited statements of income or loss of the LLC for such year. In addition, the LLC will deliver to each Member unaudited monthly summaries of its operations.

All such financial statements shall be prepared on an accrual basis of accounting in accordance with

generally accepted accounting principles consistently applied. The LLC shall furnish to each Member not later than ninety (90) days after the end of each fiscal year whatever information may be necessary for Members to file their federal income tax returns. The LLC will also make available to each Member upon request a copy or summary of all state and/or local tax returns which are filed by the LLC.

11.5.    **Banking.** All funds of the LLC shall be initially deposited in a separate bank account or accounts or in an account or accounts of a savings and loan association as shall be determined by the Board, but such funds may be invested as provided in Section 9.3.2.10 hereof.

11.6.    **Tax Matters Member.** AmSurg shall be the Tax Matters Member within the meaning of the Code.

## 12.    ASSIGNMENT AND TERMINATION OF MEMBERSHIP INTERESTS AND ADMISSION OF NEW MEMBERS

12.1.    **Assignment of Membership Interests.** No Owner may assign or transfer all or any part of his, her or its Membership Interest in the LLC (including any Financial Rights, Governance Rights or other rights pertaining to a Membership Interest) except as follows:

12.1.1.    Subject to the provisions of Section 12.2 hereof, a Member may assign all or any part of such Member's Membership Interest to another Member, without the consent of any Member other than the assignee;

12.1.2.    Subject to the provisions of Section 12.3 hereof, a Member may assign such Member's Membership Interest to any person who is not a Member who meets, or upon admission as a Member would meet, the requirements to be a Qualified Owner;

12.1.3.    A Member may not assign all or any part of such Member's Financial Rights in the LLC except pursuant to a simultaneous assignment of the Governance Rights and other rights pertaining to the entire Membership Interest to which such Financial Rights relate pursuant to this Article 12;

12.1.4.    Governance Rights may not be assigned to another person except pursuant to a simultaneous assignment of the Financial Rights and other rights pertaining to the entire Membership Interest to which such Governance Rights relate pursuant to this Article 12;

12.1.5.    AmSurg may assign all or any part of its Membership Interest to a third party without the consent of any Member; provided,

Exhibit 1
Page 18 of 90

however, that AmSurg may not assign all or any part of its Membership Interest to a hospital located in the Market Area, including, without limitation, St. Charles Health System or any of its Affiliates, without obtaining the prior written consent of the Owners holding at least a majority of the Membership Interests held by the Owners; and

12.1.6.  The LLC need not recognize any assignment of all or any part of a Membership Interest other than an assignment described in Sections 12.1.1 through 12.1.5 hereof. Any other assignment or attempted assignment shall be void. No assignment shall be effective until written notice thereof has been provided to the LLC and any other applicable requirements set forth in this Agreement or the Articles of Organization have been satisfied.

12.2.    **Assignment of Membership Interest to Another Member.** A Member may assign all or any portion of such Member's Membership Interest to an existing Member if: (a) the assignee accepts such assignment, (b) the assignor and the assignee give prior written notice of such assignment to the LLC, and (c) the assignment is approved by the Board.  Upon satisfaction of the conditions specified in the foregoing sentence, the LLC will cause Exhibit A hereto to be amended to the extent required by Section 12.9 hereof and the assignee will become the holder of the Membership Interest so assigned.

12.3.    **Assignment of Membership Interest To A Non-Member.** If an Owner (the "Transferor") desires to transfer, assign or sell all or any portion of his, her or its Membership Interest (the "Offered Interests") to a third party that is not an existing Member and that meets, or upon admission as a Member would meet, the requirements to be a Qualified Owner (the "Transferee"), the Transferor shall obtain from the Transferee a bona fide written offer to purchase the Offered Interests, stating the terms and conditions upon which the purchase is to be made and the consideration offered therefor (the "Offer"). The Transferor shall give notice to the LLC and the remaining Member(s) of his, her or its intention to sell, furnishing a copy of the entire Offer (the "Notice").

    12.3.1.    Right of First Refusal.

        12.3.1.1  Within thirty (30) days of the receipt of Notice (the "LLC Option Period"), the LLC may exercise an option to purchase all but not less than all of the Offered Interests proposed to be sold by the Transferor, upon the terms and conditions and for the same

consideration stated in the Offer.  The LLC, at the direction of the Board, shall exercise such option by giving written notice both to the Transferor and each other Member within the LLC Option Period. Should the LLC fail to give written notice within such LLC Option Period, the LLC shall be deemed to have waived such option.

12.3.1.2  If the LLC does not exercise its option to purchase all (but not less than all) of the Offered Interests, each Member other than the Transferor, within thirty (30) days beginning on the earlier of the expiration of the LLC Option Period or the date of the written notice from the LLC waiving such option (the "Member Option Period"), may exercise an option to purchase the Offered Interests upon the same terms and conditions and for the same consideration stated in the Offer, on a basis pro rata to their Membership Percentage (or on a basis pro rata to the interest of those remaining Member(s) exercising this second option to purchase), or such other allocation as all of the purchasing Members may agree to among themselves. The other Members shall exercise such options by giving written notice both to the Transferor and each other Member within the Member Option Period. Should a Member fail to give written notice within the Member Option Period, the Member shall be deemed to have waived such option.

12.3.1.3  In the event any Member shall not have exercised his or her option to purchase

Exhibit 1
Page 19 of 90

the Offered Interests, each other Member who exercises in full its option pursuant to Section 12.3.1.2 may, within ten (10) days after the expiration of the Member Option Period (the "Over-Allotment Period"), exercise an option to purchase the remaining Offered Interests upon the terms and conditions and for the same consideration stated in the Offer. In the case of a single Member, his or her option shall be to purchase all of the remaining Offered Interests. In the case of two or more other Members, each such other Member's option shall be to purchase the amount all such other Members may determine by agreement among themselves, or if they cannot agree, by one or more successive allocations in the proportion that the Membership Interest owned by each of the eligible other Members bears to the total Membership Interests owned by all such eligible other Members. Such other Members shall exercise such options by giving written notice both to the Transferor and each other Member within the Over-Allotment Period. Should a Member fail to give written notice within the Over-Allotment Period, the Member shall be deemed to have waived such option.

12.3.1.4 The LLC and the other Members must, in the aggregate, exercise their options to purchase all of the Offered Interests; otherwise, their options shall be forfeited.

12.3.1.5 Notwithstanding anything contained herein to the contrary, the rights under this Section 12.3.1 may be

waived with respect to any proposed transfer or assignment by an Owner provided that such transfer or assignment is approved by the Board and the Members elect to waive their rights under this Section 12.3.1.

12.3.2.  If the right of first refusal options set forth above are forfeited or waived, then within ten (10) days after the expiration of the last option period granted above, the Transferor may transfer the Offered Interests to the Transferee named in the Notice upon the terms specified therein, provided (i) such Transferor has provided the Notice, (ii) such transfer, sale or assignment is in compliance with the Securities Act of 1933, as amended (the "Securities Act"), and all applicable state securities laws, and, if requested by the Board, such Transferor has delivered an opinion of such Transferor's counsel to the LLC, in form and substance reasonably satisfactory to the LLC, to the effect that such transfer is either exempt from the requirements of the Securities Act and the applicable securities laws of any state or that such registration requirements have been complied with, (iii) the Board approves such transfer, sale or assignment (iv) the proposed transfer, assignment or sale is made in compliance with this Section 12.3.2, and (v) the Transferee executes a joinder to this Operating Agreement and agrees in writing to be bound by the terms hereof. Upon the satisfaction of the conditions set forth in the preceding sentence and the making of the assignment, the LLC will cause Exhibit A hereto to be amended in accordance with Section 12.9 hereof and the assignee will become a Member holding the Membership Interest so assigned.

12.4.    **Termination of a Membership Interest.** Notwithstanding any provisions to the contrary contained in the Act, a Member's Membership Interest shall be terminated only on the application of the LLC or another Member as described in Section 48-249-503(a)(6) of the Act.  In the event a Member's Membership interest is terminated:

12.4.1.  If the business and existence of the LLC are not continued, the Member whose Membership Interest is terminated is entitled to receive the Member's distribution pursuant to Article 13; and

12.4.2.  If the business and existence of the LLC are continued, the Member whose

Exhibit 1
Page 20 of 90

Membership Interest is terminated is entitled to receive the lesser of:

12.4.2.1 The value of the Member's Membership Interest on a going concern basis as determined by the LLC within 90 days of the termination date, or

12.4.2.2 The value of the Member's Membership Interest on a liquidation basis as determined by the LLC within 90 days of the termination date.

If a Member's Membership Interest is terminated in contravention of this Agreement or the Articles of Organization, the Member forfeits its Governance Rights and shall be liable to the other Members for damages incurred by the other Members and the LLC as a result of the wrongful termination. Such damages may be offset against any amount to be paid to the terminating Member. Any payment to a terminating Member shall be paid to the terminating Member within six months of the determination of the amount of the payment.

12.5. **Restrictions on Assignment.** No Member shall be permitted to assign such Member's Membership Interest, Financial Rights or Governance Rights if such assignment would result in the LLC being taxed for federal income tax purposes as an association taxable as a corporation or would constitute a violation of any applicable federal or state law. Each of the Members hereby agrees and acknowledges that the restrictions on assignment contained in this Article 12 are not unreasonable in view of the nature of the parties and their relationships to one another and the nature of the business of the LLC.

12.6. **Rights and Obligations of Former Members.** A Member who assigns all of the Governance Rights of such Member or whose Membership Interest is otherwise terminated shall cease to be a Member; provided, however, that such former Member or any Successor shall remain liable to the LLC for any obligations of such Member for unlawful distributions under Section 48-249-307 of the Act.

12.7. **Admission of New Members / Issuances of Equity.** The admission of a new Member pursuant to the issuance of a new Membership Interest which is not acquired pursuant to any assignment by or from any existing or former Member (a "New Member"), or the issuance of a new Membership Interest to an existing Member must be approved by the Board. In the case of a New Member, the New Member shall receive the total amount of the Membership Interest to be received by the New Member, as determined by the Board (the "New Member Interest"), as follows:

12.7.1. If AmSurg's Membership Percentage at the time any New Member is to be admitted is greater than 51%, then AmSurg and each Owner shall transfer to such New Member its or his pro rata share, on the basis of its or his then-current Membership Percentage, of the New Member Interest; provided, however, that in no event will AmSurg be required to transfer any portion of its Membership Interest to the New Member that would result in AmSurg's Membership Percentage following any such transfer falling below 51.0%; and provided, further, that the Owners may elect to transfer their Membership Interests in such other proportions as they may mutually agree. In the event that the Membership Interest to be transferred by AmSurg is so limited to prevent AmSurg's Membership Percentage from falling below 51.0%, each Owner shall transfer to the New Member his pro rata share, on the basis of such Owner's then-current Membership Interest as a percentage of the Membership Interests held by all Owners, of the Membership Interest that would have otherwise been transferred to the New Member by AmSurg; provided, that the Owners may elect to transfer their Membership Interests in such other proportions as they may mutually agree.

12.7.2. If AmSurg's Membership Percentage at the time any New Member is to be admitted is equal to or less than 51%, then each Owner shall transfer to the New Member his or her pro rata share, on the basis of such Owner's then-current Membership Interest as a percentage of the Membership Interests held by all Owners, of the New Member Interest; provided, that the Owners may elect to transfer their Membership Interests in such other proportions as they may mutually agree.

12.7.3. All proceeds corresponding to the transfer of any Membership Interest to a New Member pursuant to this Section 12.7 shall belong exclusively to the party transferring such Membership Interest, and, for the avoidance of doubt, neither the LLC nor any other Member shall have any right to such proceeds.

Notwithstanding anything contained herein to the contrary, the Members acknowledge and agree that it is the Members' intention that AmSurg will always own a 51% or greater Membership Interest in the LLC.

12.8. **Government Regulation.** If a Fundamental Regulatory Change should occur, AmSurg or its Affiliates or assigns may, at their option, purchase some or all of the Membership Interests of Owners for a

Exhibit 1
Page 21 of 90

purchase price equal to (a) three (3) times the LLC Profit plus the LLC's interest expense for the preceding twelve (12) calendar months (if the Center has not been in operation for a full twelve (12) months, the last six (6) months of LLC Profit will be annualized for this calculation), minus (b) the LLC's outstanding Principal Indebtedness, with this amount multiplied by the Membership Interest of Owners being purchased hereunder.

The determination that a Fundamental Regulatory Change has occurred shall be made by (a) counsel to AmSurg, with the concurrence of counsel to Owners, (b) counsel to Owners, with the concurrence of counsel to AmSurg or (c) if counsel to AmSurg and Owners cannot concur, by a nationally recognized law firm with expertise in health care law jointly selected by AmSurg and Owners.

The Membership Interest that may be purchased by AmSurg pursuant to this Section will not exceed the minimum Membership Interest required to be purchased as a result of the Fundamental Regulatory Change.

In the event of a Fundamental Regulatory Change and the exercise by AmSurg of its option as described above, the purchase price of the Membership Interest purchased shall be determined and payable in the manner hereinafter set forth:

12.8.1.   Owners shall be paid 20% of the purchase price (net after reduction for any obligations owed by any Owner to the LLC), in cash and 80% by AmSurg Corp.'s non-negotiable promissory note payable in four (4) approximately equal annual installments of principal, commencing twelve (12) months after the closing, together with interest at a rate equal to one-half percentage point over the Prime Rate.

The note shall contain provisions for (a) the acceleration of the entire unpaid balance of principal and accrued interest at the option of the holder in the event of default in payment of any principal or interest when due, (b) the payment of reasonable attorneys' fees in the event of default, and (c) prepayment, without penalty, of all or any part of the unpaid principal, any prepayment being first applied to then accrued interest.

12.8.2.   If in dispute, all determinations of LLC Profit required under this Section 12.8 shall be made by an independent certified public accountant acceptable to both Owners and AmSurg and any such determination so made shall be binding on all parties.

12.8.3.   If an Owner's Membership Interest is acquired pursuant to this Section 12.8, such

Owner will be distributed a pro rata share of the Available Cash Flow allocated to that Membership Interest for the month in which AmSurg purchases the Membership Interest based upon the number of days during such month prior to such purchase in relation to the total number of days in such month. Such distribution shall be made within ninety (90) days after the end of such month.

12.8.4.   No payment other than those specifically provided for herein shall be due or payable with respect to the Membership Interest of any Owner. Any debt due by the LLC to any Owner shall be payable according to its terms.

12.8.5.   Any closing of the purchase of an Owner's Membership Interest pursuant to this Section 12.8 shall be held at the principal office of the LLC within thirty (30) days following the exercise by AmSurg of its option to purchase such Membership Interest as described above.

At the closing, AmSurg shall pay, upon the terms specified hereinabove, the determined value of such Membership Interest to such Owner, after receiving appropriate releases and satisfactions.

12.8.6.   AmSurg may transfer or assign any of its rights to purchase the Membership Interest of an Owner to AmSurg's Affiliates or assigns.

12.8.7.   If AmSurg or its Affiliate purchases some or all of the Membership Interest of an Owner pursuant to this Section 12.8, AmSurg will use its best efforts to have such Owner released from the appropriate portion of Principal Indebtedness, if any, guaranteed by such Owner. In the event that an Owner is not so released, AmSurg and AmSurg Corp. will indemnify and hold harmless such Owner from liability resulting from that portion of such guaranty.

12.9.   **Amendment to Exhibit A.** An appropriate amendment to the amounts shown for capital account balances and Membership Percentages on Exhibit A hereto shall be made upon: (a) any assignment or termination of a Membership Interest described in Sections 12.1.1 through 12.1.5 hereof, (b) the admission of any New Member under Section 12.7 hereof, or (c) any purchase of a Membership Interest pursuant to Section 12.8 hereof.

