IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PHILLIP WALLACE, M.D.; KENT
YUNDT, M.D.; ANTHONY HADDEN,
M.D., and NORTHWEST MEDICAL
SPECIALISTS, LLC, dba Northwest
Brain and Spine,

           Plaintiffs,                    Case No. 6:15-cv-01548-MC

      v.                            OPINION AND ORDER

AMSURG HOLDINGS, INC., a Delaware
corporation,

           Defendant.

_____

MCSHANE, Judge:

       Plaintiffs Phillip Wallace, M.D., Kent Yundt, M.D., Anthony Hadden, M.D., and

Northwest Medical Specialists, LLC, dba Northwest Brain and Spine (NWBS), bring this

antitrust action against defendant AmSurg Holdings, Inc. The claims all revolve around a

covenant not to compete in an Operating Agreement signed by Drs. Yundt and Hadden and

AmSurg. In accordance with that agreement, Drs. Yundt and Hadden are currently engaged in an

arbitration proceeding with AmSurg regarding the Noncompete Covenant. Plaintiffs move to

stay the arbitration proceeding. AmSurg moves to dismiss or, in the alternative, stay this antitrust

1 – OPINION

proceeding pending the results of the arbitration proceeding. There appears to be no dispute that

Drs. Yundt and Hadden are bound by the arbitration agreement. I conclude NWBS and Dr.

Wallace, who are not signatories to the Operating Agreement, are not bound by that agreement.

Plaintiffs' motion to stay arbitration is DENIED. AmSurg's motion to dismiss or stay is

GRANTED in part. The claims of Drs. Yundt and Hadden are referred to arbitration. The claims

of NWBS and Dr. Wallace are stayed pending the outcome of arbitration between Drs. Yundt

and Hadden and AmSurg.

## BACKGROUND

In 2004, Drs. Yundt and Hadden formed NWBS in Bend, Oregon. Drs. Yundt and

Hadden are whole owners of NWBS. Dr. Wallace is an employee physician of NWBS. But for

the non-compete agreement at issue, Dr. Wallace would be a 1/3 partner in NWBS. Drs. Yundt

and Hadden are also partners in Bend Surgery Center, LLC.

In 1996, Bend Surgery Center LLP was formed as an ambulatory surgery center (ASC).

In 2011 or 2012, Drs. Yundt and Hadden purchased interests in Bend Surgery Center LLP. In

May 2014, the 43 physician partners of Bend Surgery Center LLP approved a sale to defendant

AmSurg. In July 2014, AmSurg and the physician partners of Bend Surgery Center LLP,

including Drs. Yundt and Hadden, executed the Operating Agreement of Bend Surgery Center,

LLC (BSC). In exchange for about $22 million, AmSurg obtained a 51% ownership interest in

BSC, while each physician owner obtained a 1% interest in BSC.

The Operating Agreement begins:

THIS OPERATING AGREEMENT (the "Agreement") of Bend Surgery Center,
LLC, a Tennessee limited liability company (the "LLC") is made and entered into
as of the 1st day of June, 2014 (the "Effective Date"), by and between AmSurg
Holdings, Inc., a Tennessee corporation ("AmSurg"), and each of the other
persons listed on the signature page to this Agreement . . . .

2 – OPINION

Operating Agreement, 2. Drs. Yundt and Hadden admit signing the agreement. First Am.

Compl., ¶ 27.

The agreement contains a Noncompete Covenant:

8.2 Ownership and Investment Restrictions. No Owner or Affiliated Physician, nor any Affiliate of any Owner or Affiliated Physician shall:

8.2.1. have any direct or indirect ownership interest in, or manage, lease, develop or otherwise have any financial interest in any business or entity competing or planning to compete with the LLC (including, but not limited to, any ambulatory surgery center or any physician office in which surgical procedures are performed . . . within a twenty-five (25) mile radius of the [BSC],

. . . .

in each case described in Sections 8.2.1 and 8.2.2 until the later of (i) five (5) years from the date of this Agreement, or (ii)two (2) years after such Owner (or with respect to an Affiliated Physician, the Owner with whom such Affiliated Physician is affiliated) ceases to be a Member of the LLC.