12.10.   **Pledge of Membership Interest.** No pledge of an Owner's interest may be made without the approval of AmSurg. The pledge of or the granting of a security interest, lien or other encumbrance in or against

any or all of a Member's Membership Interest shall not constitute an assignment or transfer of such Membership Interest for purposes of this Article 12 or cause such Member to cease to be a Member or to cease to have the power to exercise any of its rights or powers as a Member. Any such pledgee shall not be a Member and shall not be entitled to any rights of a Member, other than the right to receive profit and loss allocations and distributions to the extent permitted by applicable law, unless such pledgee becomes a Member pursuant to Section 12.3 hereof. In any event, the foreclosure of or exercise of other secured party remedies with respect to such pledge, security interest, lien or other encumbrance resulting in an Assignment of any such Membership Interest shall nonetheless be an Assignment subject to the restrictions of Article 12. AmSurg shall have the right to pledge or grant a security interest, lien or other encumbrance in or against any or all of its Membership Interest.

### 13. DISSOLUTION, WINDING UP, AND TERMINATION OF THE LLC'S EXISTENCE

**13.1.    Term.** The term of the LLC shall continue until earlier terminated in accordance with the provisions of this Agreement. The Members intend for the term of the LLC, and their involvement in the operation thereof, to continue until the Members mutually agree otherwise. No Member shall take any action unilaterally to terminate the LLC or withdraw as a Member.

**13.2.    Events Causing Dissolution and Winding Up.** The LLC shall be dissolved and its affairs wound up only upon the occurrence of the following events (individually, a "Dissolution Event"):

13.2.1.    At any time with the prior approval of AmSurg and the Owners holding at least a majority of the Membership Interests then held by the Owners; or

13.2.2.    Termination of this Agreement pursuant to Section 14.13 hereof.

**13.3.    Winding Up Affairs on Dissolution.** Upon dissolution of the LLC, the Officers or other persons required or permitted by law to carry out the winding up of the affairs of the LLC shall promptly notify all Members of such dissolution; shall wind up the affairs of the LLC; shall prepare and file all instruments or documents required by law to be filed to reflect the dissolution of the LLC; and, after collecting the debts and obligations owed to the LLC and after paying or providing for the payment of all liabilities and obligations of the LLC, shall distribute the assets of the LLC in accordance with Section 6.5. In determining the final balance of the Book Capital Accounts, assets of the LLC which are distributed in kind to the Members, if

any, shall be treated as if sold for their fair market value and allocations shall be made pursuant to Sections 6.1 and 6.2 hereof.

**13.4.    Waiver of Right to Partition and Decree of Dissolution.** As a material inducement to each Member to execute this Agreement, each Member covenants and represents to each other Member that, during the period beginning on the date of this Agreement, no Member, nor such Member's heirs, representatives, successors, transferees or assigns, will attempt to make any partition whatever of the assets of the LLC or any interest therein whether now owned or hereafter acquired, and each Member waives all rights of partition provided by statute or principles of law or equity, including partition in kind or partition by sale. The Members agree that irreparable damage would be done to the goodwill and reputation of the LLC if any Member should bring an action in a court to dissolve the LLC. The Members agree that this Agreement provides fair and just provisions for payment and liquidation of the interest of any Member in the LLC, and fair and just provisions to prevent a Member from selling or otherwise alienating its interest in the LLC. Accordingly, each Member hereby waives and renounces its right to such a court decree of dissolution or to seek the appointment by court of a liquidator or receiver for the LLC.

### 14. GENERAL PROVISIONS

**14.1.    Notices.** Except as otherwise provided in this Agreement, any notice, payment, demand or communication required or permitted to be given by any provision of this Agreement shall be duly given

14.1.1.    if delivered in writing, personally to the person to whom it is authorized to be given; or

14.1.2.    if sent by certified or registered mail, overnight courier service or facsimile to the address of the Member or Director reflected in the records of the LLC.

Any such notice shall be deemed to be given as of the date so delivered, if delivered personally, as of the date on which the same was deposited in the United States mail, postage prepaid, addressed and sent as aforesaid, or on the date received if sent by overnight courier services or electronic facsimile.

**14.2.    Section Captions.** Section and other captions contained in this Agreement are for reference purposes only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

**14.3.    Applicable Law.** This Agreement and the rights of the Members shall be governed by and construed and enforced in accordance with the laws of the State of Tennessee.

14.4.    **Severability.** In case any one or more of the provisions contained in this Agreement or any application thereof shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and any other application thereof shall not in any way be affected or impaired thereby. Without limiting the foregoing, the Members agree that in the event a court or arbitrator with appropriate jurisdiction determine that the geographic area and/or the time restrictions set forth in Section 8.2 hereof are unenforceable as a matter of law, then the court or arbitrator may modify the unenforceable provision in order to make it enforceable and such modification will be deemed to be valid amendment to this Agreement to which each Owner and his or her Affiliates or AmSurg and its Affiliates will be bound.

14.5.    **Binding Effect.** Except as herein otherwise provided to the contrary, this Agreement shall be binding upon, and inure to the benefit of, the Members and their respective heirs, executors, administrators, successors, transferees and assigns.

14.6.    **Terminology.** All personal pronouns used in this Agreement, whether used in the masculine, feminine, or neuter gender, shall include all other genders; and the singular shall include the plural, and vice versa.

14.7.    **Amendment.** This Agreement and/or the Articles of Organization of the LLC may be amended in writing (a) only with the consent of AmSurg and the Owners holding at least a majority of the Membership Interests then held by the Owners and (b) with respect to Exhibit A hereto, under the circumstances set forth in Sections 4.8 and 12.9 hereof.

14.8.    **Parties in Interest.** Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the Members hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors and assigns.

14.9.    **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. Electronic copies of signatures will constitute enforceable original signatures.

14.10.    **Interpretation in Accordance with Requirements for Partnership Tax Treatment.** The LLC is intended to be treated as a partnership for federal income tax purposes, and this Agreement shall be interpreted in a manner consistent with such intended tax treatment.

14.11.    **Arbitration.** All disputes arising under this Agreement shall be resolved by binding arbitration pursuant to the rules of the American Health Lawyers Association Dispute Resolution Service ("AHLA") then

pertaining. The arbitration proceedings shall be held in Denver, Colorado. The procedures for conducting discovery in connection with any such arbitration proceeding shall be determined by the mutual agreement of the Members party to the arbitration proceeding or, if such Members cannot agree, by the arbitrators. The arbitrators shall apply the substantive laws of the State of Tennessee and the United States.

The parties to the arbitration may, if they are able to do so, agree upon one arbitrator; otherwise, there shall be three arbitrators selected to resolve disputes pursuant to this Section 14.11, one named in writing by each party that is party to the arbitration proceeding (one arbitrator selected by the plaintiff and one arbitrator selected by the defendant) within thirty (30) days after notice of arbitration is served upon any Member by another Member, and a third arbitrator selected by the two arbitrators selected by the parties within fifteen (15) days thereafter.

If the two arbitrators cannot select a third arbitrator within such fifteen (15) days, either party may request that the AHLA select such third arbitrator. If one party does not choose an arbitrator within thirty (30) days, the other party shall request that the AHLA name such other arbitrator. No one shall serve as arbitrator who is in any way financially interested in this Agreement or in the affairs of any Member.

Each of the parties to the arbitration shall pay its own expenses of arbitration and one-half of the expenses of the arbitrator(s). If any position by any party to the arbitration, or any defense or objection thereto, is deemed by the arbitrator(s) to have been unreasonable, the arbitrator(s) shall assess, as part of their award against the unreasonable party or reduce the award to the unreasonable party, all or part of the arbitration expenses (including reasonable attorneys' fees) of the other party and of the arbitrator(s).

14.12.    **Access to Books and Records by Governmental Officials.** Upon written request of the Secretary of Health and Human Services or the Comptroller General or any other duly authorized representatives thereof, each Member shall make available to the Secretary those contracts, books, documents and records necessary to verify the nature and extent of the cost of providing its services to the Center. Such inspection shall be available up to four (4) years after such services are rendered. If any Member carries out any of the duties of this Agreement through subcontract with a value of Ten Thousand Dollars ($10,000) or more over a twelve (12) month period with a related individual or organization, such Member agrees to include this requirement in such subcontract. If a request from the Secretary or his representative is served on a Member, that Member will notify the LLC in writing prior to responding to the request.



14.13.    **Limited Renegotiation.** This Agreement shall be construed to be in accordance with any and all federal and state laws, including laws relating to Medicare, Medicaid and other third party payors. In the event there is a change in such laws, whether by statute, regulation, agency or judicial decision, interpretation, pronouncement, guidance or otherwise that has any material effect on any term of this Agreement, then the applicable term(s) of the Agreement shall be subject to renegotiation and any Member may request renegotiation of the affected term or terms of this Agreement, upon written notice to the other Members, to remedy such condition.

The Members expressly recognize that upon request for renegotiation, each Member has a duty and obligation to the others only to renegotiate the affected term(s) in good faith and, further, each Member expressly agrees that its consent to proposals submitted by the other Members during renegotiation efforts shall not be unreasonably withheld.

Should the Members be unable to renegotiate the term or terms so affected so as to bring it/them into compliance with the statute, regulation, agency or judicial decision, interpretation, pronouncement, guidance or other reason that rendered it/them unlawful or unenforceable within sixty (60) days of the date on which notice of a desired renegotiation is given, then AmSurg or the Owners, upon approval of the Owners holding at least a majority of the Membership Interests then held by the Owners, shall be entitled, after the expiration of said sixty (60) day period, to terminate this Agreement upon thirty (30) additional days written notice to the Members.

14.14.    **Integrated Agreement.** This Agreement constitutes the entire understanding and agreement between the Members with respect to the subject matter hereof, and there are no agreements, understandings, restrictions, representations or warranties among the Members other than those set forth herein or herein provided for.

The Members acknowledge that they have independently negotiated the provisions of this Agreement, that they have relied upon their own counsel as to matters of law and application and that no Member has relied on any other Member with regard to such matters. The Members expressly agree that there shall be no presumption created as a result of any Member having prepared in whole or in part any provision of this Agreement.

14.15.    **Spousal Consents.** The undersigned spouses, if any, of the Owners and any Affiliated Physicians join in the execution of this Agreement to evidence that their community property interest, if any, in the LLC shall be bound by the terms of this Agreement, including without limitation, restrictions on transfer of Membership Interests in Article 12 and the repurchase provisions set forth in Section 8.11 above.    The termination of the marital relationship of any Owner or the Affiliated Physician of any Owner for any reason shall not have the effect of removing any Membership Interests otherwise subject to this Agreement from the coverage hereof.    In the event any Owner should hereafter become married to any person other than such person's existing spouse, such person shall cause such new spouse promptly to execute an instrument acceptable to the Board pursuant to which said new spouse shall agree to be bound by the terms of this Agreement, including the terms of this Section 14.15. Furthermore, each of the undersigned spouses, if any, of the Owners or the Affiliated Physician of such Owner, hereby appoints the Owner or the Affiliated Physician to whom he or she is married as his or her attorney in fact to represent him or her in all matters with regard to the LLC and to bind his or her interest, jointly with such Owner's, including by execution of any document relating to the LLC.

**[Remainder of page intentionally left blank]**



Exhibit 1
Page 25 of 90

**CERTIFICATE**

IN WITNESS WHEREOF, the undersigned hereby agree, acknowledge and certify that the foregoing Agreement constitutes the Operating Agreement of Bend Surgery Center, LLC adopted by the Members.

The undersigned spouse of the Owner or Affiliated Physician, if any, named below hereby certifies that he/she has read this agreement, understands each provision, and agrees to be bound by the terms set forth in this agreement, including without limitation, Section 14.15 above.

**AMSURG HOLDINGS, INC.**

By: _____

Name: _____

Title: _____

**OWNERS:**

_____

**Robert Andrews, M.D.**

Spouse:

By: _____

Name: _____

_____

**Aaron Askew, M.D.**

Spouse:

By: _____

Name: _____

_____

**Timothy Beard, M.D.**

Spouse:

By: _____

Name: _____

_____

**Richard Bochner, M.D.**

Spouse:

By: _____

Name: _____

_____

**Stephen Boe, M.D.**

Spouse:

By: _____

Name: _____

_____

**Patricia Buehler, M.D.**

Spouse:

By: _____

Name: _____

_____

**Rodney Buzzas, M.D.**

Spouse:

By: _____

Name: _____

_____

**Arte Cantor, M.D.**

Spouse:

By: _____

Name: _____

_____

**Brian Desmond, M.D.**

Spouse:

By: _____

Name: _____

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 26 of 90

**CERTIFICATE**

IN WITNESS WHEREOF, the undersigned hereby agree, acknowledge and certify that the foregoing Agreement constitutes the Operating Agreement of Bend Surgery Center, LLC adopted by the Members.

The undersigned spouse of the Owner or Affiliated Physician, if any, named below hereby certifies that he/she has read this agreement, understands each provision, and agrees to be bound by the terms set forth in this agreement, including without limitation, Section 14.15 above.

**AMSURG HOLDINGS, INC.**

By: _____
Name: _____
Title: _____

**OWNERS:**

_____
Robert Andrews, M.D.

Spouse:

By: _Kate C. A_____
Name: _Kate C. Andrews_

_____
Aaron Askew, M.D.

Spouse:

By: _____

Name: _____

_____
Timothy Beard, M.D.

Spouse:

By: _____

Name: _____

_____
Richard Bochner, M.D.

Spouse:

By: _____
Name: _____

_____
Stephen Boe, M.D.

Spouse:

By: _____

Name: _____

_____
Patricia Buehler, M.D.

Spouse:

By: _____

Name: _____

_____
Rodney Buzzas, M.D.

Spouse:

By: _____

Name: _____

_____
Arte Cantor, M.D.

Spouse:

By: _____

Name: _____

_____
Brian Desmond, M.D.

Spouse:

By: _____

Name: _____

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 27 of 90

**CERTIFICATE**

IN WITNESS WHEREOF, the undersigned hereby agree, acknowledge and certify that the foregoing Agreement constitutes the Operating Agreement of Bend Surgery Center, LLC adopted by the Members.

The undersigned spouse of the Owner or Affiliated Physician, if any, named below hereby certifies that he/she has read this agreement, understands each provision, and agrees to be bound by the terms set forth in this agreement, including without limitation, Section 14.15 above.

**AMSURG HOLDINGS, INC.**

By: _____
Name: _____
Title: _____

**OWNERS:**

_____
Robert Andrews, M.D.

Spouse:

By: _____

Name: _____

_____
Aaron Askew, M.D.

Spouse:

By: _Pam J. Asa_

Name: _Pamela J. Askew_

_____
Timothy Beard, M.D.

Spouse:

By: _____

Name: _____

_____
Richard Bochner, M.D.

Spouse:

By: _____
Name: _____

_____
Stephen Boe, M.D.

Spouse:

By: _____

Name: _____

_____
Patricia Buehler, M.D.

Spouse:

By: _____

Name: _____

_____
Rodney Buzzas, M.D.

Spouse:

By: _____

Name: _____

_____
Arte Cantor, M.D.

Spouse:

By: _____

Name: _____

_____
Brian Desmond, M.D.

Spouse:

By: _____

Name: _____

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 28 of 90

**CERTIFICATE**

IN WITNESS WHEREOF, the undersigned hereby agree, acknowledge and certify that the foregoing Agreement constitutes the Operating Agreement of Bend Surgery Center, LLC adopted by the Members.