The agreement also contains an arbitration clause:

14.11 Arbitration. All disputes arising under this Agreement shall be resolved by binding arbitration pursuant to the rules of the American Health Lawyers Association Dispute Resolution Service ("AHLA") then pertaining. The arbitration proceedings shall be held in Denver, Colorado. The procedures for conducting discovery in connection with any such arbitration proceeding shall be determined by the mutual agreement of the Members party to the arbitration proceeding or, if such Members cannot agree, by the arbitrators. The arbitrators shall apply the substantive laws of the State of Tennessee and the United States.

In August 2014, Drs. Yundt and Hadden notified AmSurg of their plan to move NWBS

to a larger office with an adjacent ASC.[1] Drs. Yundt and Hadden constructed a new ASC facility

and NWBS moved into the new facility in April 2015.

---

[1] Drs. Yundt and Hadden allege they notified AmSurg through the CEO of BSC, who allegedly approved the ASC. First Am. Compl. ¶ 37.

3 – OPINION

In March 2015, BSC sent Drs. Yundt and Hadden a letter claiming the ASC facility would violate the Noncompete Covenant. In May 2015, BSC and AmSurg sent Drs. Yundt and Hadden an Arbitration Demand for Interim and Permanent Injunctive Relief and Request for Expedited Proceedings. First Am. Compl. ¶ 42. As alleged here by Plaintiffs:

> 43. As a direct result of AmSurg and BSC filing an arbitration demand, Drs. Yundt and Hadden have not brought Dr. Wallace on as an owner and have not started operating the planned surgery center.

> 44. Therefore, the overly broad nature of the Noncompete Covenant, as sought to be enforced, interpreted, and applied by AmSurg, restricts Dr. Wallace's ability to practice and to become a partner of Northwest Brain and Spine, resulting in reduced choice, delay in receiving timely care, and likely higher prices for Central Oregon patients, regardless of whether the planned surgery center is actually competing with BSC.

First Am. Compl. ¶¶ 43, 44.

Plaintiffs allege there are four ASCs in Bend. AmSurg allegedly is the majority owner of two, with plans on becoming the majority owner of a third.[2] Plaintiffs allege only BSC and Cascade Surgicenter, LLC (the "Center") perform neurosurgery procedures in Bend. The plaintiffs allege that AmSurg "is in the process of purchasing a majority share" in the latter. First Am. Compl. ¶ 46. An ASC in Redmond also provides neurosurgery services. *Id.* at ¶ 49.

Plaintiffs allege:

> 50. Upon information and belief, there are five neurosurgeons in Central Oregon: Dr. Yundt, Dr. Hadden, Dr. Brad Ward, Dr. Raymond Tien, and Dr. Mark Belza. Of those five neurosurgeons, all but Dr. Belza will have signed and will be restricted by AmSurg's Noncompete Covenant or a substantially similar noncompete covenant. Drs. Ward and Tien are partners in The Center, which, upon information and belief, will be majority-owned by AmSurg as described above.

---

[2] AmSurg disputes this allegation.

51. AmSurg unlawfully maintains its monopoly power through its restrictive and one-sided operating agreements, including the noncompete covenants, and by its arbitration demand to enforce the same with the threat of liquidated damages as described above. AmSurg is utilizing barriers to entry to further its monopoly power.

First Am. Compl. ¶¶ 50, 51.

Plaintiffs bring five claims. Claim one seeks declaratory relief voiding the Noncompete Covenant. This claim alleges the covenant is void as it is a covenant in restraint of trade.

Claim two seeks an injunction prohibiting AmSurg from enforcing the Noncompete Covenant.

Claim three is a Sherman Antitrust claim of Monopolization:

AmSurg has acquired and maintained market power willfully and by improper means, including use of overly broad, invalid, and unenforceable operating agreements including through its Noncompete Covenants in restraint of trade and other restrictive provisions detailed above.