The undersigned spouse of the Owner or Affiliated Physician, if any, named below hereby certifies that he/she has read this agreement, understands each provision, and agrees to be bound by the terms set forth in this agreement, including without limitation, Section 14.15 above.

**AMSURG HOLDINGS, INC.**

By: _____
Name: _____
Title: _____

**OWNERS:**

_____
Robert Andrews, M.D.

Spouse:

By: _____

Name: _____

_____
Aaron Askew, M.D.

Spouse:

By: _____

Name: _____

_____
Timothy Beard, M.D.

Spouse:

By: _Cynthia Beard_

Name: _Cynthia Beard_

_____
Richard Bochner, M.D.

Spouse:

By: _____

Name: _____

_____
Stephen Boe, M.D.

Spouse:

By: _____

Name: _____

_____
Patricia Buehler, M.D.

Spouse:

By: _____

Name: _____

_____
Rodney Buzzas, M.D.

Spouse:

By: _____

Name: _____

_____
Arte Cantor, M.D.

Spouse:

By: _____

Name: _____

_____
Brian Desmond, M.D.

Spouse:

By: _____

Name: _____

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 29 of 90

MAR/05/2014/WED 12:56 PM    Bmc GI Dept          FAX No. 541 318 3247          P. 003

## CERTIFICATE

IN WITNESS WHEREOF, the undersigned hereby agree, acknowledge and certify that the foregoing Agreement constitutes the Operating Agreement of Bend Surgery Center, LLC adopted by the Members.

The undersigned spouse of the Owner or Affiliated Physician, if any, named below hereby certifies that he/she has read this agreement, understands each provision, and agrees to be bound by the terms set forth in this agreement, including without limitation, Section 14.15 above.

**AMSURG HOLDINGS, INC.**

By: _____
Name: _____
Title: _____

**OWNERS:**

_____
Robert Andrews, M.D.

Spouse: _____

By: _____

Name: _____

_____
Aaron Askew, M.D.

Spouse: _____

By: _____

Name: _____

_____
Timothy Beard, M.D.

Spouse: _____

By: _____

Name: _____

_____
Richard Bochner, M.D.

By: *Bridgitte Bochner*
Name: *Bridgette Bochner*

_____
Stephen Roe, M.D.

Spouse: _____

By: _____

Name: _____

_____
Patricia Buehler, M.D.

Spouse: _____

By: _____

Name: _____

_____
Rodney Buzzas, M.D.

Spouse: _____

By: _____

Name: _____

_____
Arte Cantor, M.D.

Spouse: _____

By: _____

Name: _____

_____
Brian Desmond, M.D.

Spouse: _____

By: _____

Name: _____

2

Exhibit 1
Page 30 of 90

**CERTIFICATE**

IN WITNESS WHEREOF, the undersigned hereby agree, acknowledge and certify that the foregoing Agreement constitutes the Operating Agreement of Bend Surgery Center, LLC adopted by the Members.

The undersigned spouse of the Owner or Affiliated Physician, if any, named below hereby certifies that he/she has read this agreement, understands each provision, and agrees to be bound by the terms set forth in this agreement, including without limitation, Section 14.15 above.

**AMSURG HOLDINGS, INC.**

By: _____
Name: _____
Title: _____

**OWNERS:**

_____
Robert Andrews, M.D.

Spouse: _____

By: _____

Name: _____

_____
Aaron Askew, M.D.

Spouse: _____

By: _____

Name: _____

_____
Timothy Beard, M.D.

Spouse: _____

By: _____

Name: _____

_____
Richard Bochner, M.D.

Spouse: _____

By: _____

Name: _____

*Stephen Boe* M.D.
Stephen Boe, M.D.

Spouse: *Jeri J. Boe*

By: _____

Name: *Jeri J Boe.*

_____
Patricia Buehler, M.D.

Spouse: _____

By: _____

Name: _____

_____
Rodney Buzzas, M.D.

Spouse: _____

By: _____

Name: _____

_____
Arte Cantor, M.D.

Spouse: _____

By: _____

Name: _____

_____
Brian Desmond, M.D.

Spouse: _____

By: _____

Name: _____

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 31 of 90

## CERTIFICATE

IN WITNESS WHEREOF, the undersigned hereby agree, acknowledge and certify that the foregoing Agreement constitutes the Operating Agreement of Bend Surgery Center, LLC adopted by the Members.

The undersigned spouse of the Owner or Affiliated Physician, if any, named below hereby certifies that he/she has read this agreement, understands each provision, and agrees to be bound by the terms set forth in this agreement, including without limitation, Section 14.15 above.

**AMSURG HOLDINGS, INC.**

By: _____
Name: _____
Title: _____

**OWNERS:**

_____
Robert Andrews, M.D.

Spouse:

By: _____

Name: _____

_____
Aaron Askew, M.D.

Spouse:

By: _____

Name: _____

_____
Timothy Beard, M.D.

Spouse:

By: _____

Name: _____

_____
Richard Boehner, M.D.

Spouse:

By: _____

Name: _____

_____
Stephen Boe, M.D.

Spouse:

By: _____

Name: _____

_____
Patricia Buehler, M.D.

Spouse: Knute C. Buehler

By: _____

Name: _____

_____
Rodney Buzzas, M.D.

Spouse:

By: _____

Name: _____

_____
Arte Cantor, M.D.

Spouse:

By: _____

Name: _____

_____
Brian Desmond, M.D.

Spouse:

By: _____

Name: _____

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 32 of 90

**CERTIFICATE**

IN WITNESS WHEREOF, the undersigned hereby agree, acknowledge and certify that the foregoing Agreement constitutes the Operating Agreement of Bend Surgery Center, LLC adopted by the Members.

The undersigned spouse of the Owner or Affiliated Physician, if any, named below hereby certifies that he/she has read this agreement, understands each provision, and agrees to be bound by the terms set forth in this agreement, including without limitation, Section 14.15 above.

**AMSURG HOLDINGS, INC.**

By: _____
Name: _____
Title: _____

**OWNERS:**

_____
**Robert Andrews, M.D.**

Spouse:

By: _____

Name: _____

_____
**Aaron Askew, M.D.**

Spouse:

By: _____

Name: _____

_____
**Timothy Beard, M.D.**

Spouse:

By: _____

Name: _____

_____
**Richard Bochner, M.D.**

Spouse:

By: _____

Name: _____

_____
**Stephen Boe, M.D.**

Spouse:

By: _____

Name: _____

_____
**Patricia Buehler, M.D.**

Spouse:

By: _____

Name: _____

_____
**Rodney Buzzas, M.D.**

Spouse:

By: *Michelle L Buzzas*

Name: *MICHELLE L BUZZAS*

_____
**Arte Cantor, M.D.**

Spouse:

By: _____

Name: _____

_____
**Brian Desmond, M.D.**

Spouse:

By: _____

Name: _____

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 33 of 90

**CERTIFICATE**

     **IN WITNESS WHEREOF,** the undersigned hereby agree, acknowledge and certify that the foregoing Agreement constitutes the Operating Agreement of Bend Surgery Center, LLC adopted by the Members.

     The undersigned spouse of the Owner or Affiliated Physician, if any, named below hereby certifies that he/she has read this agreement, understands each provision, and agrees to be bound by the terms set forth in this agreement, including without limitation, Section 14.15 above.

**AMSURG HOLDINGS, INC.**

By: _____
Name: _____
Title: _____

**OWNERS:**

_____
**Robert Andrews, M.D.**

Spouse:

By: _____

Name: _____

_____
**Aaron Askew, M.D.**

Spouse:

By: _____

Name: _____

_____
**Timothy Beard, M.D.**

Spouse:

By: _____

Name: _____

_____
**Richard Bochner, M.D.**

Spouse:

By: _____
Name: _____

_____
**Stephen Boe, M.D.**

Spouse:

By: _____
Name: _____

_____
**Patricia Buehler, M.D.**

Spouse:

By: _____

Name: _____

_____
**Rodney Buzzas, M.D.**

Spouse:

By: _____

Name: _____

_____
**Arie Cantor, M.D.**

Spouse: Jane Birschbach

By: _____

Name: _____

_____
**Brian Desmond, M.D.**

Spouse:

By: _____

Name: _____

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 34 of 90

02/14/2014  07:48    2083368294                    BBK R BRENNEMAN                    PAGE  03

02/06/2014  10:18    2083368294        BBK R BRENNEMAN              PAGE  05

**CERTIFICATE**

IN WITNESS WHEREOF, the undersigned hereby agree, acknowledge and certify that the foregoing Agreement constitutes the Operating Agreement of Bend Surgery Center, LLC adopted by the Members.

The undersigned spouse of the Owner or Affiliated Physician, if any, named below hereby certifies that he/she has read this agreement, understands each provision, and agrees to be bound by the terms set forth in this agreement, including without limitation, Section 14.15 above.

**AMSURG HOLDINGS, INC.**

By: _____
Name: _____
Title: _____

**OWNERS:**

Robert Andrews, M.D.

Spouse:

By: _____

Name: _____

Aaron Askew, M.D.

Spouse:

By: _____

Name: _____

Timothy Beard, M.D.

Spouse:

By: _____

Name: _____

Richard Boehner, M.D.

Spouse:

By: _____
Name: _____

Stephen Boe, M.D.

Spouse:

By: _____

Name: _____

Patricia Buehler, M.D.

Spouse:

By: _____

Name: _____

Rodney Buzzas, M.D.

Spouse:

By: _____

Name: _____

Arte Cantor, M.D.

Spouse:

By: _____

Name: _____

Brian Desmond, M.D.

Spouse: Reagan Desmond

By: _____

Name: _____

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 35 of 90

Jason Dimmig, M.D.

Spouse:

By: _____

Name: Christy Picaud Dimmig

_____

Thomas Fitsimmons, M.D.

Spouse:

By: _____

Name: _____

_____

Gary Frei, M.D.

Spouse:

By: _____

Name: _____

_____

Gary Gallagher, M.D.

Spouse:

By: _____

Name: _____

_____

Ryan Gallivan, M.D.

Spouse:

By: _____

Name: _____

_____

Greg Ha, M.D.

Spouse:

By: _____

Name: _____

_____

By: _____

Name: _____

_____

Anthony Hadden, M.D.

Spouse:

By: _____

Name: _____

_____

Kenneth Hanington, M.D.

Spouse:

By: _____

Name: _____

_____

Sidney Henderson III, M.D.

Spouse:

By: _____

Name: _____

_____

Andrew Higgins, M.D.

Spouse:

By: _____

Name: _____

_____

Sandra Holloway, M.D.

Spouse:

By: _____

Name: _____

_____

Glenn Koteen, M.D.

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 36 of 90

Jason Dimmig, M.D.

Spouse:

By: _____

Name: _____

_TD Fy_

Thomas Fitzsimmons, M.D.

Spouse: _N/A_

By: _____

Name: _____

Gary Frei, M.D.

Spouse:

By: _____

Name: _____

Gary Gallagher, M.D.

Spouse:

By: _____

Name: _____

Ryan Gallivan, M.D.

Spouse:

By: _____

Name: _____

Greg Ha, M.D.

Spouse:

By: _____

Name: _____

Anthony Hadden, M.D.

Spouse:

By: _____

Name: _____

Kenneth Hanington, M.D.

Spouse:

By: _____

Name: _____

Sidney Henderson III, M.D.

Spouse:

By: _____

Name: _____

Andrew Higgins, M.D.

Spouse:

By: _____

Name: _____

Sandra Holloway, M.D.

Spouse:

By: _____

Name: _____

Glenn Koteen, M.D.

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 37 of 90

Jason Dimmig, M.D.

Spouse:

By: _____

Name: _____

Thomas Fitzsimmons, M.D.

Spouse:

By: _____

Name: _____

*Gary J Frei MD*
Gary Frei, M.D.

Spouse:

By: *Victoria T. Fre*

Name: *VICTORIA T. Frei*

Gary Gallagher, M.D.

Spouse:

By: _____

Name: _____

Ryan Gallivan, M.D.

Spouse:

By: _____

Name: _____

Greg Ha, M.D.

Spouse:

By: _____

Name: _____

Anthony Hadden, M.D.

Spouse:

By: _____

Name: _____

Kenneth Hanington, M.D.

Spouse:

By: _____

Name: _____

Sidney Henderson III, M.D.

Spouse:

By: _____

Name: _____

Andrew Higgins, M.D.

Spouse:

By: _____

Name: _____

Sandra Holloway, M.D.

Spouse:

By: _____

Name: _____

Glenn Koteen, M.D.

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 38 of 90

01/29/2014  10:21    5413227002                    NWCS                        PAGE  02/02

Jason Dimmig, M.D.

Spouse:

By: _____

Name: _____


Thomas Fitzsimmons, M.D.

Spouse:

By: _____

Name: _____


Gary Frei, M.D.

Spouse:

By: _____

Name: _____


Gary Gallagher, M.D.

Spouse: *Portia Gallagher*

By: *Portia G Gallagher*

Name: _____


Ryan Gallivan, M.D.

Spouse:

By: _____

Name: _____


Greg Ha, M.D.

Spouse:

By: _____

Name: _____


Anthony Hadden, M.D.

Spouse:

By: _____

Name: _____


Kenneth Hanington, M.D.

Spouse:

By: _____

Name: _____


Sidney Henderson III, M.D.

Spouse:

By: _____

Name: _____


Andrew Higgins, M.D.

Spouse:

By: _____

Name: _____


Sandra Holloway, M.D.

Spouse:

By: _____

Name: _____


Glenn Koteen, M.D.

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 39 of 90

_____

Jason Dimmig, M.D.

Spouse:

By: _____

Name: _____

_____

Thomas Fitzsimmons, M.D.

Spouse:

By: _____

Name: _____

_____

Gary Frei, M.D.

Spouse:

By: _____

Name: _____

_____

Gary Gallagher, M.D.

Spouse:

By: _____

Name: _____

_____

Ryan Gallivan, M.D.

Spouse: _____

By: _____

Name: _____

_____

Greg Ha, M.D.

Spouse:

By: _____

Name: _____

_____

Anthony Hadden, M.D.

Spouse:

By: _____

Name: _____

_____

Kenneth Hanington, M.D.

Spouse:

By: _____

Name: _____

_____

Sidney Henderson III, M.D.

Spouse:

By: _____

Name: _____

_____

Andrew Higgins, M.D.

Spouse:

By: _____

Name: _____

_____

Sandra Holloway, M.D.

Spouse:

By: _____

Name: _____

_____

Glenn Koteen, M.D.

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 40 of 90

_____

**Jason Dimmig, M.D.**

Spouse:

By: _____

Name: _____


_____

**Thomas Fitzsimmons, M.D.**

Spouse:

By: _____

Name: _____


_____

**Gary Frei, M.D.**

Spouse:

By: _____

Name: _____


_____

**Gary Gallagher, M.D.**

Spouse:

By: _____

Name: _____


_____

**Ryan Gallivan, M.D.**

Spouse:

By: _____

Name: _____

**Greg Ha, M.D.**

Spouse:


By: _____

Name: _Tarra Ha_


_____

**Anthony Hadden, M.D.**

Spouse:

By: _____

Name: _____


_____

**Kenneth Hanington, M.D.**

Spouse:

By: _____

Name: _____


_____

**Sidney Henderson III, M.D.**

Spouse:

By: _____

Name: _____


_____

**Andrew Higgins, M.D.**

Spouse:

By: _____

Name: _____


_____

**Sandra Holloway, M.D.**

Spouse:

By: _____

Name: _____


_____

**Glenn Koteen, M.D.**

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 41 of 90

_____
Jason Dimmig, M.D.

Spouse:

By: _____

Name: _____


_____
Thomas Fitzsimmons, M.D.

Spouse:

By: _____

Name: _____


_____
Gary Frei, M.D.

Spouse:

By: _____

Name: _____


_____
Gary Gallagher, M.D.

Spouse:

By: _____

Name: _____


_____
Ryan Gallivan, M.D.

Spouse:

By: _____

Name: _____


_____
Greg Ha, M.D.

Spouse:

By: _____
Name: _Tawnyee Hadden_

_____
Anthony Hadden, M.D.

Spouse:

By: _____
Name: _Tawnyee Hadden_


_____
Kenneth Hanington, M.D.

Spouse:

By: _____

Name: _____


_____
Sidney Henderson III, M.D.

Spouse:

By: _____

Name: _____


_____
Andrew Higgins, M.D.

Spouse:

By: _____

Name: _____


_____
Sandra Holloway, M.D.

Spouse:

By: _____

Name: _____


_____
Glenn Koteen, M.D.

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 42 of 90

Jason Dimmig, M.D.