First Am. Compl. ¶ 72.

Claim four is an attempted monopolization claim against AmSurg. Like the other claims, this claim revolves around the Noncompete Covenant. *See* First Am. Compl. ¶¶ 78 (AmSurg engaged in anticompetitive conduct by purchasing ACSs with restrictive Noncompete Covenants); 80 (AmSurg "dangerously close to obtaining market power in the relevant market due to . . . invalid Noncompete Covenants. . . .").

Claim five is an Intentional Interference with Business Relationship and Prospective Economic Advantage claim. This claim alleges AmSurg interfered with plaintiffs' business relationships "by engaging in anticompetitive and monopolistic practices, including the use of the invalid Noncompete Covenants, including the one at issue here, and filing the arbitration demand seeking to enforce the same." First Am. Compl. ¶ 90.

5 – OPINION

In their prayer for relief, plaintiffs request:

1. For a declaratory judgment that this claim may properly proceed in this Court, that Oregon law governs the enforceability of the Noncompete Covenant, and that the Noncompete Covenant is invalid and unenforceable under Oregon law;

2. For a preliminary and permanent injunction enjoining AmSurg from enforcing the Noncompete Covenant against Drs. Yundt and Hadden;

3. For an order staying arbitration proceedings brought by BSC and AmSurg until such time as this Court deems proper[.]

First Am. Compl. 23.

## DISCUSSION

As noted, the parties filed cross motions to stay and dismiss. Plaintiffs seek to stay arbitration while they proceed here on their antitrust claims. AmSurg argues all of plaintiffs' claims belong in arbitration. In the alternative, AmSurg argues some of the claims belong in arbitration and the remaining claims should be stayed in the interim.

### 1. Plaintiffs' Motion to Stay Arbitration[3]

On May 27, 2015, BSC and AmSurg sent Drs. Yundt and Hadden an Arbitration Demand. First Am. Compl., ¶ 42. In that demand, AmSurg and BSC allege plaintiffs' planned ASC would violate the Noncompete Covenant. First Am. Compl., ¶ 41. Those arbitration proceedings are ongoing, with a final hearing set for early February 2016. Neither NWBS nor Dr. Wallace are parties to the arbitration proceedings. The antitrust claims are not before the arbitrators at this time.

---

[3] At oral argument, one of plaintiffs' attorneys appeared to concede the motion to stay. As plaintiffs did not formally withdraw the motion to stay, I address it.

The parties disagree on the standards for a motion to stay arbitration. AmSurg argues plaintiffs must meet the standards for obtaining a preliminary injunction. Plaintiffs disagree, stating they seek not an injunction, but "procedural relief." Reply, 2; ECF No. 29.

Generally, a party seeking to enjoin arbitration proceedings must obtain a preliminary injunction. *Textile Unlimited, Inc. v. A..BMH & Co., Inc.*, 240 F.3d 781, 786 (9th Cir. 2001). Regardless of the standards used, and regardless of the basis for any "procedural relief" sought, plaintiffs' motion to stay is DENIED.

The Operating Agreement deals with AmSurg, a Tennessee LLC, and 50 or so Oregon physicians. As it necessarily involves a contract "evidencing a transaction involving commerce," it is governed by the Federal Arbitration Act (FAA). 9 U.S.C. § 2. Therefore, the court makes the initial arbitrability decision applying federal law. *Brennan v. Opus Bank*, 796 F.3d 1125, 1129 (9th Cir. 2015). Under the FAA, I must decide two (and only two) threshold issues: (1) whether there is an agreement to arbitrate between the parties; and (2) whether that agreement covers this dispute. *Id.* at 1130 If so, the dispute must proceed in arbitration.

There appears to be no genuine dispute that Drs. Yundt and Hadden signed the Operating Agreement. AmSurg's claim in arbitration (that Drs. Yundt and Hadden will violate the Noncompete Covenant by opening up the ASC) clearly "arises under" the Operating Agreement. Because there is an agreement to arbitrate between the parties currently involved in arbitration, and because that agreement certainly covers the current dispute in arbitration, plaintiffs' motion to stay arbitration is DENIED.