Spouse:

By: _____

Name: _____

Thomas Fitzsimmons, M.D.

Spouse:

By: _____

Name: _____

Gary Frei, M.D.

Spouse:

By: _____

Name: _____

Gary Gallagher, M.D.

Spouse:

By: _____

Name: _____

Ryan Gallivan, M.D.

Spouse:

By: _____

Name: _____

Greg Ha, M.D.

Spouse:

By: _____

Name: _____

Anthony Hadden, M.D.

Spouse:

By: _____

Name: _____

Kenneth Hanington, M.D.

Spouse: Roxanne M. Hanington

By: _____

Name: _____

Sidney Henderson III, M.D.

Spouse:

By: _____

Name: _____

Andrew Higgins, M.D.

Spouse:

By: _____

Name: _____

Sandra Holloway, M.D.

Spouse:

By: _____

Name: _____

Glenn Koteen, M.D.

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 43 of 90

_____

Jason Dimmig, M.D.

Spouse:

By: _____

Name: _____

_____

Thomas Fitzsimmons, M.D.

Spouse:

By: _____

Name: _____

_____

Gary Frei, M.D.

Spouse:

By: _____

Name: _____

_____

Gary Gallagher, M.D.

Spouse:

By: _____

Name: _____

_____

Ryan Gallivan, M.D.

Spouse:

By: _____

Name: _____

_____

Greg Ha, M.D.

Spouse:

By: _____

Name: _____

_____

Anthony Hadden, M.D.

Spouse:

By: _____

Name: _____

_____

Kenneth Hanington, M.D.

Spouse:

By: _____

Name: _____

_____ _Sidney E. Hundercutt_ mm

Sidney Henderson III, M.D.

Spouse: _Louise Coerdes Henderson_

By: _Louise C Henderson_

Name: _____

_____

Andrew Higgins, M.D.

Spouse:

By: _____

Name: _____

_____

Sandra Holloway, M.D.

Spouse:

By: _____

Name: _____

_____

Glenn Koteen, M.D.

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 44 of 90

_____
Jason Dimmig, M.D.

Spouse:

By: _____

Name: _____


_____
Thomas Fitzsimmons, M.D.

Spouse:

By: _____

Name: _____


_____
Gary Frei, M.D.

Spouse:

By: _____

Name: _____


_____
Gary Gallagher, M.D.

Spouse:

By: _____

Name: _____


_____
Ryan Gallivan, M.D.

Spouse:

By: _____

Name: _____


_____
Greg Ha, M.D.

Spouse:

By: _____

Name: _____


_____
Anthony Hadden, M.D.

Spouse:

By: _____

Name: _____


_____
Kenneth Hanington, M.D.

Spouse:

By: _____

Name: _____


_____
Sidney Henderson III, M.D.

Spouse:

By: _____

Name: _____


_____
Andrew Higgins, M.D.

Spouse:

By: _____

Name: _Michele D. Higgins_


_____
Sandra Holloway, M.D.

Spouse:

By: _____

Name: _____


_____
Glenn Koteen, M.D.


(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 45 of 90

_____

Jason Dimmig, M.D.

Spouse:

By: _____

Name: _____


_____

Thomas Fitzsimmons, M.D.

Spouse:

By: _____

Name: _____


_____

Gary Frei, M.D.

Spouse:

By: _____

Name: _____


_____

Gary Gallagher, M.D.

Spouse:

By: _____

Name: _____


_____

Ryan Gallivan, M.D.

Spouse:

By: _____

Name: _____


_____

Greg Ha, M.D.

Spouse:

By: _____

Name: _____


_____

Anthony Hadden, M.D.

Spouse:

By: _____

Name: _____


_____

Kenneth Hanington, M.D.

Spouse:

By: _____

Name: _____


_____

Sidney Henderson III, M.D.

Spouse:

By: _____

Name: _____


_____

Andrew Higgins, M.D.

Spouse:  N/A

By:  N/A

Name: _____


_____Sandra Holloway, M.D._____

Sandra Holloway, M.D.

Spouse:

By: _____

Name: _____


_____

Glenn Koteen, M.D.

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 46 of 90

By: _____

Name: _____

_____
Jason Dimmig, M.D.

Spouse:

By: _____

Name: _____

_____
Anthony Hadden, M.D.

Spouse:

By: _____

Name: _____

_____
Thomas Fitzsimmons, M.D.

Spouse:

By: _____

Name: _____

_____
Kenneth Hanington, M.D.

Spouse:

By: _____

Name: _____

_____
Gary Frei, M.D.

Spouse:

By: _____

Name: _____

_____
Sidney Henderson III, M.D.

Spouse:

By: _____

Name: _____

_____
Gary Gallagher, M.D.

Spouse:

By: _____

Name: _____

_____
Andrew Higgins, M.D.

Spouse:

By: _____

Name: _____

_____
Ryan Gallivan, M.D.

Spouse:

By: _____

Name: _____

_____
Sandra Holloway, M.D.

Spouse:

By: _____

Name: _____

_____
Greg Ha, M.D.

Spouse:

*Glenn Koteen MD*
_____
Glenn Koteen, M.D.

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 47 of 90

Spouse:

By: _____

Name: _____

_____
Darren Kowalski, M.D.

Spouse:

By: _____

Name: Sara Kowalski

_____
Linda Leffel, M.D.

Spouse:

By: _____

Name: _____

_____
Scott Letourneau, M.D.

Spouse:

By: _____

Name: _____

_____
Michael Mastrangelo, M.D.

Spouse:

By: _____

Name: _____

_____
Robert Mathews, M.D.

Spouse:

By: _____

Name: _____

_____
Moore, M.D.

Spouse:

By: _____

Name: _____

_____
Art Neeb, M.D.

Spouse:

By: _____

Name: _____

_____
Ed Paon, M.D.

Spouse:

By: _____

Name: _____

_____
Robert Quinn, M.D.

Spouse:

By: _____

Name: _____

_____
John Renton, M.D.

Spouse:

By: _____

Name: _____

_____
Michael Ryan, M.D.

Spouse:

By: _____

Name: _____

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 48 of 90

Spouse:

By: _____

Name: _____

_____
**Darren Kowalski, M.D.**

Spouse:

By: _____

Name: _____

*Linda Leffel, M.D.*
**Linda Leffel, M.D.**

Spouse:

By: _____

Name: RICHARD LINDSAY

_____
**Scott Letourneau, M.D.**

Spouse:

By: _____

Name: _____

_____
**Michael Mastrangeio, M.D.**

Spouse:

By: _____

Name: _____

_____
**Robert Mathews, M.D.**

Spouse:

By: _____

Name: _____

_____

**Kathy Moore, M.D.**

Spouse:

By: _____

Name: _____

_____
**Andrew Neeb, M.D.**

Spouse:

By: _____

Name: _____

_____
**Ed Parton, M.D.**

Spouse:

By: _____

Name: _____

_____
**Robert Quinn, M.D.**

Spouse:

By: _____

Name: _____

_____
**John Renton, M.D.**

Spouse:

By: _____

Name: _____

_____
**Michael Ryan, M.D.**

Spouse:

By: _____

Name: _____

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 49 of 90

Spouse:

By: _____

Name: _____

_____
**Darren Kowalski, M.D.**

Spouse:

By: _____

Name: _____

_____
**Linda Leffel, M.D.**

Spouse:

By: _____

Name: _____

_Whoumein v_
**Scott Letourneau, M.D.**

Spouse:

By: _____

Name: _Karen Letourneau_

_____
**Michael Mastrangelo, M.D.**

Spouse:

By: _____

Name: _____

_____
**Robert Mathews, M.D.**

Spouse:

By: _____

Name: _____

_____

**Kathy Moore, M.D.**

Spouse:

By: _____

Name: _____

_____
**Andrew Neeb, M.D.**

Spouse:

By: _____

Name: _____

_____
**Ed Parton, M.D.**

Spouse:

By: _____

Name: _____

_____
**Robert Quinn, M.D.**

Spouse:

By: _____

Name: _____

_____
**John Renton, M.D.**

Spouse:

By: _____

Name: _____

_____
**Michael Ryan, M.D.**

Spouse:

By: _____

Name: _____

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 50 of 90

Spouse:

By: _____

Name: _____


_____

**Darren Kowalski, M.D.**

Spouse:

By: _____

Name: _____


_____

**Linda Leffel, M.D.**

Spouse:

By: _____

Name: _____


_____

**Scott Letourneau, M.D.**

Spouse:

By: _____

Name: _____


_____

**Michael Mastrangelo, M.D.**

Spouse: *[signature]*

By: *[signature]*

Name: *[signature]*


_____

**Robert Mathews, M.D.**

Spouse:

By: _____

Name: _____


_____

**Kathy Moore, M.D.**

Spouse:

By: _____

Name: _____


_____

**Andrew Neeb, M.D.**

Spouse:

By: _____

Name: _____


_____

**Ed Parton, M.D.**

Spouse:

By: _____

Name: _____


_____

**Robert Quinn, M.D.**

Spouse:

By: _____

Name: _____


_____

**John Renton, M.D.**

Spouse:

By: _____

Name: _____


_____

**Michael Ryan, M.D.**

Spouse:

By: _____

Name: _____


(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 51 of 90

Spouse:

By: _____

Name: _____

_____
**Darren Kowalski, M.D.**

Spouse:

By: _____

Name: _____

_____
**Linda Leffel, M.D.**

Spouse:

By: _____

Name: _____

_____
**Scott Letourneau, M.D.**

Spouse:

By: _____

Name: _____

_____
**Michael Mastrangelo, M.D.**

Spouse:

By: _____

Name: _____

_D. C. M[signature]_
**Robert Mathews, M.D.**

Spouse:

By: _Diane R Mathews_

Name: _DIANE R. MATHEWS_

_____

**Kathy Moore, M.D.**

Spouse:

By: _____

Name: _____

_____
**Andrew Neeb, M.D.**

Spouse:

By: _____

Name: _____

_____
**Ed Parton, M.D.**

Spouse:

By: _____

Name: _____

_____
**Robert Quinn, M.D.**

Spouse:

By: _____

Name: _____

_____
**John Renton, M.D.**

Spouse:

By: _____

Name: _____

_____
**Michael Ryan, M.D.**

Spouse:

By: _____

Name: _____

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 52 of 90

Spouse:

By: _____

Name: _____

_____
Darren Kowalski, M.D.

Spouse:

By: _____

Name: _____

_____
Linda Leffel, M.D.

Spouse:

By: _____

Name: _____

_____
Scott Letourneau, M.D.

Spouse:

By: _____

Name: _____

_____
Michael Mastrangelo, M.D.

Spouse:

By: _____

Name: _____

_____
Robert Mathews, M.D.

Spouse:

By: _____

Name: _____

_____

_____
Kathy Moore, M.D.

Spouse:

By: _____

Name: _____

_____
Andrew Neeb, M.D.

Spouse:

By: _____

Name: _____

_____
Ed Parton, M.D.

Spouse:

By: _____

Name: _____

_____
Robert Quinn, M.D.

Spouse:

By: _____

Name: _____

_____
John Renton, M.D.

Spouse:

By: _____

Name: _____

_____
Michael Ryan, M.D.

Spouse:

By: _____

Name: _____

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 53 of 90

Spouse:

By: _____

Name: _____

_____
Darren Kowalski, M.D.

Spouse:

By: _____

Name: _____

_____
Linda Leffel, M.D.

Spouse:

By: _____

Name: _____

_____
Scott Letourneau, M.D.

Spouse:

By: _____

Name: _____

_____
Michael Mastrangelo, M.D.

Spouse:

By: _____

Name: _____

_____
Robert Mathews, M.D.

Spouse:

By: _____

Name: _____

_____

Kathy Moore, M.D.

Spouse:

By: _____

Name: _____

_____
Andrew Neeb, M.D.

Spouse:

By: _M. Neeb_____

Name: _Marin L. Neeb._____

_____
Ed Parton, M.D.

Spouse:

By: _____

Name: _____

_____
Robert Quinn, M.D.

Spouse:

By: _____

Name: _____

_____
John Renton, M.D.

Spouse:

By: _____

Name: _____

_____
Michael Ryan, M.D.

Spouse:

By: _____

Name: _____

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 54 of 90

Spouse:

By: _____

Name: _____


Darren Kowalski, M.D.

Spouse:

By: _____

Name: _____


Linda Leffel, M.D.

Spouse:

By: _____

Name: _____


Scott Letourneau, M.D.

Spouse:

By: _____

Name: _____


Michael Mastrangelo, M.D.

Spouse:

By: _____

Name: _____


Robert Mathews, M.D.

Spouse:

By: _____

Name: _____


Kathy Moore, M.D.

Spouse:

By: _____

Name: _____


Andrew Neeb, M.D.

Spouse:

By: _____

Name: _____


Ed Parton, M.D.

Spouse:

By: _Cheryl Parton_____

Name: _Cheryl Parton_____


Robert Quinn, M.D.

Spouse:

By: _____

Name: _____


John Renton, M.D.

Spouse:

By: _____

Name: _____


Michael Ryan, M.D.

Spouse:

By: _____

Name: _____


(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 55 of 90

Spouse:

By: _____

Name: _____

_____
Darren Kowalski, M.D.

Spouse:

By: _____

Name: _____

_____
Linda Leffel, M.D.

Spouse:

By: _____

Name: _____

_____
Scott Letourneau, M.D.

Spouse:

By: _____

Name: _____

_____
Michael Mastrangelo, M.D.

Spouse:

By: _____

Name: _____

_____
Robert Mathews, M.D.

Spouse:

By: _____

Name: _____

_____

Kathy Moore, M.D.

Spouse:

By: _____

Name: _____

_____
Andrew Neeb, M.D.

Spouse:

By: _____

Name: _____

_____
Ed Parton, M.D.

Spouse:

By: _____

Name: _____

_____
Robert Quinn, M.D.

Spouse: *NONE*

By: _____

Name: _____

_____
John Renton, M.D.

Spouse:

By: _____

Name: _____

_____
Michael Ryan, M.D.

Spouse:

By: _____

Name: _____

_____

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 56 of 90

Spouse:

By: _____

Name: _____

_____
Darren Kowalski, M.D.

Spouse:

By: _____

Name: _____

_____
Linda Leffel, M.D.

Spouse:

By: _____

Name: _____

_____
Scott Letourneau, M.D.

Spouse:

By: _____

Name: _____

_____
Michael Mastrangelo, M.D.

Spouse:

By: _____

Name: _____

_____
Robert Mathews, M.D.

Spouse:

By: _____

Name: _____

_____

Kathy Moore, M.D.