Drs. Yundt and Hadden advance no real arguments such as duress or unconscionability related to the formation of the contract.[4] Although plaintiffs make several due process related arguments concerning the fairness of the arbitration proceedings or the scope of discovery in arbitration, those arguments are premature. Drs. Yundt and Hadden should raise those arguments to the arbitrators, who are more familiar than I am with the discovery rules of the American Health Lawyers Association Dispute Resolution Service. Although those rules may be less permissive than the federal rules of discovery, it was those rules that AmSurg and Drs. Yundt and Hadden bargained for and agreed to in executing the Operating Agreement.

## 2. AmSurg's Motion to Dismiss or, in the Alternative, Stay

AmSurg argues the arbitration agreement encompasses the antitrust claims in this action. AmSurg argues those claims too must proceed in arbitration. Once again, I turn to the threshold questions of whether there is an agreement to arbitrate between the parties and, if so, whether that agreement covers this dispute. *Brennan*, 796 F.3d at 1130.

As discussed above, Drs. Yundt and Hadden signed the agreement to arbitrate with AmSurg. Dr. Wallace and NWBS, however, are not signatories to the Operating Agreement.

As arbitration agreements are contracts, "a party cannot be required to submit to arbitration any dispute to which he has not agreed to submit." *AT&T Techs. v Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (quoting *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)). AmSurg is correct that "nonsignatories of arbitration agreements may be bound by the agreement under ordinary contract and agency principles."

---

[4] At oral argument, plaintiffs' counsel argued, for the first time, that perhaps there was a genuine dispute regarding the formation of this contract. Plaintiffs did not raise this argument anywhere in over 30 pages of their briefings. Plaintiffs did not submit a sworn declaration regarding this new argument. The statement of an attorney at oral argument is not evidence. While plaintiffs could be entitled to a jury trial regarding the formation of the contract, there is no evidence in the record creating any genuine factual dispute about the formation of this contract.

Motion to Dismiss, 15. Agency and equitable estoppel are among those principles. *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2005). Other than pointing out that NWBS is a wholly-owned LLC of Drs. Yundt and Hadden, AmSurg does not indicate what agency or contract principle requires the extraordinary step of binding a nonsignatory to an arbitration agreement.[5]

Under certain circumstances, a nonsignatory could be bound by an arbitration agreement if he "knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement." *Comer*, 436 F.3d at 1101 (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates*, 269 F.3d 187, 199 (3d Cir.)). But there exists no evidence in this record that either NWBS or Dr. Wallace knowingly exploited the Operating Agreement. In fact, they both ask this court to declare important aspects of that agreement unenforceable. NWBS and Dr. Wallace appear to have received no benefit at all from the agreement. And while their claims perhaps could be viewed as "arising under" the agreement, the Ninth Circuit rejects binding a nonsignatory to an arbitration agreement merely because the claims arise under the agreement. *Id.* at 1101-02.

Judge Mosman provided a thorough discussion of the law in a somewhat analogous case. *See Legacy Wireless Services, Inc. v. Human Capital, L.L.C.*, 314 F.Supp.2d 1045 (D. Or. 2004). Judge Mosman noted that although there is a "wealth of case law" discussing when nonsignatories may be bound to an arbitration agreement, those cases almost universally involve situations where a nonsignatory attempts to force a signatory into arbitration. *Id.* at 1054. This

---

[5] Alter ego is another principle under which a nonsignatory may be bound to a contract. *Comer*, 436 F.3d at 1101. As AmSurg does not advance any argument for piercing the corporate veil, I do not consider this theory.

case, like *Legacy Wireless*, involves the opposite situation: a signatory attempting to bind a

nonsignatory to an arbitration agreement. I agree with Judge Mosman that:

> adhering to technical agency principles is justified when a signatory seeks to
> invoke the agency exception against a nonsignatory agent. Basic fairness
> principles more readily favor holding a *signatory* to a contract to which it
> specifically agreed. . . . [A]n agency relationship generally does not, itself, justify
> departure from the principle that a nonsignatory may not be compelled to
> arbitrate.