Spouse:

By: _____

Name: _____

_____
Andrew Neeb, M.D.

Spouse:

By: _____

Name: _____

_____
Ed Parton, M.D.

Spouse:

By: _____

Name: _____

_____
Robert Quinn, M.D.

Spouse:

By: _____

Name: _____

_____
John Renton, M.D.

Spouse:

By: *Jennifer Renton*

Name: *Jennifer Anne Renton*

_____
Michael Ryan, M.D.

Spouse:

By: _____

Name: _____

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 57 of 90

Spouse:

By: _____

Name: _____


_____
Darren Kowalski, M.D.

Spouse:

By: _____

Name: _____


_____
Linda Leffel, M.D.

Spouse:

By: _____

Name: _____


_____
Scott Letourneau, M.D.

Spouse:

By: _____

Name: _____


_____
Michael Mastrangelo, M.D.

Spouse:

By: _____

Name: _____


_____
Robert Mathews, M.D.

Spouse:

By: _____

Name: _____


_____

Kathy Moore, M.D.

Spouse:

By: _____

Name: _____


_____
Andrew Neeb, M.D.

Spouse:

By: _____

Name: _____


_____
Ed Parton, M.D.

Spouse:

By: _____

Name: _____


_____
Robert Quinn, M.D.

Spouse:

By: _____

Name: _____


_____
John Renton, M.D.

Spouse:

By: _____

Name: _____


_____
Michael Ryan, M.D.

Spouse:

By: _____

Name: _____


(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 58 of 90

Jan. 26. 2014  3:15PM                                    No. 0005   P.  5

_Laura Schweger_ DPM
Laura Schweger, D.P.M.

Spouse: _[signature]_
By: _Domestic Partnership_
Name: _KAREN SAVAGE_

By: _____
Name: _____

Robert Shannon, M.D

Spouse: _____

By: _____

Name: _____

Cara Walther, M.D.

Spouse: _____

By: _____

Name: _____

Randal Smith, M.D.

Spouse: _____

By: _____

Name: _____

John David Wood, M.D.

Spouse: _____

By: _____

Name: _____

Jon Swift, D.O.

Spouse: _____

By: _____

Name: _____

Kent Yundt, M.D.

Spouse: _____

By: _____

Name: _____

Michael Villano, M.D.

Spouse: _____

By: _____

Name: _____

Erin Walling, M.D.

Spouse: _____

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 59 of 90

_____
Laura Schweger, D.P.M.

Spouse:

By: _____

Name: _____

_~Robert Shannon~_  (signature) M.D.
Robert Shannon, M.D

Spouse:

By: _Susan Shannon_ (signature)

Name: _Susan Shannon_ (signature)

_____
Randal Smith, M.D.

Spouse:

By: _____

Name: _____

_____
Jon Swift, D.O.

Spouse:

By: _____

Name: _____

_____
Michael Villano, M.D.

Spouse:

By: _____

Name: _____

_____
Erin Walling, M.D.

Spouse:

By: _____

Name: _____

_____
Cara Walther, M.D.

Spouse:

By: _____

Name: _____

_____
John David Wood, M.D.

Spouse:

By: _____

Name: _____

_____
Kent Yundt, M.D.

Spouse:

By: _____

Name: _____

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 60 of 90

Laura Schweger, D.P.M.

Spouse:

By: _____

Name: _____

Robert Shannon, M.D

Spouse:

By: _____

Name: _____

Randall Smith, M.D.

Spouse:

By: _____

Name: _Kimberly Smith_

Jon Swift, D.O.

Spouse:

By: _____

Name: _____

Michael Villano, M.D.

Spouse:

By: _____

Name: _____

Erin Walling, M.D.

Spouse:

By: _____

Name: _____

Cara Walther, M.D.

Spouse:

By: _____

Name: _____

John David Wood, M.D.

Spouse:

By: _____

Name: _____

Kent Yundt, M.D.

Spouse:

By: _____

Name: _____

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 61 of 90

_____
**Laura Schweger, D.P.M.**

Spouse:

By: _____

Name: _____


_____
**Robert Shannon, M.D**

Spouse:

By: _____

Name: _____


_____
**Randal Smith, M.D.**

Spouse:

By: _____

Name: _____


_____
**Jon Swift, D.O.**

Spouse: _Nicolette M. Swift_

By: _____

Name: _Nicolette M. Swift_


_____
**Michael Villano, M.D.**

Spouse:

By: _____

Name: _____


_____
**Erin Walling, M.D.**

Spouse:


By: _____

Name: _____


_____
**Cara Walther, M.D.**

Spouse:

By: _____

Name: _____


_____
**John David Wood, M.D.**

Spouse:

By: _____

Name: _____


_____
**Kent Yundt, M.D.**

Spouse:

By: _____

Name: _____


(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 62 of 90

_____


_____

hannon, M.D


_____


_____


_____

mith, M.D.


_____


_____

, D.O.


_____


_____


_____

lano, M.D.


_____

aug w. Villano

_____

Cara Walther, M.D.

Spouse:

By: _____

Name: _____


_____

John David Wood, M.D.

Spouse:

By: _____

Name: _____


_____

Kent Yundt, M.D.

Spouse:

By: _____

Name: _____

Exhibit 1
Page 63 of 90

_____
Laura Schweger, D.P.M.

Spouse:

By: _____

Name: _____


_____
Robert Shannon, M.D

Spouse:

By: _____

Name: _____


_____
Randal Smith, M.D.

Spouse:

By: _____

Name: _____


_____
Jon Swift, D.O.

Spouse:

By: _____

Name: _____


_____
Michael Villano, M.D.

Spouse:

By: _____

Name: _____


_____
Erin Walling, M.D.

Spouse:

By:

By: _Doug Hermanson_____

Name: _____


_____
Cara Walther, M.D.

Spouse:

By: _____

Name: _____


_____
John David Wood, M.D.

Spouse:

By: _____

Name: _____


_____
Kent Yundt, M.D.

Spouse:

By: _____

Name: _____


(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 64 of 90

_____
Laura Schweger, D.P.M.

Spouse:

By: _____

Name: _____

_____
Robert Shannon, M.D

Spouse:

By: _____

Name: _____

_____
Randal Smith, M.D.

Spouse:

By: _____

Name: _____

_____
Jon Swift, D.O.

Spouse:

By: _____

Name: _____

_____
Michael Villano, M.D.

Spouse:

By: _____

Name: _____

_____
Erin Walling, M.D.

Spouse:

By: _____

Name: _____

_____
Cara Walther, M.D.

Spouse:    —

By: _____ *Cara Wal...*_____

Name: _____

_____
John David Wood, M.D.

Spouse:

By: _____

Name: _____

_____
Kent Yundt, M.D.

Spouse:

By: _____

Name: _____

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 65 of 90

---

Laura Schweger, D.P.M.

Spouse:

By: _____

Name: _____

---

Robert Shannon, M.D

Spouse:

By: _____

Name: _____

---

Randal Smith, M.D.

Spouse:

By: _____

Name: _____

---

Jon Swift, D.O.

Spouse:

By: _____

Name: _____

---

Michael Villano, M.D.

Spouse:

By: _____

Name: _____

---

Erin Walling, M.D.

Spouse:

By: _____

Name: _____

---

Cara Walther, M.D.

Spouse:

By: _____

Name: _David Wood_

---

John David Wood, M.D.

Spouse:

By: ___N/A___

Name: _____

---

Kent Yundt, M.D.

Spouse:

By: _____

Name: _____

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 66 of 90

Laura Schweger, D.P.M.

Spouse:

By: _____

Name: _____


Robert Shannon, M.D

Spouse:

By: _____

Name: _____


Randal Smith, M.D.

Spouse:

By: _____

Name: _____


Jon Swift, D.O.

Spouse:

By: _____

Name: _____


Michael Villano, M.D.

Spouse:

By: _____

Name: _____


Erin Walling, M.D.

Spouse:


By: _____

Name: _____


Cara Walther, M.D.

Spouse:

By: _____

Name: _____


John David Wood, M.D.

Spouse:

By: _____

Name: _____


Kent Yundt, M.D.

Spouse:

By: _Annette L. Yundt_

Name: _Annette Yundt_

(Signature Page to Operating Agreement of LLC)

Exhibit 1
Page 67 of 90

**EXHIBIT A**

| Member Name and Address | Capital Account Balance[1] | Membership Percentage |
|---|---|---|
| AmSurg Holdings, Inc.<br>20 Burton Hills Blvd.<br>Nashville, TN 37215<br>FEIN: 62-1595888 | | 51.00000% |
| Robert Andrews, M.D. | | 1.47147% |
| Aaron Askew, M.D. | | 1.47147% |
| Timothy Beard, M.D. | | 1.47147% |
| Richard Bochner, D.O. | | 1.47147% |
| Stephen Boe, M.D. | | 0.58859% |
| Patricia Buehler, M.D. | | 1.47147% |
| Rodney Buzzas, M.D. | | 1.47147% |
| Arte Cantor, M.D. | | 1.47147% |
| Brian Desmond, M.D. | | 1.47147% |
| Jason Dimmig, M.D. | | 1.47147% |
| Thomas Fitzsimmons, M.D. | | 0.73574% |
| Gary Frei, M.D. | | 1.47147% |
| Gary Gallagher, M.D. | | 1.47147% |
| Ryan Gallivan, M.D. | | 1.47147% |
| Greg Ha, M.D. | | 1.47147% |
| Anthony Hadden, M.D. | | 0.29429% |
| Kenneth Hanington, M.D. | | 1.47147% |
| Sidney Henderson III, M.D. | | 1.47147% |
| Andrew Higgins, M.D. | | 1.47147% |
| Sandra Holloway, M.D. | | 1.47147% |
| Glenn Koteen, M.D. | | 1.47147% |
| Darren Kowalski, M.D. | | 1.47147% |
| Linda Leffel, M.D. | | 1.47147% |
| Scott Letourneau, M.D. | | 0.58859% |
| Michael Mastrangelo, M.D. | | 1.47147% |
| Robert Mathews, M.D. | | 1.47147% |
| Kathy Moore, M.D. | | 1.47147% |
| Andrew Neeb, M.D. | | 0.29429% |
| Ed Parton, M.D. | | 0.58859% |
| Robert Quinn, M.D. | | 1.47147% |
| John Renton, M.D. | | 0.29429% |
| Michael Ryan, M.D. | | 1.47147% |
| Laura Schweger, D.P.M. | | 1.47147% |
| Robert Shannon, M.D. | | 1.47147% |
| Randal Smith, M.D. | | 0.58859% |
| Jon Swift, D.O. | | 0.29429% |
| Michael Villano, M.D. | | 1.47147% |
| Erin Walling, M.D. | | 0.29429% |
| Cara Walther, M.D. | | 1.47147% |
| John David Wood, M.D. | | 1.47147% |

[1] AmSurg's initial capital account balance will equal 51% of the total capital account balances of all Members.

DM_US 47637902-19.085092.0013

Exhibit 1<br>Page 68 of 90

| Member Name and Address | Capital Account Balance[1] | Membership Percentage |
|---|---|---|
| Kent Yundt, M.D. | | 0.29429% |
| Total | | 100.00% |

DM_US 47637902-19.085092.0013

Exhibit 1
Page 69 of 90

## EXHIBIT B

### ANNUAL ELIGIBILITY AFFIRMATION STATEMENT

The undersigned, who is an owner (directly or indirectly) of Bend Surgery Center, LLC, a Tennessee limited liability company (the "LLC"), hereby represents, warrants and affirms as follows:

1.  I AM A PHYSICIAN DULY LICENSED TO PRACTICE MEDICINE IN THE STATE OF OREGON.

2.  AT ALL TIMES IN WHICH I HAVE HAD AN OWNERSHIP INTEREST IN THE LLC, I HAVE FULLY INFORMED, AND I AGREE THAT I WILL CONTINUE TO FULLY INFORM, EACH PATIENT THAT I REFER TO THE SURGICAL CENTER OPERATED BY THE LLC (THE "CENTER") THAT I HAVE AN INVESTMENT INTEREST IN THE LLC.

Yes ☐          No ☐

3.  DURING THE 12 CALENDAR MONTHS IMMEDIATELY PRECEDING THE DATE OF THIS STATEMENT:

I have derived at least one-third of my medical practice income from the performance of outpatient surgical procedures (as defined below); and

Yes ☐          No ☐

I have performed at least one-third of my outpatient surgical procedures at the Center.

Yes ☐          No ☐

*(For purposes hereof, the term "outpatient surgical procedures" means those surgical procedures that are on the list of Medicare covered procedures authorized to be performed in ambulatory surgical centers under applicable Medicare regulations, whether or not such procedures are paid for by Medicare, workers' compensation or other payors).*

4.  I AGREE THAT, WITH RESPECT TO ANY AND ALL FEDERAL HEALTH CARE PROGRAMS IN WHICH I PARTICIPATE (INCLUDING MEDICARE AND MEDICAID), I WILL TREAT PATIENTS RECEIVING BENEFITS OR ASSISTANCE UNDER SUCH PROGRAMS IN A NONDISCRIMINATORY MANNER.

Yes ☐          No ☐

IN WITNESS WHEREOF, the undersigned has executed this Statement this _____ day of _____, 20____.

_____
(Signature of Physician)

_____
(Type of Print Name of Physician)

*If any response to the above is checked "No" attached a separate sheet and explain each "No" answer.*

DM_US 47637902-19.085092.0013

Exhibit 1
Page 70 of 90

**EXHIBIT 8.2**

**EXCEPTIONS TO NON-COMPETITION COVENANT**

**A. Services.** Dr. Buzzas may serve as the physician advisor for quality and clinical documentation for St. Charles Health System, and such services shall be deemed an exception to the non-competition covenant.

**B. Office-Based Procedures Historically Done In-Office:** Each of the following Owners may hold equity and financial interests in a medical practice that provides at the practice's facilities the specific physician-office surgery procedures that are described below that do not require anesthesia (other than local anesthesia) or intravenous conscious sedation, and correspond to such Owner or such Owner's practice, and in each case, such ownership shall not be deemed to violate Section 8.2 of this Agreement; provided, however, that with respect to each procedure at least one of the following conditions applies: (a) the Center informs the Owner that it does not desire that the procedure be performed at the Center; or (b) in the medical judgment of the applicable Owner, the procedure should be performed in such physician's office. The parties agree and acknowledge that such practices are not and will not be licensed ambulatory surgery centers.