*Id.* at 1055. In glossing over the agency exception, AmSurg does not indicate how or why Drs.

Yundt and Hadden acted as agents of NWBS or Dr. Wallace as to the Operating Agreement.

Judge Mosman also discussed when estoppel theories could apply to bind a nonsignatory

to an arbitration agreement. *Id.* at 1055-58. Once again, most of the cases deal with

nonsignatories using estoppel to bind signatories to an arbitration agreement. "In contrast, when

a signatory seeks to force a nonsignatory to arbitrate: the 'signatory may not estop [the]

nonsignatory from avoiding arbitration regardless of how closely affiliated that nonsignatory is

with another signing party.'" *Id.* at 1056 (quoting *Mag Portfolio Consult, Gmbh v. Merlin*

*Biomed Grp, Llc*, 268 F.3d 58, 62 (2d Cir. 2001)). In other words, simply because NWBS is

wholly owned and operated by Drs. Yundt and Hadden does not mean it is estopped from

avoiding arbitration. Additionally, solely because the claims are "inextricably intertwined" is not

enough to bind a nonsignatory. *Id.* (citing *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d

347, 361 (5th Cir. 2003)).

Instead, to bind a nonsignatory under an estoppel theory, the signatory must demonstrate

the nonsignatory received some "direct benefit" from the agreement. *Id.* While Drs. Yundt and

Hadden put the proceeds of the BSC sale to AmSurg into NWBS, that is not enough. In *Legacy*

*Wireless*, there was evidence that the nonsignatory had a management-fee agreement with its

10 – OPINION

subsidiary, a signatory. The underlying agreement there provided for "administrative fees" for employee-management services provided from one signatory to the other. The nonsignatory then received 50% of those "administrative fees" from the signatory in exchange for management services provided to that signatory. In addition to holding itself out as an affiliate to the signatory and receiving benefits flowing directly from the underlying agreement, the nonsignatory there actually assisted the signatory in performing the employee-management services forming the basis of the contract. Therefore, Judge Mosman concluded that, at least at the motion to dismiss stage, the nonsignatory could perhaps be estopped from avoiding that arbitration agreement.

Here, neither NWBS nor Dr. Wallace benefited directly from the Operating Agreement. They have not performed any services under the agreement. They received no payments under the agreement. They allege that far from providing benefits, the agreement actually harms them by violating antitrust laws. Based on this record, I conclude AmSurg has not demonstrated NWBS or Dr. Wallace should be estopped from avoiding arbitration.

While Drs. Yundt and Hadden may have agreed that an "affiliate" such as Dr. Wallace would not compete with BSC, such an agreement does not actually prevent Dr. Wallace from going ahead and competing with BSC. Although that may present complications for Drs. Yundt or Hadden, Dr. Wallace is not bound by the agreement and can choose to act as he pleases. The same goes for NWBS.[6] AmSurg's argument suggesting otherwise—that although the agreement does not mention NWBS, it remains bound because it is an "affiliate" of Drs. Yundt and Hadden—falls apart when considering the logical extension of that argument. AmSurg's arguments turn agency, estoppel, and corporate veil maxims upside down.

---

[6] Because NWBS appears to be owned, operated, and controlled entirely by Drs. Yundt and Hadden, and because the signatories agreed to certain restrictions on their directly controlled affiliates, AmSurg may be able to enjoin, indirectly or otherwise, the actions of NWBS a bit easier than those of, say, Dr. Wallace. Of course plaintiffs allege here that those potential restrictions violate antitrust laws.

The Operating Agreement binds signatories, and not some "affiliate" with a business relationship—however indirect—with that signatory. The signatories bargained for their rights and obligations under the Operating Agreement. The nonsignatories did not and, in fact, received no benefit from that agreement. Therefore, I conclude NWBS and Dr. Wallace are not bound by the Operating Agreement.