**For the Owners Who Are in the Group Practice Desert Orthopedics**

| | | | |
|---|---|---|---|
| 10021-10022 | 10060-10180 | 11042-11047 | 11719-11765 |
| 12001-12021 | 12031-12057 | 13100-13153 | 15271-15278 |
| 20005 | 20520-20525 | 20526-20553 | 20600-20610 |
| 20612-20615 | 20670 | 23330,23350 | 23500-23505 |
| 23520-23525 | 23540-23545 | 23570-23575 | 23600-23605 |
| 23620-23625 | 23650-23655 | 23665,23675 | 23930,24065 |
| 24200 | 24220 | 24357 | 24500-24505 |
| 24530-24538 | 24560-24566 | 24576-24577 | 24582 |
| 24600-24605 | 24520 | 24640-24655 | 24670-24675 |
| 25000-25001 | 25028-25031 | 25075-25071 | 25260,25270 |
| 25500-25505 | 25520 | 25530-25535 | 25560-25565 |
| 25600-25606 | 25622-25624 | 25630-25635 | 25650-25651 |
| 25660 | 25671-25675 | 25680,25690 | 26010-26030 |
| 26040 | 26055-26060 | 26160-26180 | 26341,26432 |
| 26600-26608 | 26641-26650 | 26670-26676 | 26700-26706 |
| 26720-26727 | 26740-26742 | 26750-26756 | 26770-26776 |
| 27000,27040 | 27047,27086 | 27093,27096 | 27193-27200 |

Exhibit 1
Page 71 of 90

| | | | |
|---|---|---|---|
| 27220-27222 | 27230-27232 | 27238,27246 | 27250,27256 |
| 27265,27267 | 27268 | 27306,27307 | 27370 |
| 27500-27503 | 27508-27510 | 27516,27517,27520 | 27530-27532 |
| 27538 | 27550-27552 | 27560-27562 | 27650,27648 |
| 27750-27756 | 27760-27762 | 27767-27768 | 27780-27781 |
| 27786-27788 | 27808-27810 | 27816-27818 | 27824-27825 |
| 27830-27831 | 27840-27842 | 28001 | 28010-28011 |
| 28080 | 28190-28192 | 28400-28406 | 28430-29436 |
| 28450-28456 | 28470-28476 | 28490-28496 | 28510-28515 |
| 28530 | 28540-28546 | 28570-28576 | 28600-28606 |
| 28630-28636 | 28660-28666 | 29000-29750 | 61070,75809 |
| 63650 | 64400-64455 | 64479-64484 | 64490-64495 |
| 64505-64530 | 64553-64566 | 64611-64617 | 64620-64640 |
| 64642-64645 | 64646-64647 | 64721 | |

### For the Owners Who Are in the Group Practice Central Oregon ENT, LLC



10021  FNA WO IMAGING
10040  ACNE REMOVAL
10060  I D ABSC CYST SIMPLE
10061  I D ABSC CYST COMP
10120  FB REM SUBQ
10121  FB REM SUBQ COMP
10140  I D HEMATOMA
10160  PUNCTURE ASPIRATION
11000  DEBRIDE ECZEMATOUS SKIN
11010  FB DEBRIDEMENT SKIN
11011  DEBRIDE SKIN MUSCLE FB REMOVAL
11012  DEBRIDEMENT FB REMOVAL
11040  DEBRIDE SKIN PART THICK
11200  SKIN TAG REMOVAL FIRST 15
11201  SKIN TAG ADDL 10
11300  SHAVING LESION
11301  SHAVE LESION 0.6-1.0
11310  SHAVE LESION 0.5 CM FACE NOSE EAR
11311  SHAVE LESION 0.6-1.0 CM FACE NOSE EAR
11400  EXC B9 TRUNK ARM LEG <0.5
11402  EXC TRUNK 1.0-2.0

Exhibit 1
Page 72 of 90



11403  EXC LESION B9 2.1-3.0 CM TRUNK ARM LEG
11404  EXC LESION B9 3.1-4.0 CM TRUNK ARM LEG
11406  EXC LESION 139 > 4.0 CM TRUNK ARM LEG
11420  EXC LESION B9 0.5 CM SCALP NECK
11421  EXC LESION B9 0.6-1.0 CM SCALP NECK
11422  EXC LESION B9 1.1-2.0 CM SCALP NECK
11423  EXC LESION B9 2.1-3.0 CM SCALP NECK
11424  EXC LESION 39 3.1-4.0 CM SCALP NECK
11426  EXC LESION B9 > 4 CM SCALP NECK
11440  EXC LESION B9 < 0.5 CM FACE NOSE
11441  EXC LESION B9 0.6-1.0 CM FACE NOSE
11442  EXC LESION 39 1.1-2.0 CM FACE NOSE
11443  EXC LESION B9 2.1-3.0 CM FACE NOSE
11444  EXC LESION 39 3.1-4.0 CM FACE NOSE
11446  EXC LESION B9 > 4 CM FACE NOSE
11602  EXC LESION M 1.1-2.0 CM TRUNK ARM LEG
11603  EXC LESION MAL 2.1 TO 3.0 CM
11604  EXC LESION M 3.1-4.0 CM TRUNK ARM LEG
11620  EXC LESION M < 0.5 CM SCALP NECK



11621  EXC LESION M 0.6-1.0 CM SCALP NECK
11622  EXC LESION M 1.1-2.0 CM SCALP NECK
11623  EXC LESION M 2.1-3.0 CM SCALP NECK
11624  EXC LESION M 3.1-4.0 CM SCALP NECK
11626  EXC LESION M > 4.0 CM SCALP NECK
11640  EXC LESION M < 0.5 CM FACE NOSE
11641  EXC LESION M 0.6-1.0 CM FACE NOSE
11642  EXC LESION M 1.1-2.0 CM FACE NOSE
11643  EXC LESION M 2.1-3.0 CM FACE NOSE
11644  EXC LESION M 3.1-4.0 CM FACE NOSE
11646  EXC LESION M > 4.0 CM FACE NOSE
11900  INJ INTRALESION 1-7 LESIONS
11901  INJ INTRALESIONAL 8 OR MORE LESIONS
11921  TATTOOING MEDICAL 6.1-20.0
11952  INJ SUBQ 5.1-10 CC
11954  INJ SUBQ FILLING>10CC
12001  REPAIR SIMPLE < 2.5 CM SCALP NECK
12002  REPAIR SIMPLE 2.6-7.5 CM SCALP NECK
12004  REPAIR SIMPLE 7.6-12.5 CM SCALP NECK
12011  REPAIR SIMPLE < 2.5 CM FACE EAR LIP
12013  REPAIR SIMPLE 2.6-5 CM FACE EAR LIP
12014  REPAIR SIMPLE 5.1-7.5 CM FACE EAR LIP

Exhibit 1
Page 73 of 90



12031  REPAIR INT < 2.5 CM SCALP
12032  REPAIR INT 2.6-7.5 CM SCALP
12034  REPAIR INT 7.6-12.5 CM SCALP
12035  REPAIR INT 12.6-20 CM SCALP
12036  REPAIR INT 20.1-30 CM SCALP
12041  REPAIR INT 2.5CM OR LESS
12042  REPAIR INT 2.6-7.5 CM NECK
12044  REPAIR INT 7.6-12.5 CM NECK
12051  REPAIR INT < 2.5 CM FACE EAR
12052  REPAIR INT 2.6-5.0 CM FACE EAR
12053  REPAIR INT 5.1-7.5 CM FACE EAR
12054  REPAIR INT 7.6-12.5 CM FACE EAR
12055  REPAIR INT 12.6-20 CM FACE EAR
12056  REPAIR INT 20.1-30 CM FACE EAR
12057  REPAIR INT >30 CM FACE EAR
13120  REPAIR COMPLX 1.1-2.5 CM SCALP
13121  REPAIR COMPLX 2.6-7.5 CM SCALP
13122  REPAIR COMPLX EA ADDL 5 CM SCALP
13131  REPAIR COMPLX 1.1-2.5 CM FACE
13132  REPAIR COMPLX 2.6-7.5 CM FACE
13133  REPAIR COMPLX EA ADDL 5 CM FACE
13150  REPAIR COMPLX < 1.0 CM NOSE EAR
13151  REPAIR COMPLX 1.1-2.5 CM NOSE EAR
13152  REPAIR COMPLX 2.6-7.5 CM NOSE EAR
13153  REPAIR COMPLX EA ADDL 5CM NOSE EAR
15820  BLEPH LOWER EYELID
15821  BLEPH LOWER EYELID EXTENSIVE
15822  BLEPH UPPER EYELID
15823  BLEPH UPPER EYELID EXTENSIVE
17000  DESTRUCT LESION B9 CRYO
17003  DESTRUCT LESION CRYO B9 2-14 LESIONS
17004  DESTRUCT LESION CRYO B9 15 OR MORE
17250  CAUTERIZE GRANULATED TISSUE
17270  DESTRCT LESION M<.5 CM SCALP NECK
20005  INC SOFT TISSUE ABSC DEEP
20206  BX NEEDLE MUSCLE NECK
20220  BX SUP BONE
20610  DRAIN/INJECT, JOINT/BURSA
21337  CLOSED TX NASAL SEPTAL FX
30140  TURBINOPLASTY SMR
30200  TURBINATE INJECTION



DM_US 47637902-19.085092.0013

Exhibit 1
Page 74 of 90



30220  SEPTAL BUTTON INSERTION
30300  FB REM INTRANASAL
30310  FB REM INTRANASAL W GA
30560  LYSIS INTANASAL SYNECHIA
30580  FISTULA REPAIR
30600  REPAIR FISTULA ORONASAL
30630  REPAIR NASAL SEPTAL PERF
30801  TURBINATE ABLATION/CAUTERY
30802  TURBINATE ABLATION INTAMURAL
30901  Control of Epistaxis - Simple
30901  EPISTAXIS CONT SIMPLE
30903  EPISTAXIS CONT COMPLX
30905  EPISTAXIS CONT POSTERIOR INITIAL
30906  EPISTAXIS CONT POSTERIOR SUBSEQUENT
30930  TURBINATE OUTFRACTURE
30999  UNLISTED PROCEDURE NOSE
31000  LAVAGE MAXILL SINUS
31002  LAVAGE SPHENOID SINUS
31295  BALOON SINOPLASTY MAXILLARY
31296  BALOON SINOPLASTY FRONTAL
31297  BALOON DILATION SPHENOID
31299  UNL PROCEDURE
31500  INTUBATION EMERGENCY
31502  TRACH TUBE CHANGE
31505  LARYNGOSCOPY INDIRECT DX
31510  LARYNGOSCOPY W BX
31511  LARYNGOSCOPY W FB REM
31512  LARYNGOSCOPY W REM OF LESION
31513  LARYNGOSCOPY W VC INJ
31515  LARYNGOSCOPY DIR ASPIRATION
31520  LARYNGOSCOPY DIR DX NEWBORN
31525  LARYNGOSCOPY DIR DX
31526  LARYNGOSCOPY DIR W MICROSCOPE
31530  LARYNGOSCOPY DIR W FB REM
31535  LARYNGOSCOPY DIR OP W BX
31536  LARYNGOSCOPY DIR OP MICROSCOPE W BX
31540  LARYNGOSCOPY DIR OP W EXC OF TUMOR
31541  LARYNGOSCOPY DIR OP MICROSCOPE W EXC OF TUMOR
31546  LARYNX RECONSTRUCTION
31560  LARYNGOSCOPY DIR W ARYTENOIDECTOMY
31561  LARYNGOSCOPY W OP MICROSCOPE ARYTENOIDECTOMY





31570  LARYNGOSCOPY DIR W INJ VC
31571  LARYNGOSCOPY DIR INJ W OP MICROSCOPE
31575  LARYNGOSCOPY FLEX FIBER DX
31576  LARYNGOSCOPY FLEX FIBER DX W BX
31577  LARYNGOSCOPY FLEX FIBER DX W REM FB
31578  LARYNGOSCOPY FLEX FIBER DX W REM LESION
31580  LARYNGOPLASTY WITH KEEL INSERTION/REMOVAL
31599  UNL PROC LARYNX
31600  TRACHEOSTOMY
31611  INSERT TFP TRACHEOSOPHAGEAL FISTULA INSERT SPEECH PROSTHESES
31612  TRACH PUNCTURE W ASPIRATION OF INJECTION
36410  VENIPUNCTURE >3 YEARS PHYSICIAN ADMIN
40490  BX LIP
40500  EXC LIP VERMILIONECTOMY W MUCOSAL ADV
40510  EXC LIP TRANS WEDGE W PRIME CLOSE
40520  EXC LIP V EXC W CLOSURE
40800  I D ABSC MOUTH
40801  ID ABSC MOUTH COMP
40806  FRENOTOMY LABIAL (UPPER)
40808  BX VESTIBULE OF MOUTH
40810  EXC LESION MUCOSA MOUTH WO  REPAIR
40812  EXC LESION MOUTH SIMPLE
40819  FRENULECTOMY BUCCAL/LABIAL W MUSCLE REMOVAL
40820  DESTRUCT LESION/SCAR MOUTH
40830  REPAIR LAC LIP < 2.5 CM
40831  REPAIR LAC LIP > 2.5 CM
40840  REPAIR MOUTH ANTERIOR
40842  EXC BUCCAL CAVITY POSTERIOR UNILATERAL
40845  REPAIR LIP W RECONST MUSCLE
41000  I D ABSC TONGUE MOUTH
41005  I D ABSC SUBLINGUAL SUPERFICIAL
41008  I D ABSC SUBMANDIBULAR SPACE
41010  FRENOTOMY LINGUAL (LOWER)
41017  I&D SUBMANDIBULAR
41100  BX TONGUE ANT TWO THIRDS
41105  BX TONGUE POSTERIOR ONE THIRD
41108  BX FLOOR OF MOUTH
41110  EXC LESION TONGUE W/O CLOSURE
41112  EXC LESION TONGUE W CLOSURE
41113  EXC LESION TONGUE POSTERIOR 1/3
41115  EXC LINGUAL FRENUM


DM_US 47637902-19.085092.0013

Exhibit 1
Page 76 of 90



41116  EXC LESION FLOOR OF MOUTH
41599  UNLISTED PROCEDURE FLOOR OF MOUTH
41800  I D ABSCESS CYST DENTOALVEOLAR
41806  FB REM DENTOALVEOLAR BONE
42000  I D ABSC PALATE
42140  UVULECTOMY
42145  UPPP
42160  DESTRCT LESION PALATE
42182  REPAIR LAC PALATE >2CM
42226  VELOPHARYGEAL FLAP  REPAIR
42400  BX SALIVARY GLAND NEEDLE
42405  BX SALIVARY GLAND I NCISIONAL
42408  EXC SALIVARY GLAND
42409  MARSIPULIZATION SALIVARY CYST
42699  SNOREPLASTY
42700  I D ABSC PERITONSILLAR
42720  I D ABSC PHARYNGEAL INTRAORAL
42725  I D ABSC RETROPHARYNGEAL
42800  BX OROPHARYNX
42802  BX HYPOPHARYNX
42804  BX NASOPHARYNX VISIBLE LESION
42806  NASOPHARYNX SURVEY FOR PRIME LESION
42808  EXC LESION PHARYNX
42809  FB REM LESION PHARYNX
42810  EXC BRANCHIAL CYST
42815  EXC BRANCHIAL CLEFT CYST
42999  UNL PHARYNX ADENOID TONSIL
43200  ESOPHAGOSCOPY RIGID FLEX DX
43202  ESOPHAGOSCOPY RIGID FLEX DX W BX
43215  ESOPHAGOSCOPY RIGID FLEX W REM FB
43450  ESOPHAGOSCOPY DILATATION
43499  ZENKERS UNLISTED
43752  NG TUBE PLACEMENT
43760  NASOGASTRIC TUBE CHANGE
49999  INJ ALCOHOL
67810  BX EYELID
67840  EXC LESION EYELID
67900  BROW LIFT
67903  REPAIR LEVATOR BROW PTOSIS INTERNAL
67904  LEVATOR BLEPHAROPTOSIS EXTERNAL
67938  FB REM EYELID



DM_US 47637902-19.085092.0013

Exhibit 1
Page 77 of 90



68899  UNLISTED PROC LACRIMAL SYSTEM
69000  ID ABSCESS EXT EAR SIMPLE
69005  ear hematoma drainage
69005  I D ABSCESS EXT EAR COMP
69020  ID ABSCESS EXT AUDITORY CANAL
69100  BX EXT EAR
69105  BX EXT EAR AUDITORY CANAL
69110  EXC EXT EAR PARTIAL SIMPLE  REPAIR
69200  FB REM EXT AUDITORY CANAL LOCAL
69205  FB REM EAR EXT AUDITORY CANAL W GA
69210  CERUMEN REMOVAL
69220  DB MASTOID SIMPLE
69399  UNLISTED PROCEDURE EAR
69420  MYRINGOTOMY LOCAL
69550  REMOVE EAR LESION
69552  REMOVE EAR LESION
69799  EAR PROCEDURE UNLISTED
69801  LABRINTHOTOMY TRANSCANAL
69990  MICROSCOPE OPERATING