As to the signatories, I now turn to the second prong in the threshold analysis: whether the agreement covers plaintiffs' claims here. Before resolving even that issue, I must first decide who—the court or the arbitrator— decides that question. This analysis depends on the language of the agreement. *Oracle Am., Inc. v. Myriad Group A.G.*, 724 F.3d 1069, 1072 (9th Cir. 2013).

The FAA recognizes the "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*, 460 U.S. 1, 24 (1983). Therefore, any "doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id.* That liberal policy, however, does not extend to deciding questions of arbitrability in the first instance. *Oracle*,724 F.3d at 1072. Instead, the question of arbitrability is "an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Id.* (citation omitted).

The Operating Agreement states "all disputes arising under this Agreement shall be resolved by binding arbitration pursuant to the rules of the American Health Lawyers Assocation Dispute Resolution Service ('AHLA') then pertaining." ¶ 14.11. The AHLA rules state "the arbitrator, once appointed, shall have the power to determine his or her jurisdiction and any issues of arbitrability." ¶ 3.1. Under the section titled "Arbitrability," the AHLA states, "Once appointed, the arbitrator may issue a preliminary award that addresses whether the arbitration

clause is valid, and whether it applies to the claims or counterclaims raised by the parties." ¶ 5.2(a).

The AHLA language is very similar to language the Ninth Circuit held constitutes "clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Oracle*, 724 F.3d at 1074. In *Oracle*, the arbitration clause provided for arbitration under the United Nations Commission on International Trade Law ("UNCITRAL") rules. *Id.* at 1071. The UNCITRAL rules provided that "[t]he arbitral tribunal shall have the power to rule on objections that it has no jurisdiction, including any objections with respect to the existence or validity of the arbitration clause or of the separate arbitration agreement." *Id.* at 1073. As the language here is similar to that discussed in *Oracle*, the language in the Operating Agreement and the AHLA constitutes clear and unmistakable evidence that the parties agreed that the arbitrator would resolve any dispute about arbitrability.

As discussed above, the claims in this case all revolve around the Noncompete Covenant. At oral argument, plaintiffs argued the Noncompete Covenant is merely the "device" by which AmSurg violates antitrust laws by obtaining, or attempting to obtain, a monopoly. That may be so, but antitrust claims may proceed in arbitration. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985). Because there is at least a legitimate question as to whether the antitrust claims here arise under the Operating Agreement, and because the parties agreed that any questions as to arbitrability shall be resolved by the arbitrators in the first instance, the claims of Drs. Yundt and Hadden must proceed to arbitration. *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000); *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1371 (Fed. Cir. 2006).

As the nonsignatories are not required to arbitrate their antitrust claims, plaintiffs argue that requiring Drs. Yundt and Hadden to proceed in arbitration risks obtaining inconsistent results and is inefficient. The Supreme Court, however, recently confirmed that "when a complaint contains both arbitrable and nonarbitrable claims, the [FAA] requires courts to 'compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums.'" *KPMG LLP v. Cocchi*, 132 S. Ct. 23, 25 (2011) (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 217 (1985)).

## CONCLUSION

Plaintiffs' motion to stay arbitration, ECF No. 8, is DENIED. AmSurg's motion to dismiss or, in the alternative, stay, ECF No. 16 is GRANTED in part. As the arbitrators must determine the arbitrability of the claims of Drs. Yundt and Hadden, their claims are stayed. FAA § 3. Although the claims of Dr. Wallace and NWBS are not subject to arbitration, I exercise discretion to stay their claims pending arbitration of the claims of Drs. Yundt and Hadden. *Moses*, 460 U.S. at 20 n.23; *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). The parties shall file a joint status report within 30 days of the conclusion of arbitration proceedings.

IT IS SO ORDERED.

DATED this 24th day of November, 2015.

     /s/Michael McShane
Michael J. McShane
United States District Judge