### For the Owners Who Are in the Group Practice Bend Memorial Clinic

36475    RFA
36476    RFA Additional Veins
37799    Ambulatory Phlebectomy 1-9 stabs
37765    Ambulatory Phlebectomy 10-20 stabs
37766    Ambulatory Phlebectomy 21+ stabs
36470    Sclerotherapy
36471    Sclerotherapy multiple
19081    Breast biopsy w/ localization using stereo guidance
19082                    additional lesion
19083    Breast biopsy w/ localization using u/s guidance
19084                    additional lesion
19281    Placemnt of breast localization using mamm guidance
19282                    additional lesion
19283    Placemnt of breast localization using stereo guidance
19284                    additional lesion
36590    Port Removal
36589    Perm Cath Removal
46221    Hemorrhoid Banding

DM_US 47637902-19.085092.0013

Exhibit 1
Page 78 of 90

| | |
|---|---|
| 46930 | Hemorrhoid cauterization (IRC) |
| 37609 | Temporal Artery Biopsy |
| 11401-11404 | Skin lesions; benign; trunk, arms legs |
| 11420-11424 | Skin lesions; benign; scalp, neck, hands, feet, genitalia |
| 11600-11604 | Skin lesions; malignant; trunk arms, legs |
| 11620-11624 | Skin lesions; malignant; scalp, neck hands, feet genitalia |
| 11200 | Skin tag removal |
| 10060 | I&D ABSCESS; SIMPL/SNGL |
| 10140 | I&D HEMATOMA/SEROMA/FLUID COLLEC |
| 10160 | PUNCT ASPIR ABSCES/HEMAT/BULLA/CYST |
| 11440 | EXC BEN LES FACE; 0.5 CM/LESS |
| 11441 | EXC BEN LES FACE; 0.6 TO 1.0 CM |
| 11442 | EXC BEN LES FACE; 1.1 TO 2.0 CM |
| 14060 | ADJAC TRANSF LIDS/LIPS; 10 SQ CM |
| 15822 | BLEPHAROPLASTY UPPER EYELID |
| 15823 | BLEPHAROPLASTY UPPER; W/EXCESS SKIN |
| 37609 | LIG/BX TEMPORAL ART |
| 65270 | REPR LACERAT; CONJUNC W/WO SCLERA |
| 67505 | RETROBULBAR INJ; ALCOHOL |
| 67700 | BLEPHAROTOMY DRAIN ABSCESS EYELID |
| 67710 | SEVERING TARSORRHAPHY |
| 67715 | CANTHOTOMY (SEPART PROC) |
| 67800 | EXC CHALAZION; SNGL |
| 67801 | EXC CHALAZION; MX SAME LID |
| 67805 | EXC CHALAZION; MX DIFF LIDS |
| 67810.50 | BX EYELID BILATERAL |
| 67840 | EXC LES LID WO CLO/W SMPL DIREC CLO |
| 67850 | DESTRCT LES LID MARGIN |
| 67875 | TEMPORARY CLO EYELIDS BY SUTURE |
| 67880 | CONSTRUCT INTERMARGINAL ADHESIONS |
| 67882 | CONSTRCT ADHESIONS; W/TRANSPOSIT |
| 67900 | REPR BROW PTOSIS |
| 67904 | REPR BLEPHAROPTOSIS; RESECT-EXT |
| 67908 | REPR BLEPHAROPTOSIS; CONJUNC-TARSO |
| 67909 | REDUCTION OVERCORRECTION PTOSIS |
| 67911 | CORRECT LID RETRACTION |
| 67912 | CORRECTION EYELID W/ IMPLANT |
| 67914 | REPR ECTROPION; SUTURE |
| 67916 | REPR ECTROPION; BLEPHAROPLASTY |
| 67917 | REPR ECTROPION; BLEPHAROPLSTY EXTEN |

| | |
|---|---|
| 67921 | REPR ENTROPION; SUTURE |
| 67923 | REPR ENTROPION; BLEPHAROPLASTY |
| 67924 | REPR ENTROPION; BLEPHAROPLSTY EXTEN |
| 67930 | SUTURE RECENT WOUND LID; PART THICK |
| 67935 | SUTURE RECENT WOUND LID; FULL THICK |
| 67938 | REMOV EMBEDDED FB EYELID |
| 67950 | CANTHOPLASTY |
| 67961 | EXC & REPR LID; TO 1/4 LID MARGIN |
| 67966 | EXC & REPR EYELID > 1/4 LID MARGIN |
| 68020 | INCS CONJUNC DRAINAGE CYST |
| 68100 | BX CONJUNC |
| 68110.50 | EXC LES CONJUNC  UP TO 1 CM BILATERAL |
| 68115 | EXC LES CONJUNC; OVER 1 CM |
| 68115 | EXC LES CONJUNC; OVER 1 CM |
| 68130 | EXC LES CONJUNC; W/ADJACE |
| 68135 | DESTRCT LES CONJUNC |
| 68200.50 | SUBCONJUNCTIVAL INJ BILATERAL |
| 68200.LT | SUBCONJUNCTIVAL INJ LT EYE |
| 68200.RT | SUBCONJUNCTIVAL INJ RT EY |
| 68320 | CONJUNCTIVOPLASTY; W/CONJUNC GFT |
| 68320.50 | CONJUNCTIVOPLASTY; W/CONJUNC GFT |
| 68325 | CONJUNCTIVOPLASTY; W/BUCCAL GFT |
| 68326 | CONJUNCTIVOPLASTY CUL-DE-SAC; W/GFT |
| 68328 | CONJUNCTIVOPL CUL-DE-SAC; BUCCL GFT |
| 68330 | REPR SYMBLEPHARON; CONJUNCTIVOPLSTY |
| 68335 | REPR SYMBLEPHARON; W/FREE GFT |
| 68340 | REPR SYMBLEPHARON; DIVIS SYMBLEPHAR |
| 68360 | CONJUNC FLAP; BRIDGE/PART (SEP PRO) |
| 68362 | CONJUNC FLAP; TOT |
| 68420 | INCS DRAINAGE LACRIMAL SAC |
| 68510 | BX LACRIMAL GLAND |
| 68530 | REMOV FB/DACRYOLITH LACRIMAL PASSG |
| 68700 | PLASTIC REPR CANALICULI |
| 68760.50 | CLO LACRIMAL PUNCTUM THERMOCAUT BILATERAL |
| 68810.50 | PROBE NASOLACRIM DUCT W WO IRRIG BILATERAL |
| 68815 | PROBE NASOLAC DUCT; W/INSERT TUBE |
| 64612 | CHEMODENERVATION OF MUSCLES (EG FOR BLEPHROSPASM, HEMIFACIAL SPASM |
| 65205 | REMOVAL FB EXTERNAL, CONJUCTIVAL SUPERFICIAL |
| 65210 | REM FB, CONJUCTIVAL EMBEDDED |
| 65220 | REM FB  CORNEAL WO SLIT LAMP |

DM_US 47637902-19.085092.0013

Exhibit 1
Page 80 of 90

| | |
|---|---|
| 65222 | REM FB  CORNEAL W SLIT LAMP |
| 65430 | SCRAPING OF CORNEA |
| 65435 | REMOVAL OF CORNEAL EPITHELIUM |
| 65436 | REMOVAL OF CORNEAL EPITHELIUM WITH CHELATION |
| 65450 | DESTRUCTION OF CORNEAL LESION |
| 65600 | MULTIPLE PUNCTURES OF CORNEA |
| 65772 | CORNEAL RELAXING INCISION |
| 65778 | PLACEMENT OF AMNIOTIC MEMBRANE- SELF RETAINING |
| 65800 | PARACENTESIS, DIAGNOSTIC |
| 65805 | PARACENTESIS WITH RELEASE OF AQUEOUS |
| 65810 | PARACENTESIS WITH REMOVAL OF VITREOUS |
| 65815 | PARACENTESIS WITH REMOVAL OF BLOOD |
| 65855 | TRABECULOPLASTY BY LASER |
| 66250 | REVISION OF OPERATIVE WOUND |
| 66761 | IRIDOTOMY/IRIDECTOMY BY LASER |
| 66821 | LASER SURGERY/EG YAG LASER |
| 67028 | Intravitreal injection |
| 67105 | Repair RD- photocoagulation |
| 67110 | Pneumatic retinpexy |
| 67141 | Cryopexy- RD/lattice/breaks |
| 67145 | Laser retinal prophylaxis |
| 67208 | Cryopexy destruction of lesion |
| 67210 | Focal laser |
| 67228 | PRP laser |
| 67515 | INJ INTO TENON'S CAPSULE |
| 67810 | BX EYELID |
| 67820 | CORRECTION OF TRICHIASIS ; EPILATION BY FORCEPS ONLY |
| 67825 | CORRECTION OF TRICHIASIS ; EPILATION BY OTHER THAN FORCEPS |
| 68110 | EXC LES CONJ UP TO 1 CM |
| 68200 | SUBCONJUCTIVAL INJ |
| 68440 | SNIP INCISION OF LACRIMAL PUNCTUM |
| 68761 | CLOSURE OF THE LACRIMAL PUNCTUM BY PLUG |
| 68801 | DILATION OF LACRIMAL PUNCTUM, W OR WO  IRRIGATION |
| 11100 | BIOPSY OF SKIN, SINGLE LESION-SIMPLE CLOSURE |
| 11101 | ADDITIONAL LESION BIOPSY |
| 11200 | REMOVAL OF SKIN TAGS UP TO AND INCUDING 15 LESIONS |
| 11440 | EXCISION BENIGN LESIONS 0.5 CM OR LESS |
| 11441 | EXCISION BENIGN LESIONS 0.6 CM TO 1.0 CM |
| 11640 | EXCISION MALIGNANT LESION 0.5 CM OR LESS |
| 15260 | FULL THICKNESS GRAFT 20 SQ CM OR LESS |
| 17110 | DESTRUCTION BENIGN LESIONS OTHER THAN SKIN TAGS(EG LASER, |

Exhibit 1
Page 81 of 90

CRYOSURGERY)

EXCISION, TUMOR, SOFT TISSUE OF FACE OR SCALP, LESS THAN 2
CM

| | |
|---|---|
| 21011 | |
| 37609 | BIOPSY TEMPORAL ARTERY |
| 10060 | I D ABSC CYST SIMPLE |
| 10061 | I D ABSC CYST COMP |
| 10120 | FB REM SUBQ |
| 10121 | FB REM SUBQ COMP |
| 10140 | I D HEMATOMA |
| 10160 | PUNCTURE ASPIRATION |
| 11000 | DEBRIDE ECZEMATOUS SKIN |
| 11010 | FB DEBRIDEMENT SKIN |
| 11011 | DEBRIDE SKIN MUSCLE FB REMOVAL |
| 11012 | DEBRIDEMENT FB REMOVAL |
| 11040 | DEBRIDE SKIN PART THICK |
| 11200 | SKIN TAG REMOVAL FIRST 15 |
| 11201 | SKIN TAG ADDL 10 |
| 11300 | SHAVING LESION |
| 11301 | SHAVE LESION 0.6-1.0 |
| 11310 | SHAVE LESION 0.5 CM FACE NOSE EAR |
| 11311 | SHAVE LESION 0.6-1.0 CM FACE NOSE EAR |
| 11420 | EXC LESION B9 0.5 CM SCALP NECK |
| 11421 | EXC LESION B9 0.6-1.0 CM SCALP NECK |
| 11422 | EXC LESION B9 1.1-2.0 CM SCALP NECK |
| 11423 | EXC LESION B9 2.1-3.0 CM SCALP NECK |
| 11424 | EXC LESION 39 3.1-4.0 CM SCALP NECK |
| 11426 | EXC LESION B9 > 4 CM SCALP NECK |
| 11440 | EXC LESION B9 < 0.5 CM FACE NOSE |
| 11441 | EXC LESION B9 0.6-1.0 CM FACE NOSE |
| 11442 | EXC LESION 39 1.1-2.0 CM FACE NOSE |
| 11443 | EXC LESION B9 2.1-3.0 CM FACE NOSE |
| 11444 | EXC LESION 39 3.1-4.0 CM FACE NOSE |
| 11446 | EXC LESION B9 > 4 CM FACE NOSE |
| 11620 | EXC LESION M < 0.5 CM SCALP NECK |
| 11621 | EXC LESION M 0.6-1.0 CM SCALP NECK |
| 11622 | EXC LESION M 1.1-2.0 CM SCALP NECK |
| 11623 | EXC LESION M 2.1-3.0 CM SCALP NECK |
| 11624 | EXC LESION M 3.1-4.0 CM SCALP NECK |
| 11626 | EXC LESION M > 4.0 CM SCALP NECK |
| 11640 | EXC LESION M < 0.5 CM FACE NOSE |
| 11641 | EXC LESION M 0.6-1.0 CM FACE NOSE |



Exhibit 1
Page 82 of 90

11642  EXC LESION M 1.1-2.0 CM FACE NOSE
11643  EXC LESION M 2.1-3.0 CM FACE NOSE
11644  EXC LESION M 3.1-4.0 CM FACE NOSE
11646  EXC LESION M > 4.0 CM FACE NOSE
12001  REPAIR SIMPLE < 2.5 CM SCALP NECK
12002  REPAIR SIMPLE 2.6-7.5 CM SCALP NECK
12004  REPAIR SIMPLE 7.6-12.5 CM SCALP NECK
12011  REPAIR SIMPLE < 2.5 CM FACE EAR LIP
12013  REPAIR SIMPLE 2.6-5 CM FACE EAR LIP
12014  REPAIR SIMPLE 5.1-7.5 CM FACE EAR LIP
12031  REPAIR INT < 2.5 CM SCALP
12032  REPAIR INT 2.6-7.5 CM SCALP
12034  REPAIR INT 7.6-12.5 CM SCALP
12035  REPAIR INT 12.6-20 CM SCALP
12036  REPAIR INT 20.1-30 CM SCALP
12041  REPAIR INT 2.5CM OR LESS
12042  REPAIR INT 2.6-7.5 CM NECK
12044  REPAIR INT 7.6-12.5 CM NECK
12051  REPAIR INT < 2.5 CM FACE EAR
12052  REPAIR INT 2.6-5.0 CM FACE EAR
12053  REPAIR INT 5.1-7.5 CM FACE EAR
12054  REPAIR INT 7.6-12.5 CM FACE EAR
12055  REPAIR INT 12.6-20 CM FACE EAR
12056  REPAIR INT 20.1-30 CM FACE EAR
12057  REPAIR INT >30 CM FACE EAR
13120  REPAIR COMPLX 1.1-2.5 CM SCALP
13121  REPAIR COMPLX 2.6-7.5 CM SCALP
13122  REPAIR COMPLX EA ADDL 5 CM SCALP
13131  REPAIR COMPLX 1.1-2.5 CM FACE
13132  REPAIR COMPLX 2.6-7.5 CM FACE
13133  REPAIR COMPLX EA ADDL 5 CM FACE
13150  REPAIR COMPLX < 1.0 CM NOSE EAR
13151  REPAIR COMPLX 1.1-2.5 CM NOSE EAR
13152  REPAIR COMPLX 2.6-7.5 CM NOSE EAR
13153  REPAIR COMPLX EA ADDL 5CM NOSE EAR
15820  BLEPH LOWER EYELID
15821  BLEPH LOWER EYELID EXTENSIVE
15822  BLEPH UPPER EYELID
15823  BLEPH UPPER EYELID EXTENSIVE

**For the Owners Who Are in the Group Practice Bend Surgical Associates**

DM_US 47637902-19.085092.0013

Exhibit 1
Page 83 of 90



11401 – 11403, 11406, 11422 – excision, benign lesions
11042 – debridement, subcutaneous tissue
11604, 11642 – excision, malignant lesions
10080, 10081 – incision/drainage of pilonidal cyst
10160 – puncture aspiration of abscess/cyst
10061 – incision/drainage abscess
13100 – repair/trunk, suturing of complicated wounds
20005 – incision/drainage of subfascial abscess
21930, 21931 – excision, mass, subcutaneous tissue
22902, 22903 – excision, mass, abdominal wall, subcutaneous tissue
25075 – excision, mass, subcutaneous tissue arm/wrist
46040 – incision/drainage of perirectal abscess
46083 – incision of thrombosed hemorrhoid
46500 – injection of sclerosing solution, hemorrhoids
46221 – hemorrhoidectomy by litigation
97597 – debridement, wound care
97605 – negative pressure wound therapy

### For the Owners Who Are in the Group Practice Northwest Brain & Spine



22524 Kypho
22523 "
22525 "
63650 Stim Trial
64555 "

64490 Facet
64491 "
64493 "
64494 "
64483 Trfran          NRB          CARVE OUT CODES 5-30-14
64479 "
64480 "
64484 "

27096 SI Joint
62310 ESI
62311 "

64405 Oxy NRB
20610 Lrg Joint
20551 Trigger
20550 "
20552 "
20553 "





64633 Rhyzo
64634 "
64635 "
64636 "

70002 Flouro
77003 "

### For Dr. Kathy Moore

Dr. Kathy Moore may perform facet blocks and epidural steroid injections in her office for patients who do not meet the Center's medical criteria, for whom the Center will not be paid a facility fee, or if otherwise in the patient's best interest.

### For Dr. Michael E. Villano

Dr. Michael Villano may perform the following procedures in his office:

10021  FNA WO IMAGING
10040  ACNE REMOVAL
10060  I D ABSC CYST SIMPLE
10061  I D ABSC CYST COMP
10120  FB REM SUBQ
10121  FB REM SUBQ COMP
10140  I D HEMATOMA
10160  PUNCTURE ASPIRATION
11000  DEBRIDE ECZEMATOUS SKIN
11010  FB DEBRIDEMENT SKIN
11011  DEBRIDE SKIN MUSCLE FB REMOVAL
11012  DEBRIDEMENT FB REMOVAL
11040  DEBRIDE SKIN PART THICK
11200  SKIN TAG REMOVAL FIRST 15
11201  SKIN TAG ADDL 10
11300  SHAVING LESION
11301  SHAVE LESION 0.6-1.0
11310  SHAVE LESION 0.5 CM FACE NOSE EAR
11311  SHAVE LESION 0.6-1.0 CM FACE NOSE EAR
11400  EXC B9 TRUNK ARM LEG <0.5
11402  EXC TRUNK 1.0-2.0
11403  EXC LESION B9 2.1-3.0 CM TRUNK ARM LEG
11404  EXC LESION B9 3.1-4.0 CM TRUNK ARM LEG
11406  EXC LESION 139 > 4.0 CM TRUNK ARM LEG
11420  EXC LESION B9 0.5 CM SCALP NECK
11421  EXC LESION B9 0.6-1.0 CM SCALP NECK
11422  EXC LESION B9 1.1-2.0 CM SCALP NECK

Exhibit 1
Page 85 of 90



11423  EXC LESION B9 2.1-3.0 CM SCALP NECK
11424  EXC LESION 39 3.1-4.0 CM SCALP NECK
11426  EXC LESION B9 > 4 CM SCALP NECK
11440  EXC LESION B9 < 0.5 CM FACE NOSE
11441  EXC LESION B9 0.6-1.0 CM FACE NOSE
11442  EXC LESION 39 1.1-2.0 CM FACE NOSE
11443  EXC LESION B9 2.1-3.0 CM FACE NOSE
11444  EXC LESION 39 3.1-4.0 CM FACE NOSE
11446  EXC LESION B9 > 4 CM FACE NOSE
11602  EXC LESION M 1.1-2.0 CM TRUNK ARM LEG
11603  EXC LESION MAL 2.1 TO 3.0 CM
11604  EXC LESION M 3.1-4.0 CM TRUNK ARM LEG
11620  EXC LESION M < 0.5 CM SCALP NECK
11621  EXC LESION M 0.6-1.0 CM SCALP NECK
11622  EXC LESION M 1.1-2.0 CM SCALP NECK
11623  EXC LESION M 2.1-3.0 CM SCALP NECK
11624  EXC LESION M 3.1-4.0 CM SCALP NECK
11626  EXC LESION M > 4.0 CM SCALP NECK
11640  EXC LESION M < 0.5 CM FACE NOSE
11641  EXC LESION M 0.6-1.0 CM FACE NOSE
11642  EXC LESION M 1.1-2.0 CM FACE NOSE
11643  EXC LESION M 2.1-3.0 CM FACE NOSE
11644  EXC LESION M 3.1-4.0 CM FACE NOSE
11646  EXC LESION M > 4.0 CM FACE NOSE
11900  INJ INTRALESION 1-7 LESIONS
11901  INJ INTRALESIONAL 8 OR MORE LESIONS
11921  TATTOOING MEDICAL 6.1-20.0
11952  INJ SUBQ 5.1-10 CC
11954  INJ SUBQ FILLING>10CC
12001  REPAIR SIMPLE < 2.5 CM SCALP NECK
12002  REPAIR SIMPLE 2.6-7.5 CM SCALP NECK
12004  REPAIR SIMPLE 7.6-12.5 CM SCALP NECK
12011  REPAIR SIMPLE < 2.5 CM FACE EAR LIP
12013  REPAIR SIMPLE 2.6-5 CM FACE EAR LIP
12014  REPAIR SIMPLE 5.1-7.5 CM FACE EAR LIP
12031  REPAIR INT < 2.5 CM SCALP
12032  REPAIR INT 2.6-7.5 CM SCALP
12034  REPAIR INT 7.6-12.5 CM SCALP
12035  REPAIR INT 12.6-20 CM SCALP
12036  REPAIR INT 20.1-30 CM SCALP
12041  REPAIR INT 2.5CM OR LESS
12042  REPAIR INT 2.6-7.5 CM NECK
12044  REPAIR INT 7.6-12.5 CM NECK
12051  REPAIR INT < 2.5 CM FACE EAR
12052  REPAIR INT 2.6-5.0 CM FACE EAR
12053  REPAIR INT 5.1-7.5 CM FACE EAR

Exhibit 1
Page 86 of 90



12054  REPAIR INT 7.6-12.5 CM FACE EAR
12055  REPAIR INT 12.6-20 CM FACE EAR
12056  REPAIR INT 20.1-30 CM FACE EAR
12057  REPAIR INT >30 CM FACE EAR
13120  REPAIR COMPLX 1.1-2.5 CM SCALP
13121  REPAIR COMPLX 2.6-7.5 CM SCALP
13122  REPAIR COMPLX EA ADDL 5 CM SCALP
13131  REPAIR COMPLX 1.1-2.5 CM FACE
13132  REPAIR COMPLX 2.6-7.5 CM FACE
13133  REPAIR COMPLX EA ADDL 5 CM FACE
13150  REPAIR COMPLX < 1.0 CM NOSE EAR
13151  REPAIR COMPLX 1.1-2.5 CM NOSE EAR
13152  REPAIR COMPLX 2.6-7.5 CM NOSE EAR
13153  REPAIR COMPLX EA ADDL 5CM NOSE EAR
14020 Skin tissue rearrangement - to 10cm² - scalp arms legs
14040 Skin tissue rearrangement - to 10cm² - face hands ax genitals feet
14060 Skin tissue rearrangement - to 10cm² - eye, nose ear lip
15240 Full thickness skin graft (FTSG) to 20cm² face, genitals, axil., hands, feet: closure included
15740 Flap: island pedicle
15620 Delay or sectioning of flap (divisionand inset); forehead, cheek, neck, axillae, genitalia, hands (cross finger), or feet
15630 Delay or sectioning of flap (divisionand inset); eyelids, ears, nose, or lips
15650 Transfer, intermediate, of any pedicle flap (walking tube eg) any location
15740 Flap: island pedicle (any location)
15760 Composite graft; including ala and ear
15770 Composite graft; including dermal/fat/fascia
15775 Hair transplant punch grafts;
15776 Hair transplant punch grafts;
15780 Dermabrasion total face
15781 Dermabrasion segmantal face
15788 Chemical peel of face - epidermal (TCA...)
15789 Chemical peel of face - dermal (Phenol)
15876 Suction assisted lipectomy; head and neck
15877 Suction assisted lipectomy; trunk
21120 Genioplasty with implant
21282 Lateral canthopexy
15820  BLEPH LOWER EYELID
15822  BLEPH UPPER EYELID
15824 Rhytidectomy of forehead; browlift (for brow ptosis use 67900)
15825 Rhytidectomy of neck with platysmal tightening
15826 Rhytidectomy of glabellar frown lines
15828 Rhytidectomy of cheek, chin, and neck
15829 Rhytidectomy of SMAS
17003  DESTRUCT LESION CRYO B9 2-14 LESIONS
17004  DESTRUCT LESION CRYO B9 15 OR MORE



DM_US 47637902-19.085092.0013

Exhibit 1
Page 87 of 90



17250  CAUTERIZE GRANULATED TISSUE
17270  DESTRCT LESION M<.5 CM SCALP NECK
20005  INC SOFT TISSUE ABSC DEEP
20206  BX NEEDLE MUSCLE NECK
21320  Closed reduction nasal fracture
21337  CLOSED TX NASAL SEPTAL FX
30140  TURBINOPLASTY SMR
30200  TURBINATE INJECTION
30220  SEPTAL BUTTON INSERTION
30300  FB REM INTRANASAL
30410  RHINOPLASTY
30560  LYSIS INTANASAL SYNECHIA
30580  FISTULA  REPAIR
30600  REPAIR FISTULA ORONASAL
30630  REPAIR NASAL SEPTAL PERF
30801  TURBINATE ABLATION/CAUTERY
30802  TURBINATE ABLATION INTAMURAL
30901  Control of Epistaxis - Simple
30901  EPISTAXIS CONT SIMPLE
30903  EPISTAXIS CONT COMPLX
30905  EPISTAXIS CONT POSTERIOR INITIAL
30906  EPISTAXIS CONT POSTERIOR SUBSEQUENT
30930  TURBINATE OUTFRACTURE
30999  UNLISTED PROCEDURE NOSE
31000  LAVAGE MAXILL SINUS
31002  LAVAGE SPHENOID SINUS
31295  BALOON SINOPLASTY MAXILLARY
31296  BALOON SINOPLASTY FRONTAL
31297  BALOON DILATION SPHENOID
31299  UNL PROCEDURE
31502  TRACH TUBE CHANGE
31505  LARYNGOSCOPY INDIRECT DX
31515  LARYNGOSCOPY DIR ASPIRATION
31575  LARYNGOSCOPY FLEX FIBER DX
31578  LARYNGOSCOPY FLEX FIBER DX W REM LESION
31599  UNL PROC LARYNX
31611  INSERT TFP TRACHEOSOPHAGEAL FISTULA INSERT SPEECH PROSTHESES
40490  BX LIP
40500  EXC LIP VERMILIONECTOMY W MUCOSAL ADV
40510  EXC LIP TRANS WEDGE W PRIME CLOSE
40520  EXC LIP V EXC W CLOSURE
40800  I D ABSC MOUTH
40801  ID ABSC MOUTH COMP
40806  FRENOTOMY LABIAL (UPPER)
40808  BX VESTIBULE OF MOUTH
40810  EXC LESION MUCOSA MOUTH WO  REPAIR



DM_US 47637902-19.085092.0013

Exhibit 1
Page 88 of 90



40812 EXC LESION MOUTH SIMPLE
40819 FRENULECTOMY BUCCAL/LABIAL W MUSCLE REMOVAL
40820 DESTRUCT LESION/SCAR MOUTH
40830 REPAIR LAC LIP < 2.5 CM
40831 REPAIR LAC LIP > 2.5 CM
40840 REPAIR MOUTH ANTERIOR
40842 EXC BUCCAL CAVITY POSTERIOR UNILATERAL
40845 REPAIR LIP W RECONST MUSCLE
41000 I D ABSC TONGUE MOUTH
41005 I D ABSC SUBLINGUAL SUPERFICIAL
41008 I D ABSC SUBMANDIBULAR SPACE
41010 FRENOTOMY LINGUAL (LOWER)
41017 I&D SUBMANDIBULAR
41100 BX TONGUE ANT TWO THIRDS
41105 BX TONGUE POSTERIOR ONE THIRD
41108 BX FLOOR OF MOUTH
41110 EXC LESION TONGUE W/O CLOSURE
41112 EXC LESION TONGUE W CLOSURE
41113 EXC LESION TONGUE POSTERIOR 1/3
41115 EXC LINGUAL FRENUM
41116 EXC LESION FLOOR OF MOUTH
41599 UNLISTED PROCEDURE FLOOR OF MOUTH
41800 I D ABSCESS CYST DENTOALVEOLAR
41806 FB REM DENTOALVEOLAR BONE
42000 I D ABSC PALATE
42140 UVULECTOMY
42160 DESTRCT LESION PALATE
42182 REPAIR LAC PALATE >2CM
42400 BX SALIVARY GLAND NEEDLE
42405 BX SALIVARY GLAND I NCISIONAL
42409 MARSIPULIZATION SALIVARY CYST
42699 SNOREPLASTY
42700 I D ABSC PERITONSILLAR
42720 I D ABSC PHARYNGEAL INTRAORAL
42800 BX OROPHARYNX
42804 BX NASOPHARYNX VISIBLE LESION
42806 NASOPHARYNX SURVEY FOR PRIME LESION
42808 EXC LESION PHARYNX
42809 FB REM LESION PHARYNX
42810 EXC BRANCHIAL CYST
42999 UNL PHARYNX ADENOID TONSIL
43752 NG TUBE PLACEMENT
43760 NASOGASTRIC TUBE CHANGE
49999 INJ ALCOHOL
67810 BX EYELID
67840 EXC LESION EYELID



DM_US 47637902-19.085092.0013

Exhibit 1
Page 89 of 90

67900  BROW LIFT
67904  LEVATOR BLEPHAROPTOSIS EXTERNAL
67938  FB REM EYELID
68899  UNLISTED PROC LACRIMAL SYSTEM
69000  ID ABSCESS EXT EAR SIMPLE
69005  ear hematoma drainage
69005  I D ABSCESS EXT EAR COMP
69020  ID ABSCESS EXT AUDITORY CANAL
69100  BX EXT EAR
69105  BX EXT EAR AUDITORY CANAL
69110  EXC EXT EAR PARTIAL SIMPLE  REPAIR
69200  FB REM EXT AUDITORY CANAL LOCAL
69210  CERUMEN REMOVAL
69220  DB MASTOID SIMPLE
69300  OTOPLASTY
69399  UNLISTED PROCEDURE EAR
69420  MYRINGOTOMY LOCAL
69550  REMOVE EAR LESION
69552  REMOVE EAR LESION
69799  EAR PROCEDURE UNLISTED
69801  LABRINTHOTOMY TRANSCANAL

### For Dr. Linda Leffel

CPT 10040 THRU 19396.

### For Dr. Andrew Higgins

Dr. Andrew Higgins may perform port removals and minor skin lesion excisions in his office for patients who do not meet the Center's medical criteria, for whom the Center will not be paid a facility fee, or if otherwise in the patient's best interest.

DM_US 47637902-19.085092.0013

Exhibit 1
Page 90 of 